MORGAN, LEWIS & BOCKIUS LLP
Melinda S. Riechert, Bar No. 65504
melinda.riechert@morganlewis.com
Claire M. Lesikar, Bar No. 311180
claire.lesikar@morganlewis.com
1400 Page Mill Road
Palo Alto, CA 94304
Tel:   +1.650.843.4000
Fax:   +1.650.843.4001

Attorneys for Defendant
YAHOO HOLDINGS, INC., successor in interest,
in part, to liabilities of YAHOO! INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| SCOTT ARD, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>YAHOO! INC., a Delaware corporation,<br><br>Defendant.<br><br>GREGORY ANDERSON, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>YAHOO! INC., a Delaware corporation,<br><br>Defendant. | Lead Case No. 5:16-CV-05635-NC<br><br>Jointly Administered with<br>Case No. 5:16-CV-00527-NC<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**<br><br>Date:       October 11, 2017<br>Time:       1:00 P.M.<br>Location: Courtroom 7, 4th Floor<br>Judge:      Honorable Nathanael Cousins |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

**TO THE COURT, PLAINTIFFS, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT on October 11, 2017 at 1:00 p.m.** at the Courthouse located at 280 South 1st Street, Courtroom 7 – 4th Floor, San Jose, CA 95113, Defendant YAHOO HOLDINGS, INC., successor in interest, in part, to liabilities of YAHOO! INC. ("Defendant" or "Yahoo") will and hereby does move this Court for judgment as a matter of law on each of Plaintiffs' claims for: (1) Gender Discrimination in Violation of the Fair Employment and Housing Act ("FEHA"); (2) Gender Discrimination in Violation of Title VII; (3) Termination in Violation of Public Policy; (4) Violation of the California Unfair Competition Law ("UCL"); and (5) Request for Declaratory Relief Concerning the Quarterly Performance Review ("QPR") Process (violation of California and federal WARN Acts, discriminatory and unfair practices, violation of covenant of good faith and fair dealing) on the ground that there is no genuine issue as to any material fact and that Defendant is entitled to judgment as a matter of law.

Alternatively, if for any reason summary judgment cannot be had, Defendant moves for partial summary judgment adjudicating that the following issues in the action, or any of them, do not raise a genuine issue of material fact; that no further proof thereon shall be required or permitted at trial of this action; and that any final judgment in this action, in addition to any matters determined at trial, shall be based on these issues so established.

1. Gender Discrimination in Violation of the Fair Employment and Housing Act ("FEHA") by Plaintiff Gregory Anderson against Defendant, on the ground that Plaintiff Gregory Anderson cannot prove that Defendant terminated his employment because of his gender;

2. Gender Discrimination in Violation of the Fair Employment and Housing Act ("FEHA") by Plaintiff Scott Ard against Defendant on the ground that Plaintiff Scott Ard cannot prove that Defendant terminated his employment because of his gender;

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

1

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

3.      Gender Discrimination in Violation of Title VII by Plaintiff Gregory Anderson against Defendant on the ground that Plaintiff Gregory Anderson cannot prove that Defendant terminated his employment because of his gender;

4.      Gender Discrimination in Violation of Title VII by Plaintiff Scott Ard against Defendant on the ground that Plaintiff Scott Ard cannot prove that Defendant terminated his employment because of his gender;

5.      Termination in Violation of Public Policy by Plaintiff Gregory Anderson against Defendant on the ground that Plaintiff Gregory Anderson cannot prove that Defendant terminated his employment because of his gender;

6.      Termination in Violation of Public Policy by Plaintiff Scott Ard against Defendant on the ground that Plaintiff Scott Ard cannot prove that Defendant terminated his employment because of his gender;

7.      Violation of the California Unfair Competition Law ("UCL") by Plaintiff Gregory Anderson against Defendant on the ground that Plaintiff cannot assert a discrimination claim under the UCL which only provides for restitution and injunctive relief and not damages, and on the ground that there is no merit to Plaintiff Gregory Anderson's discrimination claim;

8.      Violation of the California Unfair Competition Law ("UCL") by Plaintiff Scott Ard against Defendant on the ground that Plaintiff cannot assert a discrimination claim under the UCL, which only provides for restitution and injunctive relief and not damages, and on the ground that there is no merit to Plaintiff Scott Ard's discrimination claim;

9.      Request for Declaratory Relief that the Quarterly Performance Review ("QPR") Process violates the federal WARN Act and that officers and directors of Yahoo are personally liable on the ground that Plaintiffs, as former employees, lack standing to pursue claims for declaratory relief, there is no basis for their claims, and WARN does not provide for declaratory relief;

10.      Request for Declaratory Relief that the QPR Process violates the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

2

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1    California WARN Act and that officers and directors of Yahoo are personally liable

2    on the ground that Plaintiffs, as former employees, lack standing to pursue claims

3    for declaratory relief, there is no basis for their claims, and Cal-WARN does not

4    provide for declaratory relief;

5         11.    Request for Declaratory Relief that the QPR Process was used in an

6    unlawful and discriminatory manner and that Yahoo permitted its managers to use

7    the QPR Process to engage in discriminatory employment practices on the ground

8    that Plaintiffs, as former employees, lack standing to pursue claims for declaratory

9    relief, and because there is no basis for their claims; and

10        12.    Request for Declaratory Relief that the QPR Process violates the

11   covenant of good faith and fair dealing and that the QPR Process was used in a

12   capricious and arbitrary manner in breach of Yahoo's obligations to its employees

13   on the ground that Plaintiffs lack standing to pursue claims for declaratory relief,

14   and there is no basis for their claims.

15        This Motion is made pursuant to Federal Rule of Civil Procedure Rule 56

16   and based upon this Notice of Motion, the accompanying Memorandum of Points

17   and Authorities, the Index to Evidence and all attached exhibits, Proposed

18   Judgment, all pleadings and papers on file in this action, and upon such other

19   matters and argument as may be presented to the Court at the time of the hearing.

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

3

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................1

II.  FACTS ..............................................................................1

   A.   Yahoo's Media Organization .................................1

   B.   Yahoo's Quarterly Performance Review Ratings And
       Calibration Sessions ..............................................2

   C.   Greg Anderson .......................................................5

      1.   Anderson Received Consistently Low QPR Ratings................5

      2.   Anderson Received Unfavorable Feedback From His
          Direct Reports In Yahoo's Employee Engagement
          Surveys In 2012 And 2013 .............................6

      3.   Anderson's Managers, Including Ard, Highlighted
          Anderson's Poor Managerial Skills In Anderson's
          Annual Performance Reviews.............................7

      4.   April 2014: Based On Low QPR Scores And YEES
          Scores, Yahoo Identified Anderson As A Poorly
          Performing Manager ........................................8

      5.   September 2014:  Anderson Left For His Eight-Month
          Fellowship And Ard Added Anderson's Responsibilities
          To Ard's Existing Duties ..................................11

      6.   October 2014: Yahoo Increased Its Focus On Its Poorest
          Performing Employees......................................11

      7.   November 2014: Anderson's QPR Scores Placed Him In
          The Bottom 5% Of All Yahoo Employees, Yahoo
          Decided To Terminate His Employment ...............12

   D.   Scott Ard..................................................................13

      1.   July 2014: Yahoo Was Dissatisfied With Ard's
          Performance Running The Yahoo Home Page And
          Transferred Him To Running Its Commerce Sites.................13

      2.   October 2014: Yahoo Considered Terminating Ard's
          Employment, But Decided To Hold Off Doing So. ...............14

      3.   January 2015: Yahoo Terminated Ard's Employment
          Because His Manager Determined That He Added Little
          Value To The Company......................................15

   E.   Megan Liberman Has No Record of Discriminating Against
       Men................................................................16

   F.   Statistics Confirm That There Was No Discrimination Against
       Men In The Media Department Where Ard And Anderson
       Worked ..........................................................16

# TABLE OF CONTENTS
### (continued)

**Page**

G.   Plaintiffs' Terminations Did Not Trigger Liability Under WARN or Cal-WARN. ...................................................................17

III.   YAHOO IS ENTITLED TO SUMMARY JUDGMENT OF PLAINTIFFS' CLAIMS ................................................................17

A.   Plaintiffs' Gender Discrimination Claims Fail Because They Cannot Establish A Prima Facie Case Of Gender Discrimination, Yahoo Had Legitimate Reasons To Terminate Plaintiffs' Employment And There Is No Evidence Of Pretext ........17

1.   Anderson Received Low QPR Rankings And Poor Management Assessments From His Direct Reports And, As A Result, Was Terminated For Performance Deficiencies..................................................................................18

2.   Yahoo Had Legitimate Business Reasons For the Termination of Anderson's Employment And He Cannot Establish Pretext...........................................................................20

3.   Yahoo Terminated Ard's Employment Because His Manager Felt He Was Not Adding Sufficient Value Commensurate With The Role Of Senior Director and There Is No Evidence Of Pretext. ....................................................20

4.   Neither Plaintiff Was Qualified For The EIC Autos Role And The Fact That They Were Not Considered Based On Their Lack Of Qualifications Does Not Demonstrate Pretext .......................................................................................21

B.   Plaintiffs' Claims For Wrongful Termination In Violation Of Public Policy Fail Because They Were Not Terminated Because They Are Male.........................................................................................22

C.   Plaintiffs Cannot Assert Discrimination Claims Under California's Unfair Competition Law. ............................................23

D.   Plaintiffs' Terminations Did Not Trigger WARN Or Cal-WARN.........................................................................................24

E.   Plaintiffs Cannot Seek Declaratory Relief Because They Are Former Employees, and Because There Is No Basis For Their Claims...................................................................................................24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anthoine v. N. Cent. Counties Consortium,*
   605 F.3d 740 (9th Cir. 2010) ............................................................................ 19

*Bank of the West v. Superior Ct.,*
   2 Cal. 4th 1254 (1992) ..................................................................................... 23

*Barnett v. Washington Mut. Bank, FA,*
   2004 WL 2857283 (N.D. Cal. Oct. 12, 2004) ................................................. 23

*Board of Trustees of Keene State College v. Sweeney*
   439 U.S. 24 (1978) ........................................................................................... 17

*Cortez v. Purolator Air Filtration Products,*
   23 Cal. 4th 163 (2000) ..................................................................................... 23

*Farmers Ins. Exch. v. Superior Ct.,*
   2 Cal. 4th 377 (1992) ....................................................................................... 23

*Korea Supply Co. v. Lockheed Martin Corp.,*
   29 Cal. 4th 1144 (2003) .............................................................................. 23, 24

*Kraus v. Trinity Mgmt. Servs., Inc.,*
   23 Cal. 4th 116 (2000) ..................................................................................... 23

*Lewis v. Bayer Corp.,*
   No. C 03-04403 JSW, 2005 WL 2893869 (N.D. Cal. Nov. 2, 2005) ..... 17, 20, 21

*Madrid v. Perot Sys. Corp.,*
   130 Cal. App. 4th 440 (2005) .................................................................... 23, 24

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973)
   *holding modified by Hazen Paper Co. v. Biggins,*
    507 U.S. 604 (1993) .................................................................................. 17, 19

*MedImmune, Inc. v. Genentech, Inc.,*
   549 U.S. 118 (2007) ......................................................................................... 25

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

iii

*Morgan v. Regents of Univ. of Cal.*,
  88 Cal. App. 4th 52 (2000) .................................................................... 21, 22

*Roark v. S. Iron R-1 Sch. Dist.*,
  573 F.3d 556 (8th Cir. 2009) ..................................................................... 25

*Sarkizi v. Graham Packaging Co.*,
  No. 1:13-CV-1435-AWI-SKO, 2014 WL 2506600 (E.D. Cal. June
  3, 2014) ........................................................................................................ 22

*Slatkin v. Univ. of Redlands*,
  88 Cal. App. 4th 1147 (2001) ..................................................................... 17

*Slayman v. FedEx Ground Package Sys., Inc.*,
  765 F.3d 1033 (9th Cir. 2014) .................................................................... 25

*Staudt v. Glastron*,
  92 F.3d 312 (5th Cir. 1996) ........................................................................ 25

*Tameny v. Atlantic Richfield Co.*,
  27 Cal. 3d 167 (1980) ................................................................................. 22

*Vallimont v. Chevron Energy Tech. Co.*,
  434 F. App'x 597 (9th Cir. 2011) ............................................................... 18

**STATUTES**

28 U.S.C. §§ 2201-2202) ............................................................................. 24, 25

29 U.S.C. §2101, *et seq.* ..................................................................................... 24

42 U.S. § 1983 ..................................................................................................... 19

Cal. Labor Code § 1400(a) ................................................................................. 24

Cal. Labor Code § 1401 ...................................................................................... 24

Cal. Labor Code § 1440(d) ................................................................................. 24

California Unfair Competition Law ............................................................... 23, 24

Federal WARN Act and the California WARN Act ............................................. 1

Title VII ......................................................................................................... 17, 19

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

iv

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

While Plaintiffs Greg Anderson ("Anderson") and Scott Ard ("Ard") claim that Yahoo terminated their employment because they are men, the undisputed evidence confirms that this is not true.  Yahoo terminated Anderson's employment in November 2014 because of his consistently low quarterly performance ratings, which put him in the bottom 5% of the entire company. Yahoo terminated Ard's employment in January 2015 because his manager determined that he did not add sufficient value to his team, particularly given his senior level.  Neither was replaced.  Moreover, statistical data confirms that the Media Organization, where both Plaintiffs worked, did not discriminate against men.

Plaintiffs attempt to excuse their terminations by blaming Yahoo's performance management system, in which Yahoo gave Quarterly Performance Review ("QPR") ratings to all of its employees.  However, the undisputed facts confirm that there is nothing illegal about Yahoo's QPR system.  Yahoo developed the QPR system with the legitimate objective of raising the employee performance bar and systematically implemented it with checks and balances to ensure impartiality and obviate discriminatory bias.

Plaintiffs also claim that their terminations violated the Federal WARN Act and the California WARN Act (Cal-WARN). Each Act requires a threshold number of terminations from a single location during a set period of time. In the case of both Plaintiffs' terminations, these threshold numbers were not met, and accordingly their terminations did not trigger liability.

Finally, Plaintiffs, as former employees, do not have standing to assert declaratory relief claims, which, in any event, have no merit.

## II.   FACTS

### A.   Yahoo's Media Organization

Both Plaintiffs worked in Yahoo's Media Organization. Anderson Dep.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

1

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

232:8-9; Ard Dep. 212:20-23.  In September 2013, Yahoo hired Megan Liberman from the New York Times into the Media Organization to be the Editor-In-Chief of News.  Liberman Dep. 10:6-24.  Yahoo charged Liberman with building an original and breaking news organization and bringing in name talent—decreasing the amount of aggregated content that originates from other sources.  Liberman Dep. 11:10-15:1.  Ard was also part of the Media Organization, responsible for running the Yahoo Home Page.  Ard Dep. 68:7-11, 14-19.

In January 2014, Plaintiff Anderson moved into the Media Organization to run the Commerce properties, reporting to Plaintiff Ard.  Ard Dep., Vol. 2, 319:16-20, Exh. 4; Anderson Dep. 85:7-13.  Also in January 2014, Kathy Savitt, who ran Yahoo's Marketing and Customer Experience organizations, took on the additional responsibility of Head of the Media Organization.  Savitt Dep. 12:11-21, 117:12-118:4.  In February 2014, Liberman began reporting to Savitt and was given the additional responsibility over the Yahoo Home Page, becoming Ard's manager.  Liberman Dep. 19:21-20:22. 33:7-36:4.  In April 2014, Liberman also took responsibility for the Commerce properties, though News remained her primary responsibility.  Liberman Dep.  23:12-24.  Anderson remained a direct report of Ard through Anderson's termination in November 2014.  Liberman 93:19-96:21.

### B.   Yahoo's Quarterly Performance Review Ratings And Calibration Sessions

After Marissa Mayer became the Chief Executive Officer of Yahoo in July 2012, she determined that she needed to raise the bar on the performance of Yahoo employees.  Fagerlund Dep. 61:18-62:2.  A lot of employees were not performing and if the company was going to succeed, it needed to raise performance expectations, and employ and recruit high-performing employees.  Fagerlund Dep. 60:1-15.  In the third quarter of 2012, Yahoo initiated a QPR program to rate the performance of its employees on a quarterly basis.  Anderson Dep. 50:1-3.  The ratings were grouped into five buckets, with employees receiving individual scores

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

2

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

in each bucket: Misses (0.0-0.9), Occasionally Misses (1.0-1.9), Achieves (2.0-2.9), Exceeds (3.0-3.9), to Greatly Exceeds (4.0-5.0).  Ard Dep. 111:14-23.  Yahoo established guidelines for the percentage of employees to be placed in each performance level.

QPR was a method to identify the high performing players at Yahoo for promotion and to move out the low-performing players who did not meet the increasing performance requirements, as part of the broader mission to bring excellence into the company.  Reses Dep. 27:8-28:8; Savitt Dep. 28:13-29:3.  At the beginning of each quarter, each manager prepared a proposed QPR rating for his or her direct reports, to be communicated up the organization.  Day Dep. 21:12-15; Higgins Dep. 18:10-17; Reses Dep. 29:5-11, 32:14-33:13.  As explained by Ard, when he received the proposed scores from his direct reports who were managers themselves, he discussed the scores with the issuing managers, and recommended changing the score up or down based on his own personal observations.  Ard Dep. 104:4-106: 21.  The management team in each organization would then meet in a calibration session to review the scores of each individual in the organization.  Reses Dep. 32:14-33:13; Fenice Dep. 20:25-21:17; Khroad Dep. 38: 10-23.  The purpose of the calibration session was to compare employees against other employees in the same organization.  Ard Dep. 109:13-20 ("To discuss people against a larger set of employees; to see if there were people maybe across, in the larger part of the org, that, for example, that I might not be aware about, aware of; that performed exceptionally."); Savitt Dep. 161:5-162:6 ("we were always trying to make sure that one manager's "Exceeds" was another manager's "Exceeds").  The manager at the calibration session had to be able to defend the scores of all team members during calibration.  Liberman Dep. 73:15-19, 74:5-23.

During the calibration process, a higher-level manager might change the score assigned to an employee by that employee's direct manager, based on

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

3

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1   information received from other employees in the organization and on an

2   assessment of comparative value to other employees in the organization.  Ard Dep.

3   110:24-111:10; Kittenplan Dep. 74:12-19; Higgins Dep. 11:23-12:15, 27:16-20.

4   Scores could also be changed to account for expected percentages in each bucket.

5   Reses Dep. 151:15-152:6.  For example, in Q1 2015, Liberman decided that,

6   compared to all the employees in her organization, Ard had assigned too many

7   employees in the Exceeds bucket.  Ard Dep. Vol. 2, 293:11-17, Exh. 2.

8   Accordingly, she moved some of these employees from a 3.1 or a 3.0 (the bottom

9   of Exceeds) to a 2.9 or a 2.8 (the top of Achieves).  Changes to scores, however,

10   were not typical.  Liberman Dep. 65:16-76:15.

11          In order to make sure that employees received a fair evaluation of their

12   contributions each quarter, input was not based solely on a direct manager's

13   assessment, but from others in the organization who worked with that individual.

14   Reses Dep. 24:5-21.  Calibration sessions gave other managers the opportunity to

15   scrutinize and comment on the scores, based on their personal experience and

16   observations, compared to others. Liberman Dep. 65:16-76:15.  In addition, each

17   organization had a Human Resource Business Partners ("HRBP") who would run

18   the QPR process, attend calibration sessions, and ensure that sessions were fair,

19   effective, and not based on illegitimate criteria.  Reses Dep. 53:1-13; 105:9-106:17.

20          Following the calibration sessions, the scores were "locked" and employees

21   had access to their performance bucket.  Khroad Dep. 73:6-24.  Employees were

22   not informed of their specific numerical score within the bucket because the

23   company did not want employees dwelling on the actual number.  Reses Dep. 58:3-

24   11.  The goal was to drive performance and give feedback, not focus on a score. *Id.*

25   Managers were expected to meet with their direct reports each quarter to go over

26   their performance for the prior quarter and goals for the next quarter.  Yahoo also

27   monitored the scores across every team, function, metric, level, type of role, gender,

28   and race to check for fairness. Reses Dep. 105:9-106:17.

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Silicon Valley

DB2/ 31470448.16

4

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

### C.   <u>Greg Anderson</u>

Yahoo hired Anderson as the Managing Editor of Autos in November 2010 to work in its Sunnyvale headquarters.  Anderson Dep. 73:8-12, Exh. 2.  Anderson signed an acknowledgment that he was an at-will employee.  Anderson Dep. 73:5-12, 74:4-12, Exhs. 2, 4.  In June 2012, Yahoo transferred Anderson to a position of Editorial Director for Yahoo Commerce, which included Autos, Small Business, Shopping, Health, Real Estate, Travel, and Homes.  Ard Dep., Vol. 2, 319:16-20, Exh. 4; Anderson Dep. 85:7-13.  In this position, he managed a team of employees. Anderson Dep. 107:3-13, Exh. 18.

### 1.   <u>Anderson Received Consistently Low QPR Ratings.</u>

Anderson never received an "Exceeds" or "Greatly Exceeds" QPR rating. Instead, he received the following QPR scores, beginning in 2013:  In Q1 2013, Anderson received a 2.0 (Achieves).  In Q2 2013, he received a 2.0 (Achieves).  In Q3 2013, he received a 1.6 (Occasionally Misses).  In Q4 2013, he received a 2.0 (Achieves)..  In Q1 2014, he received a 2.2 (Achieves).  In Q2 2014, he received a 2.5 (Achieves).[1]  Brotherton Dec. ¶5.  These QPR scores were provided to Anderson when he reported to the following managers (at successive periods of time): Brandon Huff, Lisa Stromer, Jai Singh, and then Scott Ard.  *Id.*  Even though Anderson now claims that Yahoo discriminated against him because he is a man, three out of the four managers assigned to give him scores were men, including Ard.  *Id.*  Anderson admits that Ard did not discriminate against him in giving him his scores.  Anderson Dep. 139:2-140:8.

---

[1]   Anderson received no rating for Q3 2014, because he was on a leave of absence at the time the ratings were prepared.  Liberman Dep. 342:5-10.  Ard was Anderson's manager at the time and the person responsible for giving him the rating.  Anderson Dep. 140:9-17 ("And he (Ard) should be the one who would have assigned you a QPR rating for Q3 2014; is that correct? A: Yes.").  Ard does not recall doing so.  Ard Dep. 284:1-2, 18-20.  Anderson never followed up about not getting a rating for Q3, 2014.  Anderson Dep. 140:18-141:9.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

5

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

2. **Anderson Received Unfavorable Feedback From His Direct Reports In Yahoo's Employee Engagement Surveys In 2012 And 2013.**

Yahoo retained a third party to conduct anonymous surveys called the Yahoo Employee Engagement Surveys ("YEES").  Anderson Dep. 110:14-20, Exh. 8, Anderson Dep. 115:16-116:4, Exh. 9.  Employees were asked a number of questions about the company, their organization, and their managers, and the scores were compared to the scores received by other managers at Yahoo and in the manager's organization.  *Id.*  Anderson received a report on his YEES scores for 2012 and 2013.  *Id.*  Anderson's scores from his direct reports were consistently below the scores of other managers in his organization and other managers at Yahoo.  *Id.*  In 2012, 75% of Anderson's direct reports took the survey and he received more unfavorable than favorable ratings in almost every category surveyed.  Anderson Dep. 110:14-20, Exh. 8.  He was far below the average of other managers in his organization, Yahoo as a whole, and the survey company's norm in every category.  *Id.*  Notably, he received a 73% unfavorable rating on performance enablement (compared to 47% unfavorable rating for other managers in his organization and 48% unfavorable rating for Yahoo as a whole), 50% unfavorable rating on manager effectiveness (compared to 15% unfavorable rating for both other managers in his organization and for Yahoo as a whole) and a 67% unfavorable rating in teamwork (compared to 35% unfavorable rating for both other managers in his organization and Yahoo as a whole).  *Id.* at 9, 11, 15.  Only 22% of Anderson's direct reports agreed with the following statements: (1) "My manager does a great job at people management;" (2) "My manager does a great job of managing the work;" and (3) "My manager is an outstanding leader."  By contrast, Yahoo managers overall received favorable responses on these same questions from 64% of their direct reports—42 percentage points higher than Anderson.  *Id.* at 9.

In 2013, 100 % of Anderson's direct reports took the survey.  Anderson Dep. 115:16-116:4, Exh. 9.  Anderson again received much less favorable scores than

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

6

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

Yahoo managers received overall.  For example, on manager effectiveness, Anderson received only a 43% favorable rating, compared to Yahoo managers overall who received a 66 % favorable rating on manager effectiveness.  *Id.* at 9. Anderson was not surprised or disappointed at the scores he received.  Anderson Dep. 111:3-23; 115:16-116:4.

### 3. Anderson's Managers, Including Ard, Highlighted Anderson's Poor Managerial Skills In Anderson's Annual Performance Reviews.

In addition to QPR ratings and YEES scores, Anderson received annual performance reviews by his managers.  Anderson Dep. 98:1-11, 21-24; Brotherton Dec. ¶6, Exhs. A-C.  Throughout Anderson's employment at Yahoo, his managers continuously identified Anderson as a manager who struggled with certain core competencies.  For example, in Anderson's 2011 Performance Review, his manager wrote, "it's clear that Greg needs to be better at timely organization and planning." Brotherton Dec. ¶6, Exh. A.  In Anderson's 2013 Performance Review, Ard wrote that Anderson should "[l]earn more about" two subject-matter areas "under his jurisdiction"—"Homes" and "Travel."  Brotherton Dec. ¶6, Exh. C.  Ard wrote that Anderson focused on the Autos section, which he personally preferred.  *Id.*  Ard also wrote that Anderson could "get defensive, and bristle at constructive feedback" and Ard told Anderson that "likely there is a grain of truth [in the criticism] or it wouldn't come up."  Ard also wrote that Anderson did not regularly attend or schedule meetings with his direct reports.  *Id.*  If he did, he was often not an active participant.  In this vein, Ard reported that "it seems there are concerns about silo-ing."  *Id.*  Ard counseled Anderson to check his email after hours, because "[a]s a senior manager [it was] important to be aware and available at all hours (as much as possible)."  *Id.*  When asked why Anderson had such low ratings for a sustained period of time, Ard pointed to Anderson's "management weaknesses" and his clear interest in Autos over the other properties that he managed.  Ard Dep. Vol. 2, 319:16-20, Exh. 4.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

7

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

4.     **April 2014: Based On Low QPR Scores And YEES Scores, Yahoo Identified Anderson As A Poorly Performing Manager.  Yahoo Considered Terminating His Employment But Instead Granted His Request For An Eight-Month Leave of Absence To Attend A Fellowship.**

By March 2014, Yahoo had developed a new focus on manager effectiveness, and Anderson came up as a low performing manager.  Savitt Dep. 53:17-22; 55:18-24; 59:15-21; 120:6-9; Liberman Dep. 97:11-103:10; 108:13-20, 340:21-341:16; Exh. 70; Hill Dep. 31:14-23, 49:9-20, Exh. 54, 55, 57.  As the Vice President of Human Resources supporting the Media Organization testified regarding this new focus:

> It arose out of a conversation relative to a drop in the employee engagement scores across the company and an area that was identified as being of concern in that engagement survey process was people's perspective on whether or not they had a good manager and how they viewed their manager, and that was a particular area that had dropped.  And so from a senior leadership perspective, that was seen as problematic and something that needed to be looked into.

Day Dep. 72:1-24.

There had been a lot of complaints about the quality of the managers.  Reses Dep. 114:6-115:9.  Poorly performing managers have a disproportionate effect on the team and drive attrition, so if Yahoo could eliminate the employees who were poorly performing managers, it would benefit the morale of the company.  *Id*.  High performing employees felt demoralized when they had low performing managers.  Savitt Dep. 56:3-19.  If employees did not respect their managers or their ability to lead them, it might lead them to want to work at other places.  *Id*.  Liberman felt strongly about the importance of strong managers to an organization, testifying:

> My personal feeling is that it's bad to have a bad manager in an organization because the managers set the tone for the group that they are in, and my understanding from the company -- and also they're not effective in managing those people, and so therefore, those people are not producing at the level or quality that they might be if they were better managed.  And I have both observed and worked with both excellent managers and bad managers and observed this to be true.  But also, I know that the company had an emphasis on strong management and that there was a priority, particularly for managers, to be strong employees

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

8

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1
2

because they would have an effect on their organizations, and
that would filter down and affect not just their own performance
but the performance of their entire team.

3

Liberman Dep. 340:21-341:16.

4
5

With heightened attention on the importance of good managers in achieving

6

Yahoo's goals and retaining good employees, Yahoo established initiatives to raise

7

the performance bar for managers, including the creation of a list of poorly

8

performing managers. Day Dep. 72:1-24. Yahoo wanted to use quantitative

9

measurements to determine who the poorly performing managers were, so as to

10

come up with a fair way to evaluate whether someone was an effective manager or

11

a poorly performing manager. Reses Dep. 114:6-115:9. Managers were placed on

12

a list of poorly performing managers using three criteria: low QPR score, number of

direct reports, and/or low upward feedback. Ard Dep. 160:12-24.

13
14

In April 2014, Anderson was placed on the a list of poorly performing

15

managers. Ard Dep. 311:25-312:17; Liberman Dep. 28:13-29:14; Fenice Dep. Exh.

16

26; Savitt Dep. 77:16-78:7. Anderson's managers discussed Anderson's

17

employment at that time, and came up with the recommendation to move forward

18

with termination. Hill Dep., 49:9-20, Exh. 55; Savitt Dep. 138:11-13, 23-24, Exh.,

19

54 ("I wanted to give you a heads up that based on the new focus on manager

20

effectiveness, Greg Anderson has come up as a low performing manager. The

21

recommendation is to terminate. Let me know if you have any questions and/or

22

concerns but directionally it's pretty firm."); Fenice Dep. 49:23-50:11, Exh. 24

("Greg Anderson to be terminated.").

23
24

In April 2014, before Yahoo came to a final decision on Anderson's

25

termination, Anderson requested permission to take an eight-month personal leave

26

of absence to attend a journalism fellowship with the Knight Wallace Foundation,

27

scheduled to begin in September 2014. Savitt Dep. 12:6-15, Anderson Dep., Exh.

28

11. At the time, Yahoo's Personal Leave Policy limited personal leaves of absence

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

9

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1    to a maximum of 30 days in any 24-month rolling period.  Brotherton Dec. ¶7, Exh.

2    E.  The policy did not guarantee reinstatement after the leave ended.  *Id.*

3        In May 2014, Yahoo granted Anderson the personal leave and permission to

4    attend the fellowship, deciding not to move forward at that time with the

5    recommendation to terminate Anderson's employment.  Fenice Dep. Exh. 28;

6    Savitt Dep. 63:10-66:23. Yahoo did so to enable Anderson to participate in the

7    fellowship. Reses Dep. 127:8-128:5; Savitt Dep. 78:25-79:22.  Also, at the time,

8    Yahoo was planning to launch a digital Autos Magazine in the summer of 2014,

9    and was actively looking to hire an Editor-In-Chief to run the magazine. [2]

10    Anderson had a lot of historical knowledge about Autos at Yahoo, so there was a

11    thought that permitting Anderson to participate in the fellowship might allow the

12    opportunity for Anderson eventually to transition his Yahoo Autos knowledge to

13    the new Editor-In-Chief, once hired.  Higgins Dep. 38:2-12.  Anderson himself was

14    not considered a candidate for the Autos Magazine Editor-In-Chief because he did

15    not have the high-profile status and user draw that Yahoo was looking for in an

16    Editor-In-Chief.  Savitt Dep. 68:18-69:14.

17        Even Ard, as Anderson's manager, was not a strong supporter of keeping

18    Anderson, and recommended keeping him "for the short term" "or until there is a

19    clear succession to a new Autos magazine and EIC" to avoid a hit to Autos revenue.

20    Hill Dep. 49:9-20, Exh. 55.  Even though Savitt granted Anderson the leave, she

21    determined that Anderson needed to go at some point since he did not have the right

22    skill set to run Autos, and was not going to be the Editor-In-Chief of the Autos

23    Magazine once it was created.  Fenice Dep. Exh. 26; Savitt Dep. 77:16-78:7, 79:15-

24    18; 79:23-80:13, 82:16-22 ("He either needs to go on this fellowship or he needs to

25

26    [2]    Yahoo decided to create a number of digital magazines each run by an EIC who

27        would be a talent magnet to draw users to its site and create high quality original content. Reses. Dep. 144:14-145:14.  Susan Kittenplan was charged with hiring the EICs.  Liberman Dep. 22:16-30:6.  Autos was going to transition to being a

28        magazine. *Id.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

10

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1  be terminated, because when we have that magazine come, he's not --there's no

2  position for him running that magazine.").

3          5.       **September 2014:  Anderson Left For His Eight-Month Fellowship And Ard Added Anderson's Responsibilities To Ard's Existing Duties.**

4

5          In August 2014, Anderson left for Michigan and in September 2014, he

6  began his fellowship.  Anderson Dep. 146:25-147:6. His manager, Ard, added

7  Anderson's job duties to his own.  Ard Dep. 90:4-7; 91:15-92:10.  Anderson

8  transitioned his knowledge of Autos to Ard before he left.  Anderson Dep. 147:21-

9  25.

10         6.       **October 2014: Yahoo Increased Its Focus On Its Poorest Performing Employees.**

11

12         By October 2014, Yahoo realized that it was important to continue to raise

13 the bar of its talent.  Savitt Dep. 85:25-86:12; 86:19-87:6 ("[I]n order for us to

14 continue to build the most competitive workforce, we need to constantly be making

15 sure we have the best and brightest for the tasks at hand at Yahoo!, and so we want

16 to enable and promote our best talent, and where we have weaknesses and gaps in

17 skill set based on our evolving challenges, we need to have bandwidth to hire into

18 those positions by making sure that if we know someone is not performing that

19 those people move on to a place where they're a better fit.").

20         Yahoo therefore decided to sharpen its focus on other measures, in addition

21 to a list of poorly performing managers, to identify its poorest performers.  Day

22 Dep. 88:15-90:1.  Yahoo noted that there were many employees who were hovering

23 at the low end of the Achieves rating over several quarters, who Yahoo designated

24 as "skimmers" or "serial skimmers."  Khroad Dep. 52:20-53:10; Fenice Dep. 101:4-

25 15, Exh. 33. Yahoo identified five criteria for employees to be on the skimmers list.

26 *Id.*  For example, people managers with a QPR average below 2.5 were included on

27 the list.  Khroad Dep. 81:10-13; Fenice Dep. 101:4-15, Exh. 33. Anderson was

28 designated a "skimmer."  Khroad Dep. 65:1-16, Exh. 10.  In addition, Yahoo

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

11

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1  created the "bottom 5% list," consisting of employees, companywide, who were in

2  the bottom 5% of QPR scores averaged over the last four quarters.  Khroad Dep.

3  105:25-106:20, 107:4-13, Exh. 18.[3]

4  **7.    November 2014: Anderson's QPR Scores Placed Him In The Bottom 5% Of All Yahoo Employees, Yahoo Decided To Terminate His Employment.**

5

6  By November 2014, Anderson's four quarter QPR ratings placed him in the

7  bottom 5% of the entire company, and therefore on the bottom 5% list.  Khroad

8  Dep. 107:4-13, Exh. 18.  As a result, on November 10, 2014, Liberman, as Vice

9  President of the organization, notified Anderson of the termination of his

10  employment.  Liberman 162:10-169:1, 169:7-170:8; Khroad Dep. 135:22-136:11,

11  Exh. 22.

12  Anderson claims he was replaced by a woman, Sharon Carty, who was hired

13  5 months after his termination, as evidence of discrimination against him because

14  he is a man.  Carty, however, did not replace Anderson.  Carty was hired by Susan

15  Kittenplan as Editor-In-Chief of the Autos Magazine, which did not exist when

16  Anderson worked at Yahoo.  Kittenplan Dep. 37:9-13, 83:3-15.  Anderson was not

17  the Editor-In-Chief of Autos; he was the editorial director of Autos and other

18  Commerce properties on Yahoo's website, a role he was assigned when Yahoo's

19  focused was more directed toward aggregating content that originated from other

20  sources.  Anderson Dep. 154:15-19; Ard Dep. Vol. 1, 228:1-10.  Yahoo's strategy

21  for the Magazines, including Autos, was to have a high-profile Editor-In-Chief.

22  Fenice Dep. 72:10-19.  Carty met that requirement.  She had a history as a

23  journalist in the auto industry and was Editor-In-Chief of her auto blog, which was

24  owned by AOL.  Kittenplan Dep. 36:16-37:4.  Eight Yahoo employees—five men

25

26  [3] Defendant added the gender column to the following existing spreadsheets during discovery at Plaintiffs' request: (1) Exhibit 10 to the Deposition of Mini Khroad, attached hereto as Exhibit D; (2) Exhibit 18 to the Deposition of Gregory Anderson, attached hereto as Exhibit A; and (3) Exhibit 31 to the Deposition of Anne Fenice, attached hereto as Exhibit F.  Riechert Dec. ¶ 15.

27

28

and three women—interviewed Carty and advocated for her hire based on her extensive experience in the field. Kittenplan Dep. 18:11-19:23, Exh. 43. Josh Wolk, then Executive Editor-at-Large for Yahoo Entertainment, wrote that "Sharon has fantastic experience in covering the automotive world. She's done so at USA Today, the Wall Street Journal, and now AOL, which means not only does she know the area well, but she also has experience running a website, and knows how to engage an online audience of car geeks." *Id.* Likewise, Brian Raftery, then Editorial Director, wrote that "Sharon has years of experience in the Auto category, and has excelled at finding ways to cover cars in ways that appeal to hardcore gear-heads, curious consumers, and casual enthusiasts alike." *Id.* Susan Kittenplan also wrote that Carty "has great journalistic skills, is very savvy with digital content creation, SEO, etc. and is connected within the car industry in the way we need to partner with our sales and marketing teams." *Id.*

Before offering the position to Carty, Yahoo offered the position of Editor-In-Chief of the Autos Magazine to a male, Eddie Alterman, who declined the position. Kittenplan Dep. 114:13-22, Exh. 30. Liberman was not involved in the hiring of the Autos Editor-In-Chief. Liberman Dep. 143:3-5.

### D.   Scott Ard

Jai Singh hired Ard as a Senior Director of Editorial in September 2011. Ard Dep., Vol. I, 82:1-6, Vol. 2, 326:18-25, Exh. 7. He was hired to lead the editorial programming for the Yahoo Home Page. Ard Dep. 68:7-11, 14-19. Upon hire, Ard signed an acknowledgment that he was an at-will employee. Ard Dep., Vol. 2, 326:13-17, Exh. 6.

#### 1.   July 2014: Yahoo Was Dissatisfied With Ard's Performance Running The Yahoo Home Page And Transferred Him To Running Its Commerce Sites.

In February 2014, Ard began reporting to Liberman. Liberman Dep. 33:16-22; 174:23-24. Ard was based in California while Liberman was based in New York. Ard Dep. Vol. 2, 326:18-25, Exh. 7; Liberman Dep. 43:24-25:1. Liberman

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

13

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

set out to raise the caliber of the Yahoo Home Page, which Ard was running. Liberman Dep. 34:5-40:20.  She disagreed with the choice of Home Page stories and the way they were presented, believing that the quality should be higher. Liberman Dep. 33:7-36:4. Yahoo wanted a change in strategy because it believed the quality of Yahoo's original content was the cause of considerable customer dissatisfaction.  Savitt Dep. 18:25-19:23.  It wanted more of a true editorial bent on the news.  Savitt Dep. 140:13-141:4.  It wanted to hire people who had worked at well-known, high-quality editorial organizations who would create original writing, compared to what Yahoo had done in the past, which was more focused on aggregating content from other sources and particularly in breaking news situations where it relied on wire services.  Liberman Dep. 11:21-12:20.  The strategy included the creation of a number of digital magazines, each with its own Editor-In-Chief, with the intent to increase the content owned and created by Yahoo.  Ard Dep. 73:5-7, 73:21-74:3.

From the beginning, Liberman felt that Ard was defensive towards her leadership.  Liberman Dep. 46:8-20.  By July 2014, when the caliber of the Home Page still failed to meet Liberman's expectations under Ard's watch, Liberman made the decision to remove Ard from running the Home Page, and transferred him to running the Commerce sites.  Liberman Dep. 34:7-35:5, 51:1-12, 193:17-24. Liberman hired Lauren Johnston, an expert in breaking news, to take over the running of the Home Page and handle Breaking News.  Liberman Dep. 51:1-12.

### 2. October 2014: Yahoo Considered Terminating Ard's Employment, But Decided To Hold Off Doing So.

By October 2014, Ard's average QPR score for the most recent 4 quarters was 2.30, below the 2.5 that was expected of a people manager like Ard.  Khroad Dep. 65:1-6, Exh. 10.  Moreover, Ard's scores were trending downwards.  *Id.* Yahoo considered terminating Ard's employment, but decided not to do so at that time, putting the termination on hold.  *Id.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

14

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

### 3.   **January 2015: Yahoo Terminated Ard's Employment Because His Manager Determined That He Added Little Value To The Company.  He Was Not Replaced.**

By early 2015, Liberman could not determine what exactly Ard was contributing to the company.  Liberman Dep. 175:16-176:2.  Ard held a Senior Director role, which Liberman viewed as a "very senior position" and one that meant he should have been performing "vital service to the company."  Liberman Dep. 310:8-15.  In January 2015, Ard wrote to Liberman acknowledging that he knew that she was dissatisfied with his performance and unclear about what he was doing on a day-to-day basis.  Liberman Dep. 283:13-18, Exh. 80.  Around that time, Liberman determined that a change needed to be made.  In Liberman's view, Ard was not performing a useful, important value to the company, which was certainly a requirement for someone at his job level.  Liberman Dep. 309:19-310:15.

As she wrote, "[H]e is just not working for me in this role.  I cannot keep track of what he is doing (or not doing) and the job is just not a senior director job and is getting smaller all the time as more of the commerce categories move into magazines."  Savitt Dep. Exh. 63; Liberman Dep. 262:21-22, 298:20-299:3.  In addition to her own evaluation and experience with him over many months, Liberman spoke to two (male) employees that Ard worked with most actively to confirm that Ard was not performing some important function for her team that she was unaware of, and whether they thought Melissa O'Neal, an individual on Ard's team two levels below Ard, could absorb his role without interruption to the company or the business.  Liberman Dep. 303:15-304:6.  They agreed that O'Neal could.  *Id.*

Ard claims he was replaced by a woman in an attempt to support the notion that he was discriminated against because he is a man.  He was not replaced by anyone.  Rather, when Ard's employment terminated, Melissa O'Neal, a woman two levels below him, absorbed and performed his duties, in addition to her own duties.  Liberman Dep. 309:21-310:15.  As Liberman pointed out, "if [an

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

15

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

individual] could be eliminated without being replaced and their – the bulk of their duties absorbed by someone two levels below them, that would seem to be evidence to me that they were not performing a vital and irreplaceable function of the company." Liberman Dep. 332:2-12.

E.    **Megan Liberman Has No Record of Discriminating Against Men.**

Liberman was Ard's manager at the time of his termination and made the decision to terminate his employment.  Liberman Dep. 255:26-20; Ard Dep. Vol. 2, 298:4-8, Exh. 3.  Ard admits that he does not recall Liberman ever making any discriminatory statements.  Ard Dep. 255:11-19.  Liberman has a strong record of hiring men.  For example, as of June 14, 2017, all of Liberman's direct reports except one were men.  Liberman Dep. 323:17-324:3.  All of her star hires, highest paid employees, and most senior employees are men.  Liberman Dep. 323:17-324:3, 326:23-328:18.  The first person she hired was Matt Bai from the New York Times Magazine to be her chief political columnist.  *Id.*  The second person she hired was her deputy, Dan Klaidman, former managing editor of Newsweek.  *Id.* She hired Michael Isikoff as chief investigative writer.  *Id.*  She hired Rafe Needleman, a man, to be Editor-In-Chief of the Tech magazine.  *Id.*  She hired a man to run Yahoo! Finance, Dan Tynan as a columnist for the Tech magazine, Jon Ward to be senior political reporter and Hunter Walker to be political reporter.  *Id.*

F.    **Statistics Confirm That There Was No Discrimination Against Men In The Media Department Where Ard And Anderson Worked.**

Plaintiffs claim that Kathy Savitt, who ran the Media Organization, favored women.  However, the statistics confirm that this is not accurate.  From the beginning of Savitt's tenure as the leader of the Media Organization in January 2014 until her resignation in September 2015, the ratio of men to women in her organizations has largely remained the same.  Fong Decl. Exh. A

Likewise, the ratio of men to women senior managers over Savitt's tenure remained largely the same:  From January 15, 2014 to September 30, 2015, the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

16

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

distribution of managers in Kathy Savitt's organization stayed the same.

### G. Plaintiffs' Terminations Did Not Trigger Liability Under WARN or Cal-WARN.

In the 30 days leading up to and including Anderson's termination, Yahoo involuntarily terminated fewer than 50 people, including Anderson, at its Sunnyvale location. Brotherton Dec. ¶3. In January 2015, Yahoo involuntarily terminated fewer than 50 people, including Ard, at its Sunnyvale location. *Id.*

### III. YAHOO IS ENTITLED TO SUMMARY JUDGMENT OF PLAINTIFFS' CLAIMS

#### A. Plaintiffs' Gender Discrimination Claims Fail Because They Cannot Establish A *Prima Facie* Case Of Gender Discrimination, Yahoo Had Legitimate Reasons To Terminate Plaintiffs' Employment And There Is No Evidence Of Pretext.

To establish a *prima facie* case of discrimination under either Title VII or the FEHA, each Plaintiff must show that "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) similarly situated individuals outside the protected class were treated more favorably or some other circumstance suggests discriminatory motive." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Once a plaintiff establishes a *prima facie* case of gender discrimination, the burden of production then moves to the employer to provide a nondiscriminatory reason for terminating the plaintiff. *McDonnell Douglas Corp* 411 U.S. at 802-3; *Slatkin*, 88 Cal. App. 4th at 1156. This is a minimal burden and the employer need only "articulate some legitimate, nondiscriminatory reason . . . ." *Board of Trustees of Keene State College v. Sweeney* 439 U.S. 24, 25 (1978), *quoting McDonnell Douglas*, 411 U.S. at 802. "Failure to perform in accordance with the standards set by the employer is sufficient to constitute a legitimate business reason for termination." *Lewis v. Bayer Corp.*, No. C 03-04403 JSW, 2005 WL 2893869, at

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

17

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1 | *5 (N.D. Cal. Nov. 2, 2005).

2 |      The burden then shifts to the plaintiff, who must establish pretext through

3 | direct or circumstantial evidence. *Vallimont v. Chevron Energy Tech. Co.*, 434 F.

4 | App'x 597, 599 (9th Cir. 2011). "[W]hen the plaintiff relies on circumstantial

5 | evidence, that evidence must be specific and substantial to defeat the employer's

6 | motion for summary judgment." *Id.*

7 |      Plaintiffs cannot establish a *prima facie* case of gender discrimination

8 | because they were not performing competently in the positions they held.  Yahoo

9 | had legitimate bases to terminate Plaintiffs' employment and Plaintiffs have not and

10 | cannot produce evidence that those legitimate bases were a pretext for gender

11 | discrimination.

12 |      **1.**    **Anderson Received Low QPR Rankings And Poor**

13 | **Management Assessments From His Direct Reports And, As A Result, Was Terminated For Performance Deficiencies.**

14 |      Summary judgment is proper because Anderson consistently received low

15 | QPR scores from his male and female managers and low YEES scores from his

16 | direct reports, who had no input in the decision to terminate his employment.  As a

17 | result, Anderson cannot establish the element of his *prima facie* case that he was

18 | performing competently.  As detailed above, starting in Q1 of 2013, Anderson

19 | never had an above average QPR score.  He failed to obtain an "Exceeds" rating

20 | (let alone a "Greatly Exceeds rating) from any of his managers, most of whom were

21 | men.  His poor performance landed him on a list of poorly performing managers

22 | and the serial skimmers list, and his QPR scores ranked him in the bottom 4.2% of

23 | all Yahoo employees.  In addition, in 2012 and 2013, Yahoo Employee

24 | Engagement Survey showed that Anderson's scores from his direct reports were

25 | consistently below the scores of other managers in his organization and other

26 | managers at Yahoo by significant margins.

27 |      Anderson contends that because his Q1 2014 QPR score was reduced by

28 | Liberman from 2.5 to 2.2 during the calibration process, this is evidence of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

18

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1   discrimination.  The Ninth Circuit has concluded otherwise.  In *Anthoine v. N. Cent.*

2   *Counties Consortium,* 605 F.3d 740, 753 (9th Cir. 2010), the Ninth Circuit applied

3   the *McDonnell Douglas* framework to a claim of reverse-gender discrimination

4   under 42 U.S.C. § 1983 and upheld the district court's grant of summary judgment

5   to the employer, who had presented evidence of the plaintiff's deficient

6   performance.[4]  The plaintiff, a man, had received a "needs improvement" rating

7   during his last performance review, which was later downgraded to "unsatisfactory"

8   by a female manager.  *Id.* at 746-47.  The plaintiff presented evidence that his

9   female manager concurred in "excellent" ratings for three women and terminated

10   all three men, including the plaintiff, on the same day.  The court found this

11   evidence "[wa]s not 'specific and substantial' and d[i]d not create a triable issue of

12   fact as to ultimate issue of gender-based discrimination."  *Id.* at 754.

13         Anderson's contention that the two-tenths reduction in his first quarter 2014

14   QPR score demonstrates gender discrimination likewise is without merit.  Anderson

15   received consistently low QPR scores from male managers.  The slight reduction of

16   Anderson's score for Q1 2014 had no impact—Anderson would have remained on

17   the serial skimmers list and a list of poorly performing managers even without the

18   reduction.  A manager was considered a serial skimmer if his or her rolling four

19   quarter average or year-to-date average QPR score was lower than 2.5.  Such a

20   score indicated "sustained subaverage performance."  Fagerlund Dep. 58:4-16.

21   Even if Anderson's Q1 2014 score had not been changed from 2.5 to 2.2, his four-

22   quarter average would have been 2.33, identifying him as a serial skimmer.

23   Likewise, Anderson would have remained on a list of poorly performing managers

24   because his QPR scores averaged below 2.5.  Accordingly, Anderson cannot

25   establish that he was competently performing in his position, where he had

26

27      [4]  Although addressing a different claim, the Court applied the same standard and

28        burden shifting principals applicable to Plaintiffs' FEHA and Title VII claims.
     The Court's analysis compels the same result here.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

19

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1  sustained subaverage performance.  As such, summary judgment is proper.

2        **2.        Yahoo Had Legitimate Business Reasons For the**
3  **Termination of Anderson's Employment And He Cannot Establish Pretext.**

4        Even assuming Anderson could demonstrate he was performing competently,

5  Yahoo had a legitimate business reason to terminate Anderson's employment.  In

6  March and April 2014, Yahoo decided to terminate Anderson's employment

7  because he was on a list of poorly performing managers.  When Anderson

8  requested a leave of absence to attend a fellowship program, Yahoo gave him this

9  opportunity and obtained a special exemption from termination for Anderson.

10  While Anderson was on leave, Ard assumed all of Anderson's job duties.  By

11  November 2014, Yahoo decided to again focus on its poorest performing

12  employees and terminated Anderson's employment for his low QPR scores and

13  because he was on the bottom 5% list.  There is no evidence to suggest that this

14  legitimate business reason for Anderson's termination is a pretext for

15  discrimination against males, and indeed, Liberman's track record for hiring males

16  and the gender composition statistics of the Media Organization over Savitt's tenure

17  belie any such contention.

18        **3.        Yahoo Terminated Ard's Employment Because His**
19  **Manager Felt He Was Not Adding Sufficient Value Commensurate With The Role Of Senior Director and**
20  **There Is No Evidence Of Pretext.**

21        After removing Ard from his position running the Yahoo Home Page and

22  assigning him to run the Commerce Properties, Liberman was unable to ascertain

23  the value that he brought to Yahoo in his Senior Director role.  She therefore

24  decided to terminate his employment.  "Failure to perform in accordance with the

25  standards set by the employer is sufficient to constitute a legitimate business reason

26  for termination." *Lewis*, 2005 WL 2893869, at *5.  In *Lewis*, the plaintiff was

27  terminated for leaving unverified blanks on paperwork, having excessive absences,

28  and failing to perform an independent mathematical calculation during production,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

20

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

as her duties required, among other disciplinary issues.  *Id.* at \*1.  The court granted summary judgment to the employer, finding that the plaintiff failed to present evidence that other employees were similarly situated, engaged in similar conduct, or "had a similar record of consistently poor performance." *Id.* at \*4.  In evaluating the defendant's proffered reason for plaintiff's termination, the court expressly upheld performance deficiencies as a legitimate basis for termination.  The court found the plaintiff "failed to perform her duties in compliance with [the defendant's] expectations and standard operating procedures." *Id.* at \*5.

At the time of his termination, Ard's rolling four quarter QPR average was 2.50 and his year-to-date average was 2.30.  Fagerlund Dep. 58:4-16; Khroad Dep. Exh. 10, 81:11-13.  Moreover, Ard's scores were trending "Down."  Khroad Dep. Exh. 10; Fenice Dep. Exh. 33.  Ard failed to perform in compliance with Yahoo's expectations and he was terminated as a result.  There is no evidence to suggest that the legitimate business reason for Ard's termination is a pretext for discrimination, and, as with Anderson's termination, Liberman's track record and the gender composition statistics of the Media Organization belie any such contention

**4.    Neither Plaintiff Was Qualified For The EIC Autos Role And The Fact That They Were Not Considered Based On Their Lack Of Qualifications Does Not Demonstrate Pretext.**

Plaintiffs contend that Yahoo's failure to appoint either to the Autos Editor-In-Chief role is evidence of gender discrimination.  However, neither Ard nor Anderson had the high-profile status Yahoo sought for this position.  Fenice Dep. 72:10-19; Savitt Dep. 68:18-69:10, 69:1-3, 69:11-14.  In addition, the Autos Editor-In-Chief position would have been a demotion for Anderson, who oversaw Yahoo Autos and other Commerce Properties in his role as Editorial Director.  Anderson Dep. 154:16-19.  Likewise, the Autos Editor-In-Chief position would have been a demotion for Ard.  Fenice Dep. 72:10-19.

In *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52,  57 (2000), the plaintiff brought a race-based discrimination claim after he was laid off following a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

21

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT LEAD CASE NO. 5:16-CV-05635-NC

1   budget reduction and not rehired despite his application to multiple positions.  In

2   upholding summary judgment for the employer, the Court of Appeal noted that an

3   employee cannot "simply show the employer's decision was wrong, mistaken, or

4   unwise.  Rather, the employee must demonstrate such weaknesses, implausibilities,

5   inconsistencies, incoherencies, or contradictions in the employer's proffered

6   legitimate reasons for its action that a reasonable factfinder could rationally find

7   them 'unworthy of credence'."  *Id.* at 75.  The court reasoned that "[t]he process by

8   which individuals' qualifications and work performance are measured against job

9   requirements is often at least partially a subjective one on the part of the evaluator

10  but the plaintiff  must do more than establish a *prima facie* case and deny the

11  credibility of the defendant's witnesses."  *Id.* at 75-76 (citations omitted).

12          Since Yahoo initially offered the Autos Editor-In-Chief position to a man,

13  this negates any inference that Yahoo was only looking for a woman for the

14  position.  Nor can Plaintiffs demonstrate that Sharon Carty, a well-known auto

15  blogger with an established following was less qualified than either Plaintiff to

16  serve in this role.  While evaluation of candidates' qualifications may be subjective,

17  Plaintiffs must do more than assert subjectivity as their basis for establishing

18  discrimination.  They cannot.

19      **B.     Plaintiffs' Claims For Wrongful Termination In Violation Of
            Public Policy Fail Because They Were Not Terminated Because
20          They Are Male.**

21          A wrongful discharge claim requires (1) a public policy; (2) conduct by the

22  employer in violation of public policy, such as termination or other adverse

23  employment action, in retaliation for an employee's participation in legally

24  protected activity or refusal to commit an illegal act; and (3) damages resulting

25  from the adverse employment action.  *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d

26  167, 174, 178 (1980).  A FEHA violation may support a *Tameny* claim.  *Sarkizi v.*

27  *Graham Packaging Co.*, No. 1:13-CV-1435-AWI-SKO, 2014 WL 2506600, at *7

28  (E.D. Cal. June 3, 2014).  However, in order to establish wrongful discharge on this

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

22

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1    basis, Plaintiffs must show that discriminatory animus motivated their terminations.

2    As discussed *supra*, they cannot.  Accordingly, summary judgment is proper.

3        C.    **Plaintiffs Cannot Assert Discrimination Claims Under California's Unfair Competition Law.**

4

5            Plaintiffs allege that Yahoo violated California Unfair Competition Law

6    ("UCL") when it discriminated against them based on their gender.  Not only did

7    Yahoo not discriminate against them based on their gender, Plaintiffs cannot assert

8    a claim of discrimination under the UCL.  The UCL "borrows" violations of other

9    laws and treats them as unlawful practices independently actionable under the UCL.

10   *Farmers Ins. Exch. v. Superior Ct.*, 2 Cal. 4th 377, 383 (1992).  The only available

11   remedies are restitution and injunctive relief.  *Madrid v. Perot Sys. Corp.*, 130 Cal.

12   App. 4th 440, 467 (2005.  Damages are not available.  *Korea Supply Co. v.*

13   *Lockheed Martin Corp.*, 29 Cal. 4th 1144 (2003.  Nor are penalties.  *Barnett v.*

14   *Washington Mut. Bank, FA*, 2004 WL 2857283 *2 (N.D. Cal. Oct. 12, 2004).

15           Thus, Plaintiffs cannot assert a claim for damages for violation of the UCL.

16   A claim for damages is not a claim for restitution under the UCL.  *Bank of the West*

17   *v. Superior Ct.*, 2 Cal. 4th 1254, 1266 (1992).  An order for "restitution" is an order

18   "compelling a UCL defendant to return money obtained through an unfair business

19   practice to those persons in interest *from whom the property was taken*, that is, to

20   persons who had an ownership interest in the property or those claiming through

21   that person."  *Korea Supply*, 29 Cal. 4th at 1149 (emphasis added).  The purpose of

22   restitution under the UCL is "to restore the status quo by returning to the plaintiff

23   funds in which he or she has an ownership interest."  *Korea Supply*, 29 Cal. 4th at

24   1149. *Kraus*, 23 Cal. 4th at 126 (stating that relief under the UCL is available to

25   "restore to the parties in interest money or property taken by means of unfair

26   competition");, 23 Cal. 4th at 176.  The UCL does *not* authorize a monetary remedy

27   where the plaintiff does not have any ownership interest in the money sought.

28   Therefore, disgorging money from an employer that is "neither money taken from a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

23

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1    plaintiff nor funds in which the plaintiff has an ownership interest," is "not an

2    authorized remedy in an individual action under the UCL." *Korea Supply*, 29 Cal.

3    4th at 1140.  As such, damages to which Plaintiff has no ownership interest – such

4    as lost wages under FEHA are not recoverable under the UCL as restitution.

5         In addition, a former employee lacks standing to pursue prospective remedies

6    such as injunctive relief.  A plaintiff has standing to seek injunctive relief if he can

7    show a likelihood that he will be harmed by future misconduct; he cannot seek an

8    injunction if he only complains of past harm.  *Madrid*, 130 Cal. App. 4th at 463.

9         **D.    Plaintiffs' Terminations Did Not Trigger WARN Or Cal-WARN.**

10        Pursuant to Labor Code section 1401, "[a]n employer may not order a mass

11   layoff, relocation, or termination at a covered establishment unless, 60 days before

12   the order takes effect, the employer gives written notice of the order . . . ."  Cal.

13   Labor Code § 1400(a).  A "mass layoff" is defined as termination of 50 or more

14   employees during any 30-day period from a single location.  Cal. Labor Code

15   § 1440(d).  Similarly, Federal WARN requirements apply to layoffs of at least 500

16   full-time employees from a single location or 50 employees and 33% of the work

17   force from a single location.  29 USC § 2101, *et seq.*  Yahoo did not involuntarily

18   terminate from its Sunnyvale office where Plaintiffs worked a sufficient number of

19   employees to trigger liability under WARN or Cal-WARN.  Brotherton Dec.¶3.

20   Accordingly, Plaintiffs cannot establish that Yahoo violated WARN or Cal-WARN.

21        **E.    Plaintiffs Cannot Seek Declaratory Relief Because They Are**
22   **Former Employees, and Because There Is No Basis For Their**
     **Claims.**

23        Plaintiffs seek declaratory relief "concerning Defendant Yahoo's QPR

24   Process, including Plaintiff's rights and remedies under the WARN Acts and

25   pursuant to the Declaratory Judgment Act (28 USC §§ 2201-2202)."  Ard Complaint

26   ¶ 70; Anderson Complaint ¶ 75.  In support of this claim, Plaintiffs seek

27   declarations that (1) Yahoo's officers and directors are "personally liable" for

28   violations of the WARN Acts; (2) that the QPR process violated the WARN Acts;

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

24

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1   (3) that Yahoo used the QPR process to engage in discrimination; and (4) that

2   Yahoo breached its legal and contractual obligations to employees via the QPR

3   process.  Ard Complaint ¶¶ 70-76; Anderson Complaint ¶¶ 75-80.

4          Here, Plaintiffs are no longer employees of Yahoo and thus not subject to the

5   QPR process.  In *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033,

6   1038 (9th Cir. 2014), the named plaintiff brought wage and hour claims on the basis

7   of misclassification.  *Id.*  In reversing the district court's certification of claims for

8   injunctive and declaratory relief, the Ninth Circuit found that the plaintiff, a former

9   employee, lacked standing to seek prospective relief because he could no longer

10  benefit from such relief.  *Id.* at 1048.  The same is true here.  Plaintiffs are no

11  longer employees and cannot benefit from any declaratory judgment related to the

12  QPR process, where they are no longer subject to that process.  Likewise, Plaintiffs'

13  claims for declaratory relief based upon alleged violations of the WARN Acts do

14  seek relief against an ongoing violation that impacts them.  The Declaratory

15  Judgment Act was not intended as a "medium for securing an advisory opinion."

16  *MedImmune, Inc.*, 549 U.S. at 139.  Plaintiffs' claims are a mere rehashing of their

17  prior claims and do not demonstrate a continuous, remediable harm subject to

18  declaratory relief.[5]

19         Moreover, where the WARN Acts provide specific statutory remedies for

20  violations, declaratory relief is improper.  *See* S*taudt v. Glastron*, 92 F.3d 312, 314

21  (5th Cir. 1996) ("The Exclusive remedy for violation of [WARN] is a civil action

22  for statutory damages and attorney's fees.").  Accordingly, there is no basis on

23  which Plaintiffs may seek declaratory relief with respect to their WARN claims

24  where such relief is precluded by statute.

25  _____

26  [5]  Although requesting declaratory relief in addition to damages is not prohibited,
    where the request serves no remedial purpose, such claims are both

27  "unnecessary and inappropriate."  *Roark v. S. Iron R-1 Sch. Dist.*, 573 F.3d 556,
    562 (8th Cir. 2009).  Plaintiffs' claims for declaratory relief serve no remedial

28  purpose, especially where their underlying claims lack merit.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

25

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC

1    Dated:        August 25, 2017        MORGAN, LEWIS & BOCKIUS LLP

2                                         By  */s/ Melinda S. Riechert*
                                             Melinda S. Riechert
3                                            Attorneys for Defendant

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 31470448.16

26

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 5:16-CV-05635-NC