Jon R. Parsons (Cal. State Bar No. 88045)
JON R. PARSONS LAW FIRM
2225 East Bayshore Road, Suite 210
P.O. Box 50579
Palo Alto, California 94303
Telephone:     (650) 321-8579
Email: jon@jrplaw.com

Attorney for Plaintiffs Gregory Anderson
and Scott Ard

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SCOTT ARD, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>YAHOO!, INC., a Delaware corporation,<br><br>Defendant, | LEAD CASE NO. 16-cv-05635-NC<br><br>Jointly Administered With<br><br>CASE NO.    16-cv-00527-NC |
| GREGORY ANDERSON, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>YAHOO!, INC., a Delaware corporation,<br><br>Defendant, | PLAINTIFFS' JOINT MEMORANDUM IN OPPOSITION TO DEFENDANT YAHOO'S MOTION FOR SUMMARY ADJUDICATION<br><br>Date:        October 11, 2017<br>Time:        1:00 P.M.<br>Judge:       Mag. Judge Nathanael Cousins<br>Dept.:       Courtroom 7 - 4th Floor |

1

**TABLE OF CONTENTS**

1.   YAHOO ADOPTED THE QPR PROCESS AS A NEW MANAGEMENT TOOL TO
CONTROL COSTS AND REDUCE HEADCOUNT WHILE AVOIDING LAYOFFS ...............1

1.1.   Yahoo Wanted To Reduce Headcount Without Declaring Layoffs ......................1

1.2.   Mayer Invented QPR As A Tool To Quietly Fire Thousands of Employees
Without Full Severance Benefits...................................................................................1

1.3.   QPR Was Used In The Media Org To Discriminate Against Men ..........................3

1.4.   QPR Was Used to Avoid WARN Act Disclosures ...............................................4

2.   GREG ANDERSON WAS A HIGHLY-QUALIFIED EMPLOYEE TERMINATED
CONTRARY TO YAHOO'S USUAL PROCEDURES AND BECAUSE HE WAS A MALE
MANAGER ...............................................................................................................6

2.1.   Anderson Was A Well-Qualified Employee..........................................................6

2.2.   Anderson Was Terminated Without Cause Based On A Pretext ............................6

2.3.   In Mid-2014 Anderson Was Seen As Essential to Yahoo By Those Below Savitt
Who Actually Knew What Anderson Did........................................................................7

2.4.   Anderson's Q1 2014 Score Was Arbitrarily Reduced ........................................8

2.5.   Anderson's 2014 QPR Scores Improved Consistently And Then His Q3 2014
Rating Was Wrongly Withheld ......................................................................................8

2.6.   Anderson's YEES Scores Did Not Justify His Delayed Termination .....................9

2.7.   Despite Anderson's Importance to Yahoo, His Improving Scores, and His
Selection for A Prestigious Fellowship, Savitt Decided Months Before He Was Fired
that Anderson "Needs To Go Regardless".................................................................10

2.8.   Liberman Claimed She Was Told To Terminate Anderson Because He Was On
The Bottom 5% List ...................................................................................................10

2.9.   Anderson Should Not Have Been on the Bottom 5% List ....................................11

2.10.   No One Takes Responsibility For the Decision to Terminate Anderson ...............11

2.11.   There Was No Reason to Terminate Anderson While On Leave ..........................11

2.12.   By Yahoo's Leave Policy Anderson Should Have Returned to Work....................11

3. SCOTT ARD WAS ALSO A HIGHLY-QUALIFIED EMPLOYEE TERMINATED
CONTRARY TO YAHOO'S USUAL PROCEDURES AND BECAUSE HE WAS A MALE
MANAGER ...............................................................................................................12

3.1.   Ard Took Over Anderson's Day-to-Day Management of Autos and Other
Commerce Properties While Anderson Was On Leave...................................................12

3.2.   The Ratings Yahoo Provided For Ard In Its Motion Are False ...............................12

3.3.   Liberman and Savitt Gave Ard Low QPR Scores In 2014 Despite Clear

Evidence That They Did Not Consider His Actual Performance .......................................13

3.4.   Ard Was Terminated Because Liberman Refused to Read Ard's Reports And Then Complained She Did Not Know What He Did..................................................14

3.5.   Yahoo Can't Agree Who Made The Decision To "Action" Ard ...............................15

3.6.   Ard Was Terminated Because Liberman Gave Him A Single "Occasionally Misses" Score...................................................................................................15

3.7.   Yahoo Can't Agree On The Reason For Ard's Termination................................16

4.   YAHOO ENGAGED IN SIMILAR ACTS OF FAVORING WOMEN AND HARMING OTHER MEN DURING THE QPR PROCESS ........................................................16

4.1.   In February 2014 Savitt Suggested Lowering the Scores On Three MEN AND Raising Them On Two Women...............................................................................16

4.2.   In April 2014 Another Male Had His Score Arbitrarily Lowered ...........................17

4.3.   Higgins Warned Ard That His Continued Complaints About How QPR Was Being Misused Against Men Would Harm His Prospects At Yahoo..................................17

4.5.   Three More Men On Ard's Team Had Their Scores Lowered Without Factual Basis...................................................................................................................18

4.6.   Ard's Complaint Led To Retaliation And The Acceleration Of His Termination Date ..................................................................................................................19

4.7.   The Appeals Process Also Favored Women Over Men...........................................20

4.8.   Individual Managers Could Assign QPR Scores At "Whim" Permitting Discrimination and Favoritism..............................................................................21

4.9.   Calibration and Score-Changing Practices In The Media Org Violated Yahoo Policies and Facilitated Discrimination ..............................................................21

4.9.   The Manipulated QPR Scores Were Then Arbitrarily Applied ...............................21

5.   YAHOO'S HIRING PRACTICES FACILITATED DISCRIMINATION............................22

5.1.   Yahoo Discriminated Against Anderson and Ard Concerning the EIC Position in the Autos Digital Magazine ..............................................................................22

5.2.   Yahoo Did Not Post Open Positions Which Facilitated Its Discriminatory Hirings ...22

5.3.   Kittenplan Stated The Hope that Yahoo Could Find a Woman to Fill the Autos EIC position .........................................................................................................23

5.4.   When Anderson and Ard Applied for the EIC Position Kittenplan Ignored Them.....23

5.5.   Carty Was Less Qualified Than Several Male Candidates Already At Yahoo, and Even Mayer Was Surprised to See that Savitt Had Hired a Woman As Autos EIC ...24

5.6.   A Male Was Never Offered The Role As Autos EIC .............................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6.   DISCRIMINATORY TERMINATIONS AND HIRING PRACTICES RESULTED IN A SEA CHANGE IN GENDER COMPOSITION AMONG THE MEDIA ORG MANAGERS .....24

6.1.   The Combination of QPR Manipulation and Selective Hirings Substantially Changed the Gender Composition in the Media Org ........................................................24

6.2.   The New Magazine Leaders Were Predominantly Women ...............................25

6.3.   Women Took Over All of the Duties of Anderson and Ard After Their Terminations ..................................................................................................26

7.   YAHOO VIOLATED THE WARN ACTS THROUGH TERMINATIONS DISGUISED AS BEING FOR CAUSE ................................................................................................27

7.1.   The California Unfair Competition Law ................................................................27

7.1.1.   Yahoo's Use of the QPR Process to Reduce Headcount and Facilitate the Expression of Discriminatory Employment Actions Is an Unfair Business Practice ....27

7.1.2.   Yahoo's Use of the QPR Process to Reduce Headcount and Facilitate the Expression of Discriminatory Employment Actions Is an Unlawful Business Practice ..28

7.2.   The Federal Declaratory Relief Act Provides Plaintiffs Relief .................................28

7.3.   The QPR Process Provided Unfair and Illegal Cover For Yahoo's Disguised Reductions In Force ............................................................................................29

7.4.   Yahoo Violated The California and Federal WARN Acts .........................................29

8.   PLAINTIFFS SHOW GENDER DISCRIMINATION AND RETALIATION UNDER APPLICABLE LAW .....................................................................................................30

8.1.   Yahoo's Burden ................................................................................................30

8.2.   Disparate Treatment ........................................................................................31

8.3.   Disparate Impact ..............................................................................................32

8.4.   Discrimination in Retaliation for Advocating For Perceived Discrimination Against Other Males ......................................................................................................33

9.   PLAINTIFFS HAVE SHOWN A PRIMA FACIE CASES AND REBUTTED DEFENDANT'S PRETEXTUAL EXCUSES ..................................................................34

9.1.   Plaintiffs Have Shown a Prima Facie Case ............................................................34

9.2.   Plaintiffs Have Rebutted Defendant's Excuses ......................................................34

10.   CONCLUSION ......................................................................................................35

1

## TABLE OF AUTHORITIES

2

**Cases**

3

Alch v. Superior Court (2004) 122 Cal.App.4th 339 ............................................................28

4

Ambat v. City and County of San Francisco (9th Cir. 2014) 757 F.3d 1017 .........................30

5

Anderson v. Liberty Lobby, Inc. (1986) 477 U.S. 242 ...........................................................31

6

Antonio v. Wards Cove Packing Co., Inc. (9th Cir. 1993) 10 F.3d 1485...............................32

7

Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co. (1999) 20 Cal.4th 163......27

8

Chares J. Vacanti, M.D. Inc. v. State Comp. Ins. Fund (2001) 24 Cal.4th 800......................28

9

City and County of San Francisco v. Fair Employment and Housing Commission (1987) 191

10

   Cal.App.3d 976 .............................................................................................32, 35

11

Cornwell v. Electra Central Credit Union (9th Cir. 2006) 439 F.3d 1018 ..............................31

12

Domingo v. New England Fish Co. (9th Cir. 1984) 727 F.2d 1429.......................................33

13

Hernandez v. Atlantic Fund  Co. (1980) 105 Cal.App.3d 65................................................27

14

Hersant v. Department of Social Services (1997) 57 Cal.App.4th 997 ..................................34

15

McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792.....................................................34

16

Mixon v. Fair Employment and Housing Comm'n (1987) 192 Cal.App.3d 1306...................34

17

Nissan Fire & Marine Ins. Co. (9th Cir. 2000) 210 F.3d 1099..............................................31

18

Reeves v. Sanderson Plumbing Products, Inc. (2000) 530 U.S. 133 ...................................31

19

Smith v. Chase Mortgage Credit Group (E.D. Cal 2009) 653 F.Supp.2d 1035 ....................27

20

Southwest Marine, Inc. v. Triple A Machine Shop (ND Cal 1989) 720 F.Supp. 805.............28

21

St. Mary's Honor Center v. Hicks (1993) 509 U.S. 502 ........................................................34

22

Teamsters v. United States (1977) 431 U.S. 324.................................................................32

23

Tolan v. Cotton (2014) 572 U.S. _____, 134 S.Ct. 1861 ......................................................31

24

United States v. Johnson (8th Cir. 1976) 541 F.2d 710, 711................................................27

25

Watson v. Department of Rehabilitation (1989) 212 Cal.App. 3rd 1271 ...............................31

26

Watson v. Ft. Worth Bank and Trust (1988) 487 U.S. 977 ...................................................32

27

28

**Statutes**

28 USC § 2201 ................................................................................28

29 U.S.C. § 2101 ............................................................................29

42 U.S.C. § 2000e ..........................................................................31

Bus. & Prof. Code § 17204 ...........................................................27

Cal. Lab. Code § 1400(c) ..............................................................30

Gov't Code § 12940(a) ..................................................................31

Labor Code §§ 1400 ......................................................................29

**Rules**

Fed. R. Civ. P. 57 ..........................................................................28

# 1.  YAHOO ADOPTED THE QPR PROCESS AS A NEW MANAGEMENT TOOL TO CONTROL COSTS AND REDUCE HEADCOUNT WHILE AVOIDING LAYOFFS

## 1.1.  YAHOO WANTED TO REDUCE HEADCOUNT WITHOUT DECLARING LAYOFFS

During Marissa Mayer's time as CEO of Yahoo she was under pressure to reduce costs and, as she stated, "our biggest expense is in headcount…our biggest expense is in people." [Anderson Exhibits 482] At the same time Yahoo acquired numerous companies and added "several thousand" new employees to its payroll. [Exh I Reses Dep. 73:4-74:6; 105:1-3] Layoffs would trigger WARN Act notices, attract negative press coverage, and discourage recruitment, which was a concern. [Mayer Dep. 57:3-16] And Mayer had told the employees there would be no more layoffs like her predecessor had done months before she arrived. [Anderson Exhibits 475]

## 1.2.  MAYER INVENTED QPR AS A TOOL TO QUIETLY FIRE THOUSANDS OF EMPLOYEES WITHOUT FULL SEVERANCE BENEFITS

Within months of taking over Mayer invented the Quarterly Performance Review (QPR) which assigned a numerical score (between 0.0 and 5.0) to each employee every 3 months, and placed each employee in one of five categories or "buckets." ("Greatly Exceeds", "Exceeds", "Achieves", "Occasionally Misses", and "Misses.") [Mayer Dep. 31:17-32:18; Motion Memo 2:26-27] Managers were instructed not to tell their direct reports the numerical score they received (or that a numerical score even existed) but rather only the bucket "rating" they had been assigned. [Mayer Dep. 42:14-19; Exh N: 333]

A specified percentage of employees had to be placed in each of the buckets each quarter and a manager's average score had to meet a predetermined mean number set to the hundredths of a point. [Exh N: 3007] Senior VP Kathy Savitt noted that, "you were strongly encouraged to meet that curve." [Exh G Savitt Dep. 74:3-20] Employee scores were reviewed and possibly raised or lowered at "calibration" sessions with higher level managers. The employee score ultimately assigned was subjective and at the manager's "whim." [Exh D Fenice Dep. 66:4-8]

Yahoo would then pick and choose from these metrics to justify terminating as many

1  employees as it wanted to cut that quarter to make room for new hires and acquisitions.

2  [Exh I Reses Dep. 71:18-74:24] For example, terminations may be based on a "[1] rolling

3  four-quarter QPR average below 2.2; [2] rolling four-quarter average of low-mid Achieves

4  and trending down; [3] failed to achieve a QPR rating above 2.4 since Q4 of 2013 (last 4

5  quarters, inclusive of Q3 2013); [4] received an O[ccasionally] M[isses] rating in the last

6  year; [5] people manager with a QPR average below 2.5." [Exh N: 1462] In practice

7  managers could "manage out" almost anyone they wanted. [Exh M: 548, 550, 1461]

8      QPR-based headcount reductions impacted the Media Org Savitt noted how "Marissa

9  had the belief that Media had way too many people in it, that I had not been – even though I

10  had managed out quite a few, she felt that I could be tougher or, you know, I could do more

11  with less." From January 2014 to September 2015 the total size of Savitt's three

12  organizations, Marketing, Media and Customer Experience, went from 1,318 employees to

13  only 530. [Exh G Savitt Dep. 114:9-13, Exh N: 1535, 3083, 3139]

14      These reductions permitted Yahoo to bring on "several thousand" new employees

15  through acquisitions and targeted hirings. [Exh I Reses Dep. 105:1-3] In April of 2014,

16  Mayer described how: "We started off with a higher percentage of people being in Misses

17  and Occasionally Misses ... in some quarters, we set it as high as fifteen percent."

18  [Anderson Exhibits 476] According to 30(b)(6) witness Minnie Khroad, QPR numbers were

19  adjusted "based on just overall company performance, earnings announcement, those kind

20  of things." [Exh C Khroad Dep. 21:1-16]

21      Mayer again used QPR in Q1 2015 to control headcount in what Yahoo 30(b)(6)

22  witness Khroad called a time of "aggressive performance management." [Exh C Khroad

23  Dep. 150:1-11] Mayer commented during her Q1 2015 earnings recap that during the past

24  two and a half years "we have … reduced the number of contractors by nearly 2,000 and

25  reduced our full-time employee count by nearly 3,000 people, including our recent reduction

26  of about 1,100 full-time employees this past quarter." [Ard Declaration Exh. A]

27      Savitt explicitly tied the use of QPR-based terminations to business developments.

28  The QPR process was "both a way in good times of promoting the best and brightest as well

as, if hard times were to come, how would you prioritize the most critical players to continue to work at Yahoo..." [Exh G Savitt Dep. 28-29:13-3] Thus, when "hard times" required headcount reduction, Yahoo could modify the bucket percentages and increase the termination criteria to cut as many employees as needed. Mayer told her staff they should not use the word "layoff," but rather "remix," to describe these changes in headcount. [Mayer Dep. 55:9-13]

Besides keeping layoffs out of the headlines, Mayer had a compelling financial reason to call terminations performance-based. Such terminations did not trigger the substantial payout that Yahoo made to employees eliminated in a reduction in force. Yahoo's U.S. Severance Guidelines show that its "Standard Severance Package (Position Elimination or Reduction in Force Only)" for Directors such as the Plaintiffs, provided 8 weeks' notice, 12 weeks' severance pay and a "notice period bonus" of 8 weeks, for a total of 28 weeks' pay. Plus, these employees received 3 months of paid health care and 4 months of job-search services. On the other hand, Directors terminated by "Mutual Agreement," defined as "Performance, skill set issues, change in job requirements," received "up to 2 weeks" notice and "up to 10 weeks" severance. They received no health care payments and no outplacement services (which would have been especially valuable as these employees were labeled poor performers and fired). [Exh N: 2991] By paying out roughly one-third the pay and benefits than it would for standard layoffs, Yahoo had a tremendous financial incentive to characterize each employee's departure as being for cause under cover of the QPR process. And in doing so, Yahoo denied thousands of employees their proper separation benefits.

### 1.3. QPR WAS USED IN THE MEDIA ORG TO DISCRIMINATE AGAINST MEN

In 2014 the Media Org was a division of Yahoo consisting of approximately 450 employees. [Exh N: 1535] In the Media Org QPR scores were manipulated in a variety of ways, including the lowering of men's scores regardless of actual performance. Megan Liberman, for example, told HR "I have never even met Greg so I would be in no position to rate him". But she then reduced his score from 2.5 to 2.2, a change which she understood

put Anderson "at risk" for later termination. [Exh M: 621-622] Liberman later refused to give Anderson any QPR score at all for Q3 2014, on the baseless ground that he was not entitled to a score because he had been on leave for a fraction of the quarter.

Other men's scores were similarly reduced by female managers who knew nothing about them. When Ard complained about Savitt's termination of a high-performing male in May 2014, Val Higgins in HR warned Ard that his continued support for men being terminated would be seen by Savitt as a negative "reflection on his business judgment." [Exh N: 2819-2820] When three men's score were wrongly reduced in January 2015, Ard complained again [Exh N: 2652-2657] and was fired three days later. [Exh N: 2546-47]

### 1.4.   QPR WAS USED TO AVOID WARN ACT DISCLOSURES

Yahoo did not count QPR-based terminations in its WARN Acts calculations. They should have, however, because terminations through QPR were not truly performance-driven because the scores were so subjective, and they were used in various way to justify any number of terminations and control headcount. In January 2015, for example, when Ard was terminated, Yahoo raised the bar to hit more aggressive headcount targets:

> "...Here is the breakdown of the number of employees that would be impacted if we used the corporate criteria of 2.2 rolling four quarter average or if we use the 2.3 rolling average as we've discussed in the past. **Utilizing a 2.2 average would result in 10 terminations and utilizing the 2.3 rolling average would result in 18 terminations.** I recommend that we utilize the 2.3 rolling four quarter average to help you get in front of the HC [headcount] work that Anne has been working on with McKinsey." [Exh N: 2549, boldface added]

Savitt testified how McKinsey & Company, a consulting firm advising Yahoo on headcount reduction would be "given a target by Marissa of what she thought was appropriate and then they worked with myself and Anne Fenice to try and back our way into that number." [Exh G Savitt Dep. 150:6-11] QPR and headcount control went hand in hand.

Mayer naturally wanted to keep layoffs at Yahoo out of the news and provide the appearance of a company stabilizing if not growing under her leadership. If Yahoo filed public WARN Act notifications there would be negative headlines about layoffs at a time when "we wanted to be able to attract high-performing people." [Mayer Dep. 57:7-14] And rubbing salt in the wound, Yahoo would have to pay substantially increased severance

1  payments for non-performance-based terminations. [Exh N: 2991]

2          The impact of the QPR system on Yahoo employees was immediate and deep,

3  driving one employee to attempt to bribe Anderson into assigning scores. [Exh A Anderson

4  Dep. 173:5-6] Between September 2012 and September 2014, Yahoo "had nearly 2,000

5  performance related departures in the company" Mayer said. [ARD EXHIBITS 439] Savitt

6  testified how in 2014 Mayer decided to "lay off" 5% of the company, largely identified

7  through QPR and the creation of a "Bottom 5% List". [Exh G Savitt Dep. 138-139:24-25, Exh

8  N: 1462-63]. Yahoo 30(b)(6) witness Khroad was asked "Were all of those employees who

9  appeared on the five percent list, were they all terminated at the same time?" She replied

10  that  ".. I don't know that I would say on the same day, but within a short period of each

11  other, but short -- yeah, within a short period of time" of approximately 30 days. [Exh C

12  Khroad Dep. 158:10-18] She elsewhere explained that "we basically take an entire list of the

13  employee population and cut off five percent." [Exh C Khroad Dep. 105:25-106:20] If true,

14  Yahoo terminated about 300 U.S. employees within a month of generating the October 30,

15  2014 "Bottom 5% List," with 50 of those employees reporting to Kathy Savitt. [Exh N: 2534-

16  2543] This number should have triggered at least California WARN Act safeguards for

17  Plaintiffs. Yahoo also "managed out" certain employees and then considered them

18  "voluntary." The result is that Yahoo terminated 73 people in Sunnyvale in November, for

19  example, 39 of whom were considered "involuntary" and another 34 of whom were

20  considered "voluntary" but were managed out. [Exh K Higgins Dep. 69:3-22, Parsons

21  Declaration, Exhibit A]

22          Employees were terminated in controlled quarterly tranches on the pretext of low

23  QPR scores. Managers could put any of their employees "at risk" for performance-related

24  termination immediately or later, by assigning an arbitrary low score in one quarter. The role

25  of subjective assessment facilitated the expression of both intentional and implicit biases.

26  There was no accountability and no actual safeguards against abuse. [Exh I Reses Dep.

27  144:3-6] Although employees can learn the bucket they are in that quarter, they are not told

28  their numeric score. Thus, an "Achieves" employee does not know if she/he has "knocked it

JON R. PARSONS
L A W   F I R M

1  out of the park" [Exh K Higgins Dep. 40:8] with a high Achieves of 2.9 or received an "at

2  risk" 2.2 signaling termination sooner or later. Employees only know what their managers

3  tell them. [Exh N: 2760] When Liberman refused to meet with Ard for the first three quarters

4  of 2014 she kept him in the dark about his scores and refused to give him feedback so he

5  could do better. While HR representatives "give guidance" to managers on assigning

6  scores, and often attend calibration sessions, Jacqueline Reses, head of HR, observed that

7  "I wouldn't call them safeguards." [Exh I Reses Dep. 144:3-6]

### 2.  GREG ANDERSON WAS A HIGHLY-QUALIFIED EMPLOYEE TERMINATED CONTRARY TO YAHOO'S USUAL PROCEDURES AND BECAUSE HE WAS A MALE MANAGER

#### 2.1.  ANDERSON WAS A WELL-QUALIFIED EMPLOYEE

11  Anderson joined Yahoo in 2010 as the Autos editor. By 2011, Anderson had taken

12  Autos "from 0% original content to upwards of 60% original content." [Anderson Exhibits 36]

13  In his 2011 annual review he was described as "a great champion for his site and the

14  people who report to him … He stands up for what he believes is right."[ Exh N: 533] In

15  2012 he received a 23% pay increase and promotion to Editorial Director overseeing the

16  Commerce group's six content verticals: Autos, Homes, Shopping, Small Business, and

17  Travel. [Exh N: 809] By letter dated March 1, 2013 Mayer gave Anderson a generous

18  retention bonus "In recognition of your incredible contributions and hard work." [Anderson

19  Declaration Exhibit A]  In 2013, Anderson achieved an 82% increase overall in page views,

20  doubling traffic to Autos and tripling traffic to Homes. [Exh N: 523] Anderson recruited, hired,

21  and managed the three "outstanding" editors for Autos. [Exh M: 505]

22  In April 2014 Anderson was considered so important to the Autos vertical that one

23  executive observed it "will be a disaster for us on Autos if we let him go now." [Exh N: M:

24  621] He ran the Autos property until he went on leave in 2014 to attend the Knight-Wallace

25  Fellowship at the University of Michigan, a prestigious honor for journalists.

#### 2.2.  ANDERSON WAS TERMINATED WITHOUT CAUSE BASED ON A PRETEXT

27  The motion claims Anderson was terminated "because of his consistently low

28  quarterly performance ratings, which put him in the bottom 5% of the entire company."

1  [Memo 1:5-7] Anderson's QPR scores had been artificially deflated, but they still improved
2  quarter over quarter. He was on the bottom 5% list only because his Q1 2014 score had
3  been reduced and he was not given a Q3 2014 score he was eligible to receive. Anderson's
4  termination had been pre-determined by Savitt since at least April 29, 2014, when she wrote
5  he would have to go "regardless." [Exh M: 614-615] This was part of a larger trend in the
6  Media Org forcing men out of management positions.

7  In January 2014, Mayer fired COO Henrique De Castro and handed his Media Org
8  responsibilities to Kathy Savitt. [Exh G Savitt Dep. 12:13-15] At the same time five (5) male
9  leaders – 4 Vice-Presidents and 1 Senior Director – were terminated or otherwise had their
10 roles replaced by females. [Exh B Ard Dep. 340:17-25, Ard Declaration ¶ 2] By March 2014,
11 Savitt had concluded that Anderson also needed to be fired someday. [Exh N: 1538]
12 Yahoo's practice and policy was to fire an employee as soon as a decision was made to let
13 that employee go. "The policy was ... when you make the decision, you terminate. You don't
14 -- you don't -- unless there is a material business reason, you don't delay a termination."
15 [Exh G Savitt Dep. 154:25-155:4]  Thus, Anderson's delayed termination was unusual.

16 In November 2014, Liberman told Anderson he was being fired because his QPR
17 scores placed him in the "lowest 5% in four quarters of performance reviews." [Exh M: 546]
18 This was the "Bottom 5% List" newly crafted after Anderson left on approved personal leave.

19 ### 2.3.  IN MID-2014 ANDERSON WAS SEEN AS ESSENTIAL TO YAHOO BY THOSE
20 ### BELOW SAVITT WHO ACTUALLY KNEW WHAT ANDERSON DID

21 Although Yahoo now claims it terminated Anderson for poor performance the
22 evidence shows the opposite. Even Liberman acknowledged in early 2014 that it would be a
23 "disaster for us on autos if we let him go now" [Exh M: 621] because "Autos has been a
24 strong revenue driver for us" [Exh N: 803] generating about $65 million in annual revenue in
25 early 2014. [Exh N: 2283-2284] Because of the strength of the Autos team Anderson had
26 recruited, when Sharon Carty was hired as EIC of the Autos magazine in April 2015, her
27 hiring packet concluded that "Autos is slated to be one of our most successful conversions
28 of a legacy site to a digital magazine." [Exh N: 509] Susan Kittenplan described the Autos

team assembled by Anderson as "outstanding and it would be a loss for the company to have any of them leave." [Exh E Kittenplan Dep. 40:6-12, 41:3-8]  Not only did Carty replace Anderson in the Autos property, she also took over the three-person team that had reported to Anderson and later to Ard.

## 2.4. ANDERSON'S Q1 2014 SCORE WAS ARBITRARILY REDUCED

Ard gave Anderson a 2.5 rating for Q1 2014, a good mid-Achieves rating which was initially approved by Liberman during her calibration session with Ard. [Exh M: 621-22] However, Higgins in HR knew that Savitt was going to challenge Anderson's rating and those of two other male managers. On April 15, 2014 she wrote to Liberman "to make sure you're prepared for these so you are not caught off guard!!" [Exh M: 622]

Liberman replied, "I have never even met Greg, so I am in no real position to rate him" but then suggested dropping his score to the "low 2s". [Exh M: 621] This baseless reduction in Anderson's score occurred after Higgins reminded Liberman that "if we put him lower than 2.5, he's at risk." [Id.] Anderson's 2.5 rating was indeed lowered by Higgins to 2.2 for Q1 2014. [Exh N: 2805, 2808] This lowered score caused Anderson to be placed on the "Bottom 5% List" six months later, providing the pretext for his termination. [Exh M: 546]

## 2.5. ANDERSON'S 2014 QPR SCORES IMPROVED CONSISTENTLY AND THEN HIS Q3 2014 RATING WAS WRONGLY WITHHELD

During the last four quarters he received ratings Anderson received increasingly higher scores as follows: Q3 2013 = 1.6; Q4 2013 = 2.0; Q1 2014 = 2.2 (after the change noted above), Q2 2014 = 2.5. [Exh M: 833] Then he received no score for Q3 2014 despite being entitled to one. Anderson went on approved leave beginning the third month of Q3 2014. Under Yahoo's QPR process he should have received a QPR rating for that quarter because "An employee must be active for two months of the quarter to be eligible to receive a rating." [Exh N: 363] Anderson worked all of July and August and his leave of absence did not start until September. [Exh M: 560] Yahoo 30(b)(6) witness Khroad confirmed that Anderson was indeed eligible for a QPR rating and said she was unaware of any other employees who did not receive a rating in a quarter they were eligible. [Exh C Khroad Dep.

1    69: 6-11] Once again, Anderson was treated differently.

2        Ard testified that he does not remember giving Anderson, or any other employee, a

3    score for Q3, but would have done so if the Rating Tool allowed him to. [Exh B Ard Dep.

4    284:1-4] Fagerlund in HR explained to Liberman that if an employee "is ineligible for a QPR

5    they will be automatically grayed out of the tool. All employees that are listed as "Y" under

6    column A are eligible for a QPR rating" [Exh N: 1106] Anderson's entry was not grayed out

7    and the "Y" indicated that he was entitled to a score. [Exh N: 2809-2812]  Liberman modified

8    the Rating Tool on October 13, 2014, and wrote that Anderson was not getting a score

9    because he was on leave for "more than 30 days" [Exh N: 2810] But Anderson had not been

10   on leave for more than 30 days [Exh M: 560]. Anderson was entitled to a score and should

11   have received one. Instead, Yahoo fired him because of his deflated and missing scores.

12       **2.6.  ANDERSON'S YEES SCORES DID NOT JUSTIFY HIS DELAYED TERMINATION**

13       Defendant's motion claims that Anderson was placed on a "bad managers list"

14   because of the results of a Yahoo Employee Engagement Survey (YEES) from 2013.

15   [Memo 6:3-7:5] This is also incorrect.

16       Yahoo's witnesses state that the company did <u>not</u> use YEES survey results to

17   determine whether an employee needed counseling or additional guidance, and YEES

18   surveys were not used to determine whether an employee should be terminated. [Exh F Hill

19   Dep. 31:22-25] This is because many of the questions deal with an employee's perceptions

20   of upper management and the company overall. Some examples from the surveys include,

21   "I have confidence in the future of Yahoo" (17% favorable rating) or "Yahoo has an effective

22   Decision-Making process"  (17% favorable). [Exh N: 0041, 0044] In addition, most  of the

23   examples cited by Yahoo were from a 2012 survey, two years before Anderson was

24   terminated. [Exh N: 0001] Furthermore, Anderson's 2013 scores showed marked

25   improvement, and Yahoo conducted the engagement surveys "just to see if there was any

26   improvement." [Exh F Hill Depo. 16:5-11] Yahoo did not produce any 2014 results.

27       The survey warned that with less than 50 respondents the results could be off by "15

28   percentage points or more". Moreover, with only a handful of responses, Anderson's reports

for 2012 and 2013 noted on every page that there was "Insufficient Data to Report." [Exh N: 1, 7, 65, 69, 71] Anderson had eight (8) respondents in 2013 and six (6) in 2012. [Exh N: 0005, 0039, 141] Thus, Yahoo could not have used the YEES survey to determine that Anderson should be terminated in the Spring of 2014.

### 2.7. DESPITE ANDERSON'S IMPORTANCE TO YAHOO, HIS IMPROVING SCORES, AND HIS SELECTION FOR A PRESTIGIOUS FELLOWSHIP, SAVITT DECIDED MONTHS BEFORE HE WAS FIRED THAT ANDERSON "NEEDS TO GO REGARDLESS"

The decision to terminate Anderson was made early in Savitt's tenure at the Media Org. An "Strategy Working Session" presentation dated March 25, 2014, states "Greg Anderson to be terminated," the only employee so identified [Exh N: 1528-1538 at 1538]. Liberman explained that Anderson's termination was delayed because "from a revenue perspective ... we need (Anderson) in this slot until we get an autos magazine started." [Exh M: 622]  "What I hear on Greg is that it will be a disaster for us on autos if we let him go now … I also don't want to take abuse for causing a revenue problem." [Exh M: 621]

By April 28, 2014, Savitt had decided that if Anderson could not be conveniently terminated immediately, she could wait, but "he needs to go regardless." [Exh M: 614]  Even with the Q2 reduction from 2.5 to 2.2, Anderson's QPR numbers rose substantially each quarter from Q3 2013. He and his team continued to do well, the revenue kept coming in, and early in 2014, he was honored by admission to the prestigious Knight Wallace Fellowship. None of Anderson's accomplishments mattered, however, because Savitt had made up her mind that he was to be fired "regardless" of what he did or did not do, or how much he contributed to Yahoo. [Id.]

### 2.8. LIBERMAN CLAIMED SHE WAS TOLD TO TERMINATE ANDERSON BECAUSE HE WAS ON THE BOTTOM 5% LIST

On November 10, 2014, Megan Liberman terminated Anderson by phone while he was in attendance at the Fellowship in Ann Arbor, Michigan. Liberman did not go through the usual channel of having Anderson's supervisor (Scott Ard) communicate the termination and she performed the task herself.  She explained to Ard that she had no choice and was required to terminate Anderson – "Not my call. Just lowest 5%." [Exh M: 546] She explained

in deposition that the phrase "not my call" meant "that this decision was delivered to me as opposed to my having initiated it." [Exh J Liberman Dep. 171:7-12]

### 2.9.  ANDERSON SHOULD NOT HAVE BEEN ON THE BOTTOM 5% LIST

The Bottom 5% List was based on employees' rolling four-quarter averages as of October 2014. The threshold for making the list was 2.25 and Anderson had a 2.23. [Exh N: 2534-2543 at 2541] However, this rating was tainted by the improper lowering of Anderson's score in Q1, when Ard gave Anderson a 2.5 rating. If Liberman had not changed that score to the "at risk" 2.2, Anderson would have had a rolling average of 2.33 and would not been considered "bottom 5 percent." [Exh N: 2534-43]

### 2.10.  NO ONE TAKES RESPONSIBILITY FOR THE DECISION TO TERMINATE ANDERSON

Everyone at Yahoo points to someone else as the person who terminated Anderson. As noted, Liberman claimed the termination was "not my call" and "this decision was delivered to me," [Exh M: 546], Exh J Liberman Dep. 171:7-12, 343:2-5] Savitt, who was Liberman's boss, testified, "The recommendation [to terminate Greg Anderson] came from HR, which would have come from Jackie Reses' work with Marissa Mayer." [Exh G Savitt Dep. 55:20] But Reses and Mayer both deny having any involvement in Anderson's termination [Exh I Reses Dep. 116:6; Mayer Dep. 21:6-8]. This unwillingness to acknowledge who made the decision to terminate shows a consciousness of guilt.

### 2.11.  THERE WAS NO REASON TO TERMINATE ANDERSON WHILE ON LEAVE

The callous termination of Anderson shortly after he began the Knight-Wallace Fellowship cannot be justified by any rational business reason. He was on unpaid leave, and his continued employment through the end of the program cost Yahoo nothing. Moreover, HR acknowledged that the "Knight-Wallace Fellowship is a pretty big deal that gives Yahoo some credibility," and Anderson was using it to create a documentary for Yahoo Autos with Yahoo's assistance.[ Exh N: 623 Exh A Anderson Dep. 165:14-166:17]

### 2.12.  BY YAHOO'S LEAVE POLICY ANDERSON SHOULD HAVE RETURNED TO WORK

Yahoo's written leave policy provides that an employee on leave can be terminated

1  for "legitimate business reasons". [Exh N: 2575] But Yahoo promised employees whose

2  positions had been eliminated that it would "consider you for any available vacancy" upon

3  return. [Id.] Yahoo took no efforts, however, to find a place for Anderson when his leave was

4  over. Rather, Yahoo fired him in the midst of his leave, without an Autos EIC yet chosen.

5  Once again, in terminating Anderson Yahoo breached its own written policies.

### 3. SCOTT ARD WAS ALSO A HIGHLY-QUALIFIED EMPLOYEE TERMINATED CONTRARY TO YAHOO'S USUAL PROCEDURES AND BECAUSE HE WAS A MALE MANAGER

#### 3.1.  ARD TOOK OVER ANDERSON'S DAY-TO-DAY MANAGEMENT OF AUTOS AND OTHER COMMERCE PROPERTIES WHILE ANDERSON WAS ON LEAVE

10  Ard received 5 "Exceeds" ratings in 7 quarters during 2012 and 2013. [Exh M: 843] At

11  the time Savitt took over Media, Ard was in the top 20% of performers in Savitt's

12  organization of about 1,400 employees. [Exh N: 2525] In his last quarter at Yahoo, while

13  running Autos and other Yahoo properties, Ard nearly tripled social referrals to Autos

14  against a goal of 25%. [Exh N: 2714 and Exh B Ard Dep. 209:16-21] He also filed two (2)

15  patent applications while at Yahoo, one of which was subsequently granted. [Exh N: 821,

16  Ard Declaration ¶ 3] Prior to working at Yahoo, Ard was Editor in Chief of CNET, the leading

17  Website for technology news and reviews. At CNET, Ard also had three years' experience

18  running an autos site of similar staff size and editorial voice to Yahoo Autos. [Exh N: 2839]

19  Moreover, Yahoo was aware that Ard received numerous kudos from co-workers in

20  his year-end reviews for 2014 and 2013 including statements such as "Scott is one of our

21  thought leaders at Yahoo and a tremendous asset;" "Scott also gets very involved if he

22  spots content on the homepage that is problematic. He is accountable and makes the team

23  accountable;" "I joined Yahoo to work with creative, bright, and hardworking people with big

24  ideas. Scott Ard embodies all of these characteristics;" and "Scott currently programs one of

25  Yahoo's most visible assets and one of our key differentiators. He is the best in the

26  business." [Exh N: 826-830; 661-663]

#### 3.2.  THE RATINGS YAHOO PROVIDED FOR ARD IN ITS MOTION ARE FALSE

28  Yahoo's motion states, "By October 2014, Ard's average QPR score for the most

recent 4 quarters was 2.30, below the 2.5 that was expected of a people manager like Ard."

[Memo: 14:24-25] That is false. In October, Ard's most recent four QPR scores were 3.1,

2.0, 2.7 and 2.2, which average out to a 2.5. [Exh M: 833] This 2.5 score is exactly the score

that the motion states Yahoo "expected of a people manager." [Memo 14:25]

Yahoo claims that "Moreover, Ard's scores were trending downwards." [Memo 14:26]

That also is false. Ard's scores of 3.1 - 2.0 - 2.7 - 2.2 [Exh M: 833] may be considered

inconsistent, but they are not trending downwards. [Exh M: 833]

### 3.3. LIBERMAN AND SAVITT GAVE ARD LOW QPR SCORES IN 2014 DESPITE CLEAR EVIDENCE THAT THEY DID NOT CONSIDER HIS ACTUAL PERFORMANCE

In Q1 2014, Savitt gave Ard a very low 2.0 "Achieves" score, a sharp decline from the

3.1 "Exceeds" Ard received in the previous three-month period. Savitt failed to meet with Ard

for this required performance discussion, and Ard complained to HR. [Exh N: 1520]

Scott Day, a VP in HR, wrote to Liberman stating that "I am sure that Kathy didn't

schedule time with him as she had so many to do and he now reports to you. She wouldn't

have anything to share anyhow, as she had no interaction with him." HR was not surprised

that Savitt did not meet with Ard because she knew nothing about Ard's performance -

although she had secretly given Ard a low score placing him "at risk" for later termination.

Day recommended that Liberman meet with Ard to discuss his Q1 score. He also

stated that "You can also use this as a chance to start setting a stage for any future

departure that may be coming." - indicating that the 2.0 rating Savitt had given Ard was a

sign that he would someday be terminated. [Exh N: 1520]

For Q3 2014, Liberman gave Ard a rating of 2.2, also a low "Achieves" rating,

although she confessed she was not aware of what Ard what working on when she gave

him his rating. Exh B Ard Dep. 246:18-22] The QPR process only worked properly if a

reviewing manager had knowledge of the person being given a score. [Mayer Dep. 66:12-

16] Managers were expected to determine Q3 performance ratings between September 25

and October 2. Liberman emailed Ard on September 24 stating, "We need to find some time

to chat. I feel very out of touch with what you are working on." [Exh N: 207, 2827]. Even so,

1    Liberman did not meet with Ard until December. [Exh B Ard Dep. 248:11]

2        For Q4 2014, Liberman gave Ard a 1.8 "Occasionally Misses" score, his first score of

3    less than "Achieves" while at Yahoo. She testified that this rating was not the result of any

4    actual review of Ard's performance. Rather, "A decision had already been made to terminate

5    Scott before...I did 2014 year-end evaluations." [Exh J Liberman Dep. 246:18-20] The

6    decision to terminate Ard came first and his scores generated later to justify that decision.

7        ### 3.4.  ARD WAS TERMINATED BECAUSE LIBERMAN REFUSED TO READ ARD'S REPORTS AND THEN COMPLAINED SHE DID NOT KNOW WHAT HE DID

8

9        Liberman claims she could never figure out what Ard was doing and that is why she

10    fired him. [Exh J Liberman Dep. 199:13-202:24, 175:18-22] In fact all employees, including

11    Ard, posted their goals each quarter on the company intranet and those goals were

12    available to anyone in the company to read. In addition, managers were supposed to hold

13    regular feedback and goal-setting sessions to gather this information, but Liberman failed to

14    do so with Ard. [Exh B Ard Dep. 148:8-20]

15        Additionally, Ard reached out to Liberman on numerous occasions to fill her in on

16    what he was doing. Liberman failed to reply to his numerous attempts to communicate. In

17    March 2014, he emailed Liberman his list of goals and other tasks he was working on for Q2

18    without reply. [Exh N: 1111-1112] In late September, Liberman failed to make a meeting she

19    requested with Ard, so he immediately and proactively sent her list of tasks and projects he

20    was working on. He received no reply. [Exh N: 2826-2827]. Ard emailed Liberman in

21    October to note that his mother was battling cancer and "entering a difficult period" that

22    might require him to take some time off on short notice. Liberman did not reply. [Exh N:

23    2828] Ard forwarded an email to Liberman in late October informing her that he filed his

24    second patent application for Yahoo. Liberman did not reply. [Exh N: 2829]  Liberman set up

25    a phone meeting with Ard in November but she did not make the call. [Exh N: 2831]

26        When Ard and Liberman finally met in December, Liberman was 10 minutes late and

27    said she didn't have time to get into the details of Ard's responsibilities. Instead, they agreed

28    that Ard would break out his duties in greater detail in his year-end review to be completed

1   in a few weeks, which he did. [Ard Dep. 248:11-14]

2   **3.5.  YAHOO CAN'T AGREE WHO MADE THE DECISION TO "ACTION" ARD**

3   In her deposition, Liberman stated "I believe I made the decision [to terminate Ard]

4   based on his performance over the past few quarters." [Exh J Liberman Dep. 255 17-19] But

5   she had told the California Department of Fair Employment and Housing, "my boss was

6   definitely of the view that it was time to end this relationship." [ARD EXHIBITS  225]

7   But an email thread from two weeks before Ard's termination also reveals Savitt

8   made the decision to terminate Ard in Q4 but that Liberman intervened. Reviewing a list of

9   employees to be terminated in February 2015, Savitt saw Ard's name and remarked: "Some

10   of these were actioned a while ago. Are we using current data?" Fenice explained, "we did

11   not action scott ard in q4, megan declined, we will action him with this round." [Exh N: 2665]

12   **3.6.  ARD WAS TERMINATED BECAUSE LIBERMAN GAVE HIM A SINGLE**
**"OCCASIONALLY MISSES" SCORE**

13

14   In what was supposed to be a performance review discussion on January 30, 2015,

15   Liberman informed Ard that she gave him an "Occasionally Misses" rating and that he was

16   being terminated that same day. [Exh B Ard Dep. 246:10-22]. Yahoo told the DFEH, the

17   company "routinely asks employees who receive a rating of "Occasionally Misses" or

18   "Misses" during the latest quarterly review to separate from the company." [Exh N: 709] That

19   statement is also false.

20   At a meeting with Yahoo's global workforce in April 2014, Mayer herself stated, "And

21   again, missing expectations for a single quarter...shouldn't in and of itself...it's not ideal. But

22   it shouldn't in and of itself be a big deal. It's when you've got multiple quarters like that,

23   when you ultimately have a problem." [Anderson Exhibits 477]

24   Further evidence that a single "Occasionally Misses" was not necessarily fatal exists

25   in the "serial skimmers" list Yahoo created to target employees for termination late in 2014.

26   Exh M: 833. Column Z indicates whether an employee received an "Occasionally Misses"

27   rating "in the past year." Of the 84 employees, the vast majority are marked "yes." The fact

28   that they are included on the spreadsheet means they were still employed despite an

1   "Occasionally Misses" rating that may have been more than a year old.

2       Yahoo's own HR policy states that an employee who receives a "first Occasionally

3   Misses" rating should be given the choice of a performance improvement plan or a "mutual

4   agreement" resignation with severance. Yahoo did not give Ard this option. [Exh N: 2989]

5           **3.7.  YAHOO CAN'T AGREE ON THE REASON FOR ARD'S TERMINATION**

6       Showing how blurred the line was between layoffs and performance-related

7   departures, Yahoo states that Ard's termination was performance related. [Memo: 15:10-12]

8   But Liberman also testified, "I don't recall where Autos resided when Scott was laid off."

9   [Exh J Liberman Dep. 312:8-9]

10      Another witness testified that Ard's termination was done for efficiency reasons, not

11  performance: "in looking at...the head count strategy, [Ard's] role at his level was not part of

12  the strategy to be efficient with the head count at the senior director role. And I think it was

13  identified as a layer that was unnecessary while we were trying to be very efficient with the

14  head count." [Exh D Fenice Dep 139:15-23] In another document from late 2014 listing

15  employees for possible termination, Yahoo described Ard as having "no clear role or need"

16  in a list of employees being considered for termination in Q4. [Exh N: 2554-56] A question

17  remains as to why Ard was actually terminated, who decided to let him go, and if the

18  termination was really performance-based or whether Ard should have been considered a

19  reduction in force because Yahoo no longer had a need for him. This confusion cuts against

20  Yahoo's story that he was fired because his scores were "trending downwards" or because

21  he did not add "sufficient value to his team." (Memo 1:7-9 and 14:26)

22      **4.   YAHOO ENGAGED IN SIMILAR ACTS OF FAVORING WOMEN AND
         HARMING OTHER MEN DURING THE QPR PROCESS**

23

24      **4.1.  IN FEBRUARY 2014 SAVITT SUGGESTED LOWERING THE SCORES ON THREE
             MEN AND RAISING THEM ON TWO WOMEN**

25      On February 13, 2014, a Yahoo VP emailed Savitt a list of eight "media leaders" who

26  had begun reporting to her. The email included the ratings they had been assigned for the

27  prior quarter (Q4 2013) before Savitt took over the Media Org. Even though Savitt had not

28  worked with those employees during that quarter, she "totally disagree[d]" with the

1   previously awarded numbers and suggested raising one woman from "Achieves" to

2   "Exceeds," raising another woman from "Exceeds" to "Greatly Exceeds," lowering one man

3   from "Exceeds" to "Achieves", and lowering the scores (but not the bucket) for two other

4   men. [Exh N: 1077-1078] This is an early example of Savitt lowering men's scores and

5   raising women's even though she did not work in the Media Org when the scores were

6   earned and knew nothing about the employees' performances. Liberman, who reported to

7   Savitt, testified that such changes to scores were unusual. [Exh J Liberman Dep. 65:16-

8   76:15]

9               **4.2.  IN APRIL 2014 ANOTHER MALE HAD HIS SCORE ARBITRARILY LOWERED**

10          In April 2014, another male manager in the Media Org had his Q1 rating lowered and

11  was terminated soon thereafter. P-- C---, who was a part of Ard's homepage team, made

12  substantial contributions to Yahoo's Olympics coverage in Q1, often logging 14-hour days.

13  [Exh N: 2822] Nevertheless, Liberman and Higgins, who did not know what he did, agreed

14  that his high-Achieves score of 2.9 should be lowered. [Exh M: 544].

15          In the same email thread discussing whether Liberman could support Anderson's 2.5

16  rating during Savitt's calibration meeting, two other males were also singled out with the

17  same question. [Exh N: 1077, Exh M: 621-622] Regarding P-- C---, Liberman said, "Again, I

18  have not worked with him and I am functioning purely on what Scott [Ard] said -- that he had

19  a string (sic) quarter, especially on Olympics --and past ratings." Still, Liberman

20  recommended a more "middling" score of "maybe 2.6 or 2.7. [Exh M: 621] P-- C--- was

21  terminated in mid-May 2014, when his wife was full-term pregnant and just 5 days after he

22  had applied for paternity leave. [Chiem Declaration ¶¶ 2-3]

23          **4.3.  HIGGINS WARNED ARD THAT HIS CONTINUED COMPLAINTS ABOUT HOW QPR**
                **WAS BEING MISUSED AGAINST MEN WOULD HARM HIS PROSPECTS AT YAHOO**
24

25          Upon learning P-- C-- was to be terminated, Ard tried to appeal the decision. HR's

26  Higgins replied: "Kathy has not responded to our request to retain him. Given the history of

27  [P--- C---'s] performance, Scott [Day] doesn't feel comfortable repeatedly asking her for an

28  exception for someone she's already expressed disinterest in retaining, so we need to plan

1   to move forward with termination for [P--- C---].”

2   Ard responded, “A lack of response doesn't sound like a good reason to terminate

3   someone. Can I try to raise with [Savitt]?” Ard added, “We are talking about terminating an

4   employee ... but I don't think there has been an appropriate level of due diligence.” This

5   pushed Higgins to shut down the conversation with a veiled threat: “this would also be a

6   reflection of your business judgment to Kathy, and I truly think you have bigger cases to

7   fight for that show the type of leader you're willing to be.” [Exh N: 2819-2823] In her

8   deposition Higgins expanded on her warning: “If you're going to be at a company that has

9   this type of program in place, shouldn't you be behind it and believe in it if you're

10  participating in it? And if you don't, why are you at the company?” [Exh K Higgins Dep.

11  101:7-17]. When Mayer was asked if it was considered improper for a manager to advocate

12  on behalf of his direct reports that they not be terminated she stated it was not improper.”

13  [Mayer Dep. 38:12-20] Moreover, when Ard similarly advocated on behalf of a female

14  employee he received no pushback or warning. [Ard Declaration ¶ 4] In Q2 2014 the rating

15  of a female employee was lowered without Ard's awareness from a 1.8 to a 1.0. With Ard's

16  support that employee appealed and Ard convinced HR to restore the rating back to a 1.8.

17  [Exh N: 0712]

### 4.4.   THREE MORE MEN ON ARD'S TEAM HAD THEIR SCORES LOWERED WITHOUT FACTUAL BASIS

20  In January of 2015, in accordance with QPR guidelines [Exh N:  2652] Ard submitted

21  five employees as Exceeds (42% when 45% allowed): three men and two women. Liberman

22  emailed Ard that he had “way too many exceeds” and asked him to send a prioritized list of

23  the ranked employees, which Ard did. Without further discussion, Liberman lowered the

24  three men in “Exceeds” to “Achieves” even though one of the men was Ard's top priority.

25  The two females remained in “Exceeds,” including one whom Ard had specifically called out

26  as the first employee Liberman should drop to “Achieves.” [Exh N: 2652-2657]

27  When Ard learned of the changes he asked Liberman for an explanation but received

28  no response. He then complained to Artimiss Fagerlund in HR, who indicated that the

1  changes had been made at Savitt's calibration session. [Exh N: 2662]

2  **4.5.  ARD'S COMPLAINT LED TO RETALIATION AND THE ACCELERATION OF HIS**
3  **TERMINATION DATE**

4       Yahoo had scheduled Ard's termination to take place in mid-February when a large

5  group of Yahoo employees were also to be given layoff packages [Exh D Fenice Dep.

6  139:6-8, Exh N: 2668]. On January 26, 2015, Ard informed Fagerlund by phone about the

7  score changes to three male reports and noted that Liberman, contrary to her prior practice,

8  had not invited Ard to a calibration session where he could defend those scores. In a follow-

9  up email the next day Ard wrote, "I don't feel good about how this process is playing out, for

10  the second time in the past three quarters … Like in Q2, I'm walking a fine line between

11  crossing my manager an [sic] doing what I feel is right by my employees." [Exh N: 2662]

12       Between Ard's phone call and his follow-up email to Fagerlund, the evidence shows

13  that Fagerlund emailed Liberman asking if she wanted to terminate Ard or put him on a

14  Performance Improvement Plan. [Exh N: 2671] Liberman and Fagerlund had earlier

15  participated in email conversations concerning Ard's termination then set for mid-February

16  2015, [Exh N: 1028] yet neither of them now mentions that termination. Instead, in her

17  January 27, 2015, email to Fagerlund, just three days before Ard is fired, Liberman writes

18  that she has not decided whether to terminate Ard, and that there "might be a place for him

19  in the company." [Exh N: 2671] The only event occurring around this time, and which

20  appears to have precipitated the decision to terminate Ard was his complaint about the

21  changing of men's QPR scores. On January 30, 2015, three (3) days after Ard's written

22  complaint to HR about the changes to the men's scores Liberman and Fagerlund fire Ard.

23  [Exh B Ard Dep. 246:10-22] Yahoo's motion for summary judgment ignores Ard's claim that

24  Yahoo retaliated against him because of his complaints about what he saw to be the

25  different treatment of male employees.

26       Liberman may be changing her story. In deposition she testified that the reason she

27  did not prepare a Q4 2014 year-end review for Ard, due in January, was because she had

28  already decided to terminate Ard. [Exh J Liberman Dep. 246:18-20]. Liberman did not have

a performance discussion with Ard for all of 2014, even though told to do so by HR [Exh N: 2662], and then she did not bother to write a year-end review because she had already decided to fire him. A week after firing Ard Liberman changed her mind, wrote up a belated and self-serving review of Ard, and tried unsuccessfully to slip it into Ard's now-closed personnel file. [Exh N: 2675-2676] HR knew what Liberman was doing and reviewed drafts of her report, but the document was not added to Ard's file until after Yahoo was contacted by an investigator from the Department of Fair Employment and Housing. [Exh N: 2844-2846]

### 4.6.  THE APPEALS PROCESS ALSO FAVORED WOMEN OVER MEN

In Q2 2014 a female on Ard's team had her score reduced to a dangerous 1.0 during calibration. She appealed and with Ard's support, her rating was restored. [Exh N: 712]

Ard was fired on the day he received his first "Occasionally Misses" rating and he appealed it by email sent to Savitt and Jackie Reses, the Senior Vice President of HR, from home. [Exh N: 2815-18] It was ignored because the decision had already been made that it was Ard's time to go. As Reses testified: "... anyone can complain at any particular time .... Now, whether that changes the decision or not, they would have already thought through that and clearly they would have made a determination that it wouldn't have changed the decision." In other words, Liberman and Savitt must have had their reasons, so entertaining Ard's appeal would be wasting time.  [Exh I Reses Dep. 163:3-9]

Anderson also appealed a low QPR rating he received in 2013 from an absentee manager, which arose out of a troubling incident in which an employee, in an effort to protect himself from the forced curve, attempted to bribe, then intimidate, Anderson into changing the scores he was assigning to his direct reports. Management reassigned Anderson to a new manager, but did not change or expunge his low score.  [Khroad . 252-253:21-18] Anderson was tainted by association and received another low score of 2.0 for Q4 2013. Reses testified that his allegations of bribery and extortion were serious enough that they should have come to her attention, but they did not. [Exh I Reses Dep. 156:7-14]

1

2

### 4.7. Individual Managers Could Assign QPR Scores At "Whim" Permitting Discrimination and Favoritism

3

Anne Fenice, Savitt's Chief of Staff, agreed that employee ratings could be changed

4 on a "whim." [Exh D Fenice Dep. 66:4-8] Scott Day, who ran Savitt's calibration sessions

5 [Exh H Day Dep. 10:25-13:5] said, "It was a manager's prerogative, at any level higher, to

6 change ratings as they saw fit because they had a wider purview over a number of different

7 employees and so that would not have been uncommon for a more senior manager to

8 change a rating." Asked if the rating could be changed even when the senior manager "was

9 not familiar with the employee's performance?" Day replied, "It could be, yes." [Exh H Day

10 Dep. 106:17-107:3]

11

12

### 4.8. Calibration And Score-Changing Practices In The Media Org Violated Yahoo Policies And Facilitated Discrimination

13

As the above discussion shows, Media Org management used the QPR process in

14 violation of its written guidelines. Scores should have been changed only during formal

15 calibration sessions by persons who knew about the employee's performance that quarter.

16 [Exh N: 370] In practice scores were changed outside of those sessions through emails and

17 phone calls by people who knew nothing about the employees being reviewed. [Exh M: 614-

18 615, Exh M: 544-545, 621-622,]  Scores should have been explained by managers in one-

19 on-one performance conversations each quarter. [Exh C Khroad Dep. 54:19-55:11, Mayer

20 Dep. 28:5-9] Yet Liberman went a year without ever having any of those conversations with

21 Ard.

22

### 4.9. The Manipulated QPR Scores Were Then Arbitrarily Applied

23

Not only were QPR scores arbitrarily set and then manipulated in calibration, the

24 application of those QPR Scores to make termination decisions was equally subjective.

25 Yahoo had no written policy for what QPR score would result in termination [Exh N: 2614],

26 which allowed Yahoo maximum flexibility in using QPR to reduce headcount. [Exh M: 621]

27

In late 2014, Yahoo executives received an email from HR about "serial skimmers"

28 informing them that they would be receiving a list of employees who met any one of several

1  performance criteria: "rolling four-quarter QPR average below 2.2; rolling four-quarter
2  average of low-mid Achieves and trending down; failed to achieve a QPR rating above 2.4
3  since Q4 of 2013 (last 4 quarters, inclusive of Q3 2013); received an OM rating in the last
4  year; people manager with a QPR average below 2.5." [Exh N: 1462]. The executives were
5  told that these multiple criteria were designed to generate a lengthy list of employees to
6  consider for termination. "It is our hope that a larger list will encourage us to be more
7  aggressive … in identifying who should be part of your go-forward organization." HR was
8  eager to cut more if desired. "Please let us know if you would like us to cast that initial net
9  more broadly - we can definitely do that." [Exh N: 1462]

### 5.  YAHOO'S HIRING PRACTICES FACILITATED DISCRIMINATION

#### 5.1.  YAHOO DISCRIMINATED AGAINST ANDERSON AND ARD CONCERNING THE EIC POSITION IN THE AUTOS DIGITAL MAGAZINE

13      Yahoo's digital magazines were sections of the Yahoo website alternately called
14  "verticals" or "Properties" [Exh G Savitt Dep. 177:22-25; Exh E Kittenplan Dep. 23:14-24:17]
15  Plaintiffs should have been in consideration for the Autos EIC position, the same position
16  held both by Anderson and then by Ard after Anderson left on leave. Although Yahoo's
17  motion claims that Anderson never held the EIC position, Yahoo repeatedly referred to him
18  as the "Autos EIC." [Exh M: 548, 555; Exh G Savitt Dep. 138:18-22]. When Anderson went
19  on personal leave Ard managed Autos and the writers and editors for the site reported
20  directly to Ard. [Exh B Ard Dep. 90:5-7]

#### 5.2.  YAHOO DID NOT POST OPEN POSITIONS WHICH FACILITATED ITS DISCRIMINATORY HIRINGS

23      Yahoo facilitated this gender manipulation by not publicly posting the open positions
24  for magazine editors. Rather, Yahoo decided who to contact for the new positions, referred
25  to as "targets." [Exh N: 584] All 22 of the "targets" identified to run Yahoo Health, for
26  example, were female. [Exh N: 2624-2625] Yahoo produced no evidence that the magazine
27  EIC jobs were posted publicly and none of its witnesses knew about any postings.
28      In an August 2015 Tumblr post CEO Mayer announced the hiring of Martha Nelson

1  as Yahoo's top Global Editor in Chief and noted that Nelson "was the first and only name on

2  my list for Editor-in-Chief of Yahoo and I'm so happy we made this a reality!" [Ard

3  Declaration, ¶ 6, Exhibit B]  Mayer also hired Katie Couric and Savitt after meeting them at a

4  Fortune Most Powerful Women networking event. [Exh G Savitt Dep. 12:25-13:3] This

5  selection of candidates from a small pool of people is recognized to increase the risk of

6  intentional and implicit bias in hirings.

### 5.3.   KITTENPLAN STATED THE HOPE THAT YAHOO COULD FIND A WOMAN TO FILL THE AUTOS EIC POSITION

9  In late July 2014, Susan Kittenplan, the hiring manager for the Autos EIC position,

10  had a phone meeting with Anderson and Ard. During this call Kittenplan said, "You know,

11  **wouldn't it be great if we could get a female for this role**," quickly adding, "I know that

12  sounds bad." Ard then asked, "You mean like Danica Patrick?" to which she said, 'Oh,

13  Danica would be great.'" [Anderson 150-51:17-6] [Ard: 232-33:23:3] Thus Kittenplan, who

14  was actively recruiting for the new digital magazines, stated a hope that Yahoo "could get a

15  female" to fill this position. Such a statement shows an unacceptable gender orientation that

16  would naturally impact hiring decisions.

### 5.4.   WHEN ANDERSON AND ARD APPLIED FOR THE EIC POSITION KITTENPLAN IGNORED THEM

19  Because the Autos EIC position was not posted publicly, Anderson and Ard made

20  direct inquiries to Kittenplan and Savitt. Savitt initially set up a meeting in late March with

21  Anderson and the head of talent acquisition to discuss the job. Prior to the meeting taking

22  place Savitt canceled and a meeting was not rescheduled before the University of Michigan

23  offered Anderson the Fellowship. [Anderson Declaration ¶ 4]

24  Ard spoke by phone with Kittenplan about his interest in the position and emailed his

25  resume in December 2014. Kittenplan did not reply and never spoke further with Ard about

26  the position. [Exh B Ard Dep. 237:3-6]

27

28

### 5.5.  Carty Was Less Qualified Than Several Male Candidates Already At Yahoo, and Even Mayer Was Surprised to See that Savitt Had Hired a Woman As Autos EIC

Sharon Carty, who was chosen as Autos EIC, lacked the extensive leadership and automotive magazine experience of either Plaintiff Anderson or Ard. CEO Mayer, was surprised when presented with a woman to lead the Autos magazine, but then became convinced to approve the hiring. [Mayer Dep. 17:6-8]

Compared to Carty, who had never worked at a magazine, Anderson had a combined eight years of automotive magazine experience at Automobile Magazine, Robb Report, and Popular Mechanics. He had extensive automotive editorial experience at car buying website Edmunds.com and was the lead Yahoo Autos editor from 2010. He personally hired and managed the entire Autos editorial staff. [Anderson Declaration ¶ 5-6]

Although Yahoo says it wanted to hire a "talent magnet" to lead each magazine [Exh I Reses Dep. 144:16-20], this did not apply to the Autos magazine. The EIC only had three people reporting to her, and they were already in place because Anderson had recruited the entire team years before. Thus, Yahoo's justification for hiring Carty, with the more experienced Plaintiffs already in place, makes no sense.

### 5.6.  A Male Was Never Offered The Role As Autos EIC

Yahoo states in its Motion that the Autos EIC position was offered to a man. [Memo, 22:12]. This is unsupported by the facts. The documents produced by Defendant lack any offer letter, agreement, or "offer packet" for Mr. Alterman. Such an offer packet was provided for Carty leading up to her being offered the EIC position. [Exh N: 509]. Sharon Carty was seen as one of many in the "Option B" category [Exh N: 597] but was then offered the job as "an amazing diversity candidate" [Exh N: 519].

## 6.  DISCRIMINATORY TERMINATIONS AND HIRING PRACTICES RESULTED IN A SEA CHANGE IN GENDER COMPOSITION AMONG THE MEDIA ORG MANAGERS

### 6.1.  The Combination of QPR Manipulation and Selective Hirings Substantially Changed the Gender Composition in the Media Org

Yahoo states in its motion "the ratio of men to women senior managers over Savitt's

1   tenure remained largely the same." [Memo: 16:27-28] The only support for this assertion is a

2   reference to Exhibit A to the Fong Declaration, which contains three lists of employees in

3   Savitt's organization for January 15, 2014, December 31, 2014, and September 30, 2014.

4   An examination of Exhibit A reveals a <u>dramatic change in gender composition</u>. Anderson

5   was a Director (M5) and Ard was a Senior Director (M6). When Savitt took control of Media

6   in January of 2014, there were 26 employees at the level of director (M5) and above: 19

7   males and 7 females. By September of 2015, about one month before Savitt left Yahoo,

8   there were 35 media employees at M5 and higher: 17 men (a <u>decline of 11%),</u> and 18

9   women (an <u>increase of 157%</u>).

10       This same gender impact can be seen in Savitt's larger organization (Marketing,

11   Media and Customer Experience). In January 2014, Savitt's org had 1,318 employees, but

12   then shrank to 530 by September 2014, a decline of 60%. The decline was felt

13   disproportionately among the males in her organizations. Men at the level of M5 and above

14   declined from 64 to 36 (a 44% decrease), while females declined from 33 to 31 (a 6%

15   decrease). [Exh N: 3027-3139], Ard Declaration ¶ 7-9]

16         **6.2.  THE NEW MAGAZINE LEADERS WERE PREDOMINANTLY WOMEN**

17       An astounding 83% of the leaders of the new digital magazines were women. Fifteen

18   (15) of the eighteen (18) leaders of the digital magazines hired in 2014 through mid-2015

19   were females chosen for the position without public postings of the job availability. [Exh B

20   Ard Dep. Vol. II, 332:4-8]  All 22 of the candidates for the Health magazine were women.

21   [Exh N: 2624-2625] These hiring decisions cannot be explained other than other than by

22   intentional or implicit bias.

23       Three (3) males were hired to lead magazines under Savitt and Kittenplan: Brian

24   Raftery (Movies), Josh Wolk (Entertainment), and Joe Zee (Style). [Exh E Kittenplan Dep.

25   58-68.] It should be noted that David Pogue, the editor of Yahoo Tech, had been hired

26   before Savitt and Kittenplan took over Media responsibilities. [Ard Declaration ¶ 10]

27       On the other hand Savitt and Kittenplan hired or promoted fifteen (15) females to

28   lead the new magazines: Kristin Baldwin (TV), Laura Begley-Bloom (Travel, after Paula

1   Froelich), Katie Brown (DIY/Makers), Bobbi Brown (Beauty), Sharon Carty (Autos), Rebecca

2   Detken (Celebrity), Kerry Diamond (Food, after Sarah McColl), Garance Franke-Ruta

3   (Politics), Paula Froelich (Travel), Jennifer Karmon (Homes), Sarah McColl (Food), Kerrie

4   Mitchell (Movies after Brian Raftery), Lindsay Powers (Parenting), Michele Promaulayko

5   (Health), Lindsey Parker (Music). [Anderson Declaration ¶ 7; Exh E Kittenplan Dep. 58-68]

### 6.3.   WOMEN TOOK OVER ALL OF THE DUTIES OF ANDERSON AND ARD AFTER THEIR TERMINATIONS

8       Yahoo's motion claims that neither Anderson nor Ard were replaced by females.

9   [Memo 12:14 and 15:24-28] This is incorrect, and, when considering just the Autos

10   magazine, directly refuted by Savitt's testimony. "My assumption…was that we would find

11   an EIC for Autos, which would have meant he [Anderson] had to be terminated from that

12   role because his current role, I believe, was EIC of Autos…" [Savitt 138:18-22] In fact, all of

13   the duties handled by Anderson and Ard were assumed by various females. In early 2014,

14   Anderson led the Autos, Homes, Shopping, Small Business, and Travel verticals. In April,

15   Savitt hired Paula Froelich to take over Travel (and one of Anderson's direct reports, Greg

16   Keraghosian, who had previously edited Travel, began reporting to her). Susan Kittenplan

17   was then hired to find an Autos EIC and staff the "magazines," including the verticals over

18   which Anderson had previously been responsible for staffing. Anderson maintained

19   leadership of the remaining Commerce properties (Autos, Homes, and Small Business) until

20   he left for the Fellowship in September 2014. [Exh M: 548, 555]

21       At the time Savitt took over Media, Ard led the Yahoo homepage group and a team of

22   editors who worked on an AT&T/Yahoo partnership. He also managed Anderson, and by

23   extension his content areas, and represented Editorial with the Product Organization

24   division of Yahoo. The homepage, Ard's largest team, was taken over by new-hire Lauren

25   Johnston in July 2014. [Ard Declaration 11] After Ard was terminated in January 2015, his

26   (a) AT&T and Product duties were passed to Melissa O'Neill, (b) his Small Business and

27   Shopping duties were moved under Kittenplan, (c) his Homes property was passed to

28   Jennifer Karmon, and (d) Autos was taken over by Carty, hired about three months after

1  Ard's termination. [Ard Declaration 12]

2  **7.  YAHOO VIOLATED THE WARN ACTS THROUGH TERMINATIONS DISGUISED AS BEING FOR CAUSE**

3

4  Plaintiffs request two forms of relief for Yahoo's breach of the WARN Acts: (1) a

5  determination that they were mischaracterized as "for cause" terminations and denied the

6  benefits of the WARN Acts and (2) a declaration that Yahoo's practice of classifying

7  terminations under the WARN Act as being "for cause" is illegal and unenforceable.

8  **7.1.  THE CALIFORNIA UNFAIR COMPETITION LAW**

9  The California Business & Profession Code § 17200, et seq., (the Unfair Competition

10  Law or UCL) prohibits business practices consisting of "any unlawful, unfair or fraudulent

11  business act or practice and unfair, deceptive, untrue or misleading advertising..."  The

12  evidence shows that Yahoo's use of the QPR process constitutes both an "unfair" and an

13  "unlawful" practice under the UCL. Yahoo is responsible for its employee's violations

14  committed within the course and scope of their employment. United States v. Johnson (8th

15  Cir. 1976) 541 F.2d 710, 711-713. Plaintiffs have each been harmed by Yahoo's unfair and

16  unlawful practices, and each has standing to assert his claims. Bus. & Prof. Code § 17204;

17  Hernandez v. Atlantic Fund  Co. (1980) 105 Cal.App.3d 65, 71-73. Even if some underlying

18  statute does not provide for a private cause of action, a plaintiff may challenge an illegal

19  practice through the UCL. Smith v. Chase Mortgage Credit Group (E.D. Cal 2009) 653

20  F.Supp.2d 1035, 1044 ("section 17200 can form the basis for a private cause of action even

21  if the underlying statute does not.")

22  **7.1.1.  Yahoo's Use of the QPR Process to Reduce Headcount and Facilitate the Expression of Discriminatory Employment Actions Is an Unfair Business Practice**

23

24  The unfair prong of the UCL addresses business practices that are in some way

25  unfair, even if the practice is not otherwise illegal (unless it has been declared lawful). Cel-

26  Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163,

27  182. A violation of a company's internal policies can provide the bases for a finding of

28  unfairness. Smith v. Chase Mortgage Credit Group, supra. 653 F.Supp.2d at 1047-1048.

1  Yahoo's betrayal of the principles underlying the QPR process and its use to decimate its

2  workforce to achieve illegal objections, constitutes such an unfair practice.

### 7.1.2.   Yahoo's Use of the QPR Process to Reduce Headcount and Facilitate the Expression of Discriminatory Employment Actions Is an Unlawful Business Practice

5  The "unlawful" prong of the UCL borrows from federal and state laws and regulations

6  to determine the unlawfulness of challenged conduct. A violation of California FEHA states

7  an UCL violation. <u>Alch v. Superior Court</u> (2004) 122 Cal.App.4th 339, 401 (violation of FEHA

8  also violates the UCL). Similarly, a violation of the federal or California WARN Acts may

9  provide grounds for a UCL violation. See, <u>Chares J. Vacanti, M.D. Inc. v. State Comp. Ins.</u>

10  <u>Fund</u> (2001) 24 Cal.4th 800, 828 (federal Fair labor Standards Act); <u>Bureerong v. Uvawas</u>

11  (CD Cal 1996) 922 F.Supp. 1450, 1477 (Labor Code § 2675 and FLSA).

12  An illegal or unfair practice which gives the defendant a commercial advantage over

13  competitors can state a violation. In <u>Southwest Marine, Inc. v. Triple A Machine Shop</u> (ND

14  Cal 1989) 720 F.Supp. 805, 808, Judge Weigel found a cause of action where a competitor

15  obtained unfair advantage in bidding process by illegally disposing of chemical waste and

16  becoming more competitive because of the cost savings. These cases indicate that state

17  and federal WARN Acts may similarly be used to show that a business practice is unlawful.

### 7.2.   THE FEDERAL DECLARATORY RELIEF ACT PROVIDES PLAINTIFFS RELIEF

19  Plaintiffs also request relief under the federal Declaratory Relief Act (28 USC § 2201

20  and Fed. R. Civ. P. 57) Pursuant to 28 USC § 2201(a)the Court "may declare the rights and

21  other legal relations of any interested party seeking such declaration, whether or not further

22  relief is or could be sought." The controversy among the parties involves (a) whether or not

23  the QPR process has the intent or effect of disguising reductions in force as terminations for

24  cause, (b) whether that mischaracterization resulted in a violation of the California or federal

25  WARN Acts, and (c) the recovery available to Plaintiffs under the WARN Acts and Bus. &

26  Prof. Code § 17200.

27  These issues raise questions of public interest and employee welfare far beyond this

28  lawsuit. A declaratory judgment could provide guidance for other employers with similar

1  facially neutral management devices used to control headcount and subject to the biases,

2  intentional and implicit, of the decision makers.

3        Plaintiffs request that the Court declare that they are entitled to the 60 day notice and

4  pay benefits of the California and federal WARN Acts because they were fired not for cause,

5  but because their positions were eliminated. If Defendant is right that the Plaintiffs' positions

6  were not replaced, then they should have been classified as a reduction in force and

7  discharged with Yahoo's generous RIF packet. [Exh N: 2991]  Terminations under the QPR

8  system resulted from the arbitrary assignment of numbers which often bore little

9  resemblance to actual performance. These terminations should be included in the

10  headcount to trigger WARN Act protections. When the other employees so terminated within

11  the 30 or 90 day window of the state and federal acts are included in the calculations, it

12  appears that Yahoo has violated the WARN Acts without providing statutory notice and

13  severance benefits. Plaintiffs are entitled to disgorgement of the benefits due to them which

14  Yahoo wrongly withheld by mischaracterizing their terminations.

### 7.3.  THE QPR PROCESS PROVIDED UNFAIR AND ILLEGAL COVER FOR YAHOO'S DISGUISED REDUCTIONS IN FORCE

17        Not only was QPR used to target individual employees, and men in particular in

18  Savitt's organization, but it served a larger purpose for Mayer in keeping layoffs out of the

19  news, which provided a value by encouraging people to apply for jobs at Yahoo.

### 7.4.  YAHOO VIOLATED THE CALIFORNIA AND FEDERAL WARN ACTS

21        The federal and California WARN Acts require employers to provide advance written

22  notice at least 60 calendar days before any covered plant closing or mass layoff. The

23  federal WARN Act (29 U.S.C. § 2101 et seq.) and the California version of the WARN Act

24  (Labor Code §§ 1400 et seq.)

25        A WARN notice is required when a business with more than 100 full-time (at least 20

26  hours per week) workers is laying off more than 500 workers (not counting part-time

27  workers) at a single site of employment during a 90-day period; or lays off 50 or more

28  workers and these layoffs constitute 33% of the employer's total active workforce (not

1  counting part -time workers) at the single site of employment. They may be hourly and

2  salaried workers, including managerial and supervisory employees. All employees being let

3  go are counted in the number except that employees who are terminated "for cause" do not

4  need to be provided with a notice.

5      The California statute use somewhat different terminology. It applies to a "mass

6  layoff" of 50 or more full or part time employees within 30 days at a "covered establishment,"

7  which is defined as "any industrial or commercial facility or part thereof" that employs the

8  requisite number of persons. Layoff is defined to be "a separation from a position for lack of

9  funds or lack of work." Cal. Lab. Code § 1400(c).

10      Yahoo's manipulation of the WARN Acts indicate that it fired thousands of employees

11  to reduce costs, disguising these terminations as being for cause, when they were really to

12  cut costs and eliminate positions.

13      **8.  PLAINTIFFS SHOW GENDER DISCRIMINATION AND RETALIATION**
       **UNDER APPLICABLE LAW**

14

15      Plaintiffs were the targets of knowing gender discrimination by the increasingly

16  female-dominated management in the Media Organization ("disparate treatment"). They

17  were also victims of the QPR Process, which while neutral on its face, facilitated not only

18  intentional discrimination, but also the unfettered expression of implicit biases among the

19  female management ("disparate impact"). Whether or not the women making the

20  employment decisions realized what they were doing, their implicit biases resulted in a sea

21  change in the gender composition of the Media Org, reshaping it in their own image.

22      In addition, the events leading up to Ard's termination show that Yahoo retaliated

23  against him on account of his complaints about the arbitrary reductions on men's scores.

24      **8.1.  YAHOO'S BURDEN**

25      Defendant Yahoo bears a "heavy burden" to show the absence of triable issues of

26  fact. Ambat v. City and County of San Francisco (9th Cir. 2014) 757 F.3d 1017, 1031. To

27  prevail on summary judgment Yahoo must either (1) negate an essential element of each of

28  Plaintiffs' claims or (2) show that Plaintiffs cannot establish an essential element of their

1   claims. <u>Nissan Fire & Marine Ins. Co.</u> (9th Cir. 2000) 210 F.3d 1099, 1102. The motion must

2   be denied if "a fair-minded jury could return a verdict for [Plaintiffs] on the evidence

3   presented." <u>Anderson v. Liberty Lobby, Inc.</u> (1986) 477 U.S. 242, 252.

4       All inferences are drawn most favorably to Plaintiffs opposing the motion. <u>Tolan v.</u>

5   <u>Cotton</u> (2014) 572 U.S. ____, 134 S.Ct. 1861, 1863.  Plaintiffs' evidence is accepted as true

6   and disputes of facts are resolved in Plaintiffs' favor. When a Defendant employer's

7   explanation of events is shown to be false, it creates an inference of intentional

8   discrimination and that "the employer is dissembling to cover up a discriminatory motive."

9   <u>Reeves v. Sanderson Plumbing Products, Inc.</u> (2000) 530 U.S. 133, 147.

10                          **8.2.  DISPARATE TREATMENT**

11      Plaintiffs show disparate treatment based on their gender in violation of both the

12  California Fair Employment and Housing Act (Gov't Code § 12940(a)) and Title VII of the

13  Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) by the actions of Yahoo's management

14  in arbitrarily reducing men's scores while increasing those of women, motivated

15  substantially by considerations of gender, stating a desire to appoint a woman to the Autos

16  CEO position (traditionally held by males), filling positions by word of mouth instead of

17  public posting, using the QPR process to systematically pressure men and empower

18  women, and appointing women to the new digital magazines, such that within a year and a

19  half under Savitt women came to dominate the Media Org's management. Only intentional

20  discrimination can explain how an amazing 83% of the people holding leadership positions

21  in the new digital magazines were women.

22      Because direct evidence of discriminatory animus is rare, circumstantial evidence is

23  sufficient. <u>Cornwell v. Electra Central Credit Union</u> (9th Cir. 2006) 439 F.3d 1018, 1029-

24  1030. A defendant will often have "mixed motives" that include legitimate justifications. In

25  such situations, a defendant is guilty of discrimination if gender was a "motivating reason" in

26  Plaintiffs' terminations. Thus, Yahoo is liable if Plaintiffs' terminations were motivated by

27  gender bias, even if other factors were in play. <u>Watson v. Department of Rehabilitation</u>

28  (1989) 212 Cal.App. 3rd 1271, 1290.

It is impossible to explain the actions of Yahoo's female management other than in terms of differential treatment based on gender, reflecting both an intentional desire to assist women in positions of management and a deeper-seated implicit bias favoring women in positions of power.

### 8.3. DISPARATE IMPACT

The Court has evidence of gender-based discrimination without having to parse the motivations of the female management. The QPR process was an arguably gender-neutral process, but one always so subjective and lacking meaningful oversight, that judgmental biases and prejudices ran free. Thus, the QPR process in its actual operation, including how management applied it, was the device that permitted both violations of the WARN Acts and the expression of biases in employment decisions, both intentional and implicit.

Disparate impact is actionable under both FEHA and Title VII when a facially neutral employment practice in fact falls more harshly on members of a protected group more than it impact non-members of that group. Teamsters v. United States (1977) 431 U.S. 324, 335 n. 15; City and County of San Francisco v. Fair Employment and Housing Commission (1987) 191 Cal.App.3d 976, 985-987.

Plaintiffs also allege that the facially neutral QPR Process was used intentionally to discriminate, but alternatively it also operated to discriminate against men in the Media Org through "implicit" or "hidden bias" in the minds of the women assigning scores, reducing men's scores while increasing women's scores, and hiring females to fill the new digital magazine slots. See, Watson v. Ft. Worth Bank and Trust (1988) 487 U.S. 977, 989-991 (subjective assessments by supervisors permits finding of discrimination).

Plaintiffs show the disparate impact of Yahoo's hiring practices and use of the QPR process by the dramatic change in gender composition of managers in the Media Org. In addition, recruitment by "word of mouth" has been recognized as being subject to discriminatory impacts, because current management replicates itself by hiring only similarly situated employees. Antonio v. Wards Cove Packing Co., Inc. (9th Cir. 1993) 10 F.3d 1485, 1491, observed that it was "obvious" that practices like word-of-mouth recruiting "can cause

1    a discriminatory impact."; <u>Domingo v. New England Fish Co.</u> (9th Cir. 1984) 727 F.2d 1429,

2    1435- 36 (per curiam), modified, 742 F.2d 520 (9th Cir. 1984)).

### 8.4.  DISCRIMINATION IN RETALIATION FOR ADVOCATING FOR PERCEIVED DISCRIMINATION AGAINST OTHER MALES

Yahoo engaged in sex-based discrimination not only by reducing Plaintiff's scores and terminating them, but also by retaliating against Scott Ard because of his repeated attempts to address what he saw as the arbitrary lowering of men's QPR scores and the wrongful termination of men. It is itself a violation of FEHA and Title VII, for an employer to retaliate against an employee who advocates on behalf of others who he sincerely believes are themselves the target of discrimination. Yahoo's motion ignores this aspect of Plaintiffs' complaints.

In 2014 Plaintiffs Anderson and Ard complained about a female's QPR score that had been reduced dramatically by 48%. They received no negative push-back, and the appeal was successful. [Exh N: 2651] However, when Ard questioned why a man who he had given a 2.9 rating was being terminated, Higgins called his leadership into question and stated: "Kathy [Savitt] has not responded to our request to retain him" and that Kathy had "already expressed disinterest in retaining, so we need to plan to move forward with termination." [Exh N: 2647, 2819-2822]

On January 26, 2015 Ard asked HR about the ratings changes and why he had not been invited to a calibration session where such changes would normally be determined. [Exh N: 2662]. The HR rep immediately emailed Ard's supervisor Liberman, asking if she wanted to terminate him. [Exh N: 2671]

Liberman, who testified that she did not conduct a review of Ard because the decision had already been made to terminate, [Exh J Liberman Dep. 246:18-20, Exh N: 3375-76] replied to Fagerlund she had not made a decision and claimed that "there might be a place for him in the company, but he is just not working for me in this role." [id.] Liberman and Fagerlund notified Ard of his termination on January 30.

The acceleration and timing of Ard's termination, following on the heels of his

advocacy for three male employees, raises an inference of cause and effect. Despite numerous opportunities in depositions, Yahoo has never explained why it moved up Ard's termination and escorted him out the door the same day he received his first Occasionally Misses rating.  It appears that Ard's termination was accelerated to halt any further inquiry about why three men's scores were dropped below two women's scores. Yahoo illegally retaliated against Ard to silence his continued advocacy.

## 9.  PLAINTIFFS HAVE SHOWN A PRIMA FACIE CASES AND REBUTTED DEFENDANT'S PRETEXTUAL EXCUSES

### 9.1.  PLAINTIFFS HAVE SHOWN A PRIMA FACIE CASE

Under McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792 Plaintiffs each establish a prima facie case by showing (1) they are members of the protected class, (2) they were qualified for employment, (3) they were terminated, and (4) replaced with an employee not of their protected class. After this relative minimal showing, the burden shifts to Defendant to show some "legitimate, non-discriminatory reason for its actions." id. at 802; Mixon v. Fair Employment and Housing Comm'n (1987) 192 Cal.App.3d 1306, 1318.

Plaintiffs have shown their prima facie cases because  (1) they are men, (2) qualified for employment, (3) who were terminated, and (4) replaced with females. They also both applied for the position of Autos EIC, for which they were both highly qualified, and a female was hired instead, who was less qualified.

### 9.2.  PLAINTIFFS HAVE REBUTTED DEFENDANT'S EXCUSES

To the extent that Yahoo asserts legitimate and non-discriminatory reasons for its actions, then the burden shifts to Plaintiffs to show discrimination. St. Mary's Honor Center v. Hicks (1993) 509 U.S. 502, 506; Hersant v. Department of Social Services (1997) 57 Cal.App.4th 997, 1003. Plaintiffs may prevail on their burden by showing that the employer's stated reason was in fact a pretext for discrimination. Texas Department of Community Affairs v. Burdine (1981) 450 U.S. 248, 256; Mixon, supra., 192 Cal.App.3d at 1318-1319.

Pretext may be shown when (a) a discriminatory motive is more likely than not or (b) defendant's proffered reason is unworthy of credence. As discussed above, Yahoo's

1   innocent excuses based on QPR numbers do not explain the behind-the-scenes

2   shenanigans. Once Plaintiffs have shown that Yahoo's hiring and firing policies had a

3   disparate impact along gender lines, the burden shifts to Yahoo to show that its employment

4   decisions were all neutral and job-related. City and County of San Francisco v. Fair

5   Employment and Housing Commission (1987) 191 Cal.App.3d 976, 989. Under Plaintiffs'

6   FEHA claims Yahoo must also show that there are no less discriminatory alternatives to

7   achieve its legitimate interests. id. at 989-990.

8                              **10.  CONCLUSION**

9          Both Plaintiffs show that they were fully qualified for their current positions and to be

10   EIC of the Autos digital magazine. Their QPR scores were artificially set and manipulated,

11   and they were then terminated on the basis of those bogus scores. Other men also had

12   their scores arbitrarily lowered while women had theirs protected or increased. And

13   Plaintiffs' manufactured terminations occurred during a dramatic shift in the gender

14   composition of the Media Org. The Plaintiffs qualified for the EIC position but were turned

15   down in favor of a woman who was less qualified. The woman in charge of filling that

16   position had once stated that she hoped to find a women for the position.

17          Ard complained about the reduction of men's scores and was warned that his

18   advocacy could get him in trouble. When he continued to object to the arbitrary reduction of

19   men's score he was fired.

20          The QPR process provided cover for Yahoo to disguise layoffs as terminations for

21   cause. In doing so Yahoo denied thousands of employees their severance benefits and the

22   protections of the state and federal WARN Acts.

23          Dated: September 8, 2017              Jon R. Parsons Law Firm

24                                               /Jon R. Parsons/

25                                               _____
                                                 Jon R. Parsons
26                                               Attorney for Plaintiffs Gregory
                                                 Anderson and Scott Ard
27

28