UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT ARD,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>YAHOO! INC.,<br><br>　　　　　Defendant. | Case No. 16-cv-05635 NC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART YAHOO!'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 42 |
| GREGORY ANDERSON,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>YAHOO!, INC.,<br><br>　　　　　Defendant. | Case No. 16-cv-00527 NC<br><br><br>**TEMPORARILY UNDER SEAL** |

In this consolidated case, plaintiffs Gregory Anderson and Scott Ard allege their former employer Yahoo!, Inc. discriminated against them on the basis of their gender. Specifically, Anderson and Ard allege that the female upper level management lowered the scores given to them during their Quarterly Performance Reviews (QPR), and used those lowered scores as pretext to fire them. Anderson and Ard also allege that their treatment was part of a larger practice at Yahoo of firing males, ostensibly for performance reasons, when the purpose of these terminations was so that Yahoo would not be required to pay generous severance payments to employees.

Case Nos. 16-cv-05635 NC, 16-cv-00527 NC

United States District Court
Northern District of California

1      Much of the information in this motion is personal in nature, and the Court is

2   sensitive to labeling people "bad managers" or "unqualified." However, in bringing this

3   lawsuit, the plaintiffs brought their own qualifications and professional reputations into

4   issue, and made serious accusations of former Yahoo employees.

5      Yahoo moves for summary judgment as to the entire case. Plaintiffs oppose the

6   motion. The Court here considers the motion and evidence presented, and finds that

7   neither Anderson nor Ard raised a triable issue of material fact regarding the alleged

8   existence of gender-based discrimination in their terminations. Yahoo's motion for

9   summary judgment on these claims is GRANTED. The Court finds Ard raised a triable

10  issue of material fact as to his failure to obtain the Autos digital magazine Editor-in-Chief

11  (EIC) position under a disparate treatment theory. Anderson cannot bring a claim under

12  this theory because he failed to exhaust his administrative remedies with the Department of

13  Fair Employment and Housing (DFEH) and the Equal Employment Opportunity

14  Commission (EEOC).

15     The Court also GRANTS Yahoo's motion for summary judgment on plaintiffs'

16  disparate impact claims. Though Ard has standing to bring a disparate impact claim

17  regarding the QPR process, he presents insufficient proof to survive summary judgment.

18  Anderson lacks standing to bring a disparate impact claim regarding the QPR process for

19  failure to exhaust administrative remedies. Both plaintiffs likewise lack standing to bring a

20  disparate impact claim regarding Yahoo's hiring practices and the gender composition of

21  the Media Organization for failure to exhaust administrative remedies.

22     The Court GRANTS Yahoo's motion for summary judgment as to plaintiffs' state

23  law claims for termination in violation of public policy, under the Unfair Competition Law

24  (UCL), and for declaratory relief. Thus, the Court GRANTS IN PART and DENIES IN

25  PART Yahoo's motion.

26  **I.   BACKGROUND**

27      **A.   Yahoo's Quarterly Performance Review Process**

28      The Court usually begins its summary of the facts with a synopsis of the relevant

Case Nos. 16-cv-05635 NC, 16-cv-00527 NC      2

histories of the parties.  Here, however, the purposes of clarity are served by first describing Yahoo's QPR process, which was largely the basis for plaintiffs' terminations. The parties disagree as to the application of the QPR, but the facts of its basic history and nature are undisputed.  On July 17, 2012, Marissa Mayer became the CEO of Yahoo.  Dkt. No. 1[1] at 5.  In August 2012, Yahoo adopted and implemented the QPR, which required managers who directly supervised an employee each quarter to assign that employee a rating from 0.0 to 5.0 based on how that employee performed when compared to his or her peers.  *Id*.  These ratings are "Greatly Exceeds" (4.0-5.0), "Exceeds" (3.0-3.9), "Achieves" (2.0-2.9), "Occasionally Misses" (1.0-1.9), and "Misses" (0.0-0.9).  *Id*.  The plaintiffs refer to each of these numbers as "buckets," and so will the Court.

According to plaintiffs, "[e]ach quarter a specified percentage of each department's employee population would be assigned to each Bucket.  Managers were required to rank their employees so that a sufficient number of employees were assigned to each Bucket, even if all of the employees were performing well or at the same level."  *Id*.  Yahoo concedes that manager-assigned scores could be changed to account for expected percentages in buckets, but asserts that such changes were "not typical," and occurred when a manager assigned too many direct reports to a single bucket.  Dkt. No. 42 at 12.

The QPR process had a second step, "calibration," during which the scores given by managers could be modified up or down by upper-level management. Dkt. No. 1 at 6. Employees were never told their score, but were told which bucket they scored in.  *Id*. Plaintiffs contend that QPR scores were changed outside of the calibration sessions "through emails and phone calls by people who knew nothing about the employees being reviewed."  Dkt. No. 49 at 27.  Per plaintiffs, the scores should only have been changed during official calibration sessions, and changes in scores should have been discussed with an employee's manager.  *Id*.  With respect to Ard's direct supervisor, Megan Liberman, this never occurred.  *Id*.

---

[1] Except where otherwise noted, this order will refer to the docket in *Ard*, 16-cv-05635.

Yahoo's description of the QPR is more benign: "QPR was a method to identify the high performing players at Yahoo for promotion and to move out the low-performing players who did not meet the increasing performance requirements, as part of the broader mission to bring excellence into the company." Dkt. No. 42 at 11. Likewise, Yahoo characterizes the calibration sessions as having the purpose of comparing employees against other employees in the same organization and making sure that a given score meant the same level of performance across all managers. *Id*. Managers were required to defend the scores given to their subordinates during calibration, and upper-level management might change an employee's score. *Id*. at 11-12. The reasons for changing those scores are at issue. If a manager assigned too many or too few direct reports to a bucket, management could change scores to account for expected percentages in each bucket. *Id*. at 12. Lastly, each Yahoo organization had a member of Human Resources (HR) run the QPR process, attend calibration sessions, and "ensure that sessions were fair, effective, and not based on illegitimate criteria." *Id*. at 12.

In fall 2014, Yahoo began concentrating on the company's lowest performing employees. Day Dep. at 88 (Dkt. No. 43-14). This new focus was a product of Yahoo's introduction of the "serial skimmers list" and the "bottom 5% list," which both indicated Yahoo's lowest performing employees. *Id*. at 89. Plaintiffs deposed the former Vice President of HR for Yahoo, Mini Khroad, who helped administer the QPR. Khroad Dep. at 22 (Dkt. No. 43-7). Khroad testified that in Q4 2014, people managers receiving QPR score of 2.5 and below were asked to leave Yahoo. *Id*. at 51. This guideline was reflected in the "skimmers list" or "serial skimmers list." *Id*. at 52. A "skimmer" was a people manager receiving QPR scores of 2.5 and below. *Id*. at 52-53.

In the spring of 2014, Yahoo created a "bad/low managers list," which was "a spreadsheet of managers who have QPR ratings at or below the 2.5 rating among other . . . assessments of being a people manager based on surveys that we've completed at the company." *Id*. at 122. Having a QPR score of 2.5 or less was the main factor in categorizing a manager as a "bad manager." However, Yahoo Employee Engagement

1    Surveys (Employee Surveys) were also considered.  *Id.*

2        If a manager was categorized as poorly performing, there were three ways the

3    situation could be dealt with.  *Id.* at 81-82.  The default response was to terminate, the

4    second was to convert the manager into an individual contributor, and the third was to

5    leave the manager in his or her position.  *Id.*  The second and third options required an

6    exception from HR, which according to Khroad, were rare.  *Id.*  An individual contributor

7    is a Yahoo employee, but not a people manager.  *Id.* at 83.

8        **B.    Greg Anderson**

9        Anderson was hired by Yahoo in November 2010 as an at-will employee.  Dkt. No.

10   1 at 3 (Anderson Compl.).  On June 11, 2012, Anderson was promoted to the position of

11   Editorial Director of Yahoo's Autos, Homes, Shopping, Small Business, and Travel

12   verticals.  *Id.*  The order of seniority above Anderson was (1) Ard, (2) Liberman, (3) Kathy

13   Savitt, the Chief Marketing Officer and Head of Global Media, and (4) Marissa Mayer, the

14   CEO of Yahoo.  *See id.* at 4, *see* Ard Compl. at 10.  Anderson received the following QPR

15   scores: Q1 2013 – 2.0, Q2 2013 – 2.0, Q3 2013 – 1.6, Q4 2013 – 2.0, Q1 2014 – 2.2, and

16   Q2 2014 – 2.5.  Dkt. No. 42 at 13.  Anderson does not argue Ard discriminated against him

17   in assigning scores.  *Id.* (citing Anderson Dep. at 139-40 (Dkt. No. 43-1)).  Anderson was

18   placed on the poorly performing managers list in spring 2014.  Dkt. No. 43-10 at 29.

19       On March, 26, 2014, Anderson emailed Savitt to suggest himself as EIC for the new

20   and upcoming Yahoo Autos digital magazine.  Dkt. No. 49-12 at 2 (Anderson Decl.).  A

21   meeting to discuss Anderson's candidacy for the position was cancelled in April 2014, and

22   was not rescheduled.  *Id.*  In May 2014, Anderson was selected to attend a journalism

23   fellowship at the University of Michigan as a representative of Yahoo.  Dkt. No. 1 at 4

24   (Anderson Compl.).  Anderson received approval to attend this fellowship from Savitt and

25   Yahoo's Chief Development Officer, Jacqueline Reses.  *Id.*  Anderson was terminated

26   while attending the fellowship on November 10, 2014.  *Id.*  Per Anderson, Liberman told

27   him that his QPR scores were the basis of his termination.  *Id.*  Liberman informed

28   Anderson that he was in the lowest 5% of Yahoo employees in performance, and that other

1    employees performing at the same level were being terminated.  *Id.*  Anderson allegedly

2    "requested documentation of these numbers and copies of his peer reviews to rule out

3    some mistake," but no such information was provided.  *Id.*

4        **C.    Scott Ard**

5            Ard was hired by Yahoo as an at-will employee in September 2011 as Senior

6    Director, Editorial of the Yahoo homepage.  Dkt. No. 1 at 2, 3 (Ard Compl.); Dkt. No. 43-

7    6 at 19.  Before Savitt and Liberman took over the Media Organization, Ard received

8    performance ratings of "Exceeds" or "Greatly Exceeds" in 5 out of 7 quarters.  *Id.* at 3.

9    Ard reported directly to Liberman.  *Id.*  While Anderson was on leave, Ard filled in for

10   Anderson's Autos duties.  Ard Dep. at 92 (Dkt. No. 43-5).  Ard testified that he is "quite

11   certain" he submitted his resume to Susan Kittenplan, who was in charge of hiring the EIC

12   for the Autos digital magazine so he could apply for the position.  *Id.* at 237.  Ard never

13   heard back.  *Id.*  On January 30, 2015, Liberman informed Ard that he was being

14   terminated for performance reasons, effective that date.  *Id.* at 4.  According to Ard, he was

15   not allowed to view his QPR or appeal the decision.  *Id.*  Melissa O'Neal took over Ard's

16   duties after his termination.  Liberman Dep. at 309 (Dkt. No. 43-18).

17       **D.    Procedural History**

18           Plaintiffs filed timely administrative complaints with the DFEH and EEOC alleging

19   gender discrimination and retaliation against Yahoo before filing suit.  Dkt. No. 1 at 9;

20   Dkt. No. 58-1.  Plaintiffs received Right to Sue Notices from both entities, and timely

21   sued.  *Id.*  Only Scott Ard discussed his failure to obtain the Autos EIC position in his

22   administrative complaint.  *Compare* Dkt. Nos. 58-1 at 12 *with* 58-1 at 2.

23           Anderson and Ard filed their cases in federal court on February 1, 2016, and

24   October 4, 2016, respectively.    Plaintiffs allege: (1) gender-based discrimination in

25   violation of the California Fair Employment and Housing Act, Cal. Govt. Code §

26   12940(a); (2) gender-based discrimination in violation of Title VII of the Civil Rights Act,

27   42 U.S.C. § 2000e-2(a); (3) termination in violation of public policy; (4) violation of the

28   UCL, Cal. Bus. & Prof. Code § 17200; and (5) declaratory relief.  Dkt. No. 1.  This case

     Case Nos. 16-cv-05635 NC, 16-cv-00527 NC      6

1    was consolidated on October 31, 2016.  Dkt. No. 7.  All parties consented to the

2    jurisdiction of a magistrate judge under 28 U.S.C. § 636(c).  Dkt. No. 7 at 3.

3    **II.    LEGAL STANDARD**

4          Summary judgment may be granted only when, drawing all inferences and

5    resolving all doubts in favor of the nonmoving party, there is no genuine dispute as to any

6    material fact.  Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014);

7    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under

8    governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty*

9    *Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the

10   evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

11   Bald assertions that genuine issues of material fact exist are insufficient.  *Galen v. Cnty. of*

12   *L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

13         The moving party bears the burden of identifying those portions of the pleadings,

14   discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.

15   *Celotex*, 477 U.S. at 323.  Once the moving party meets its initial burden, the nonmoving

16   party must go beyond the pleadings, and, by its own affidavits or discovery, set forth

17   specific facts showing that a genuine issue of fact exists for trial.  Fed. R. Civ. P. 56(c);

18   *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v.*

19   *Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)).  All justifiable inferences, however,

20   must be drawn in the light most favorable to the nonmoving party.  *Tolan*, 134 S. Ct. at

21   1863 (citing *Liberty Lobby*, 477 U.S. at 255).

22   **III.   DISCUSSION**

23         The Court first addresses plaintiffs' gender discrimination claims under federal law

24   because Title VII and California's FEHA "operate under the same guiding principles."

25   *Anderson v. City & Cty. of San Francisco*, 169 F. Supp. 3d 995, 1015 (N.D. Cal. 2016)

26   (citations omitted).  The Court will then consider the claims under the federal WARN Act

27   and the Cal-WARN Act.  Then, the Court will consider the claims for termination in

28   violation of public policy, the UCL, and for declaratory relief.

United States District Court
Northern District of California

### A.    Disparate Treatment

Plaintiffs establishing a prima facie case of disparate treatment must "offer evidence that 'give[s] rise to an inference of unlawful discrimination,' either through the framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (citing 411 U.S. 792 (1973)).

Except where otherwise noted, there is no direct evidence of discrimination in this case, so plaintiffs rely on the *McDonnell Douglas* burden shifting framework to oppose Yahoo's motion. *See Anderson*, 169 F. Supp. 3d at 1015. To establish a prima facie case of gender-based discrimination based on circumstantial evidence, the plaintiff must show that: "(1) the plaintiff belongs to a protected class, (2) he was performing according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 691 (9th Cir. 2017) (citing *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010), *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) and *McDonnell Douglas*, 411 U.S. at 802). Under *McDonnell Douglas*, if the plaintiff establishes his or her prima facie case, "the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action." *Reynaga*, 847 F.3d at 691 (citing *Hawn*, 615 F.3d at 1155).

"If the defendant meets this burden, then the plaintiff 'must then raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere pretext for unlawful discrimination.'" *Reynaga*, 847 F.3d at 691 (quoting *Hawn*, 615 F.3d at 1155). A plaintiff may establish pretext directly or indirectly. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112-13 (9th Cir. 2011). Direct evidence is evidence that shows "unlawful discrimination more likely than not motivated the employer." *Id.* Indirect evidence is evidence that shows "the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Id.* at 1113.

"[A] plaintiff's burden to raise a triable issue of pretext is hardly an onerous one." *Id.* (internal citations and quotation marks omitted). However, such evidence must be specific and substantial. *Dep't of Fair Employment & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 746 (9th Cir. 2011). "'An employee in this situation can not simply show the employer's decision was wrong, mistaken, or unwise.' 'Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for the . . . non-discriminatory reasons.'" *Id.* at 746 (internal citation omitted) (quoting *Morgan v. Regents of the Univ. of Cal.*, 88 Cal. App. 4th 52, 75 (2000)).

### 1. Greg Anderson

#### a. Anderson Has Not Raised A Triable Issue of Material Fact to Suggest That the Decision to Terminate Him Was Animated By Gender-Based Discrimination.

The Court begins by considering Anderson's termination. Yahoo argues Anderson was terminated because of his poor performance, not because he is a man. As a result, Yahoo argues, Anderson cannot establish a prima facie case. Dkt. No. 42 at 25.

##### i. Prima Facie Case & Legitimate Non-Discriminatory Reason

Anderson's prima facie case is that (1) as a man he belongs to a protected class, (2) he was performing according to Yahoo's legitimate expectations, (3) he was fired, and (4) he was replaced by a woman. *See Reynaga*, 847 F.3d at 691. Yahoo does not dispute that Anderson is a member of a protected class or that he was fired. Yahoo disputes that Anderson was qualified and that he was replaced by a woman.

Here, the first and second steps of the *McDonnell Douglas* burden-shifting test meld because Yahoo's legitimate, non-discriminatory reason for firing Anderson was that he performed poorly. Yahoo uses the same evidence in attacking Anderson's prima facie case as it does in establishing its reason for firing him.

Yahoo proffers the following to support its contention that Anderson was a poor manager, and thus unqualified: (1) Anderson's 2013 and 2014 QPR scores, and (2) the

1   results of Anderson's Employee Surveys, in which direct report subordinates rated

2   Anderson's managerial performance.[2]  Dkt. No. 42 at 13-14.  Per Yahoo, Anderson's QPR

3   scores and Employee Survey results were the bases for putting him on the "bad manager

4   list," the placement in which put him at risk of termination.  *See id.* at 17.  Anderson's

5   QPR scores were also the basis for placing him on the skimmers list and bottom 5% list.

6   Anderson does not dispute that he received the following QPR scores: Q1 2013: 2.0, Q2

7   2013: 2.0, Q3 2013: 1.6, Q4 2013: 2.0, Q1 2014: 2.2, and Q2 2014: 2.5.  *Id.* at 13, *see also*

8   Brotherton Decl. at ¶ 5 (Dkt. No. 45).  None of Anderson's managers gave him an

9   "Exceeds" rating.  *Id*.

10         As to the Employee Surveys,[3] the Court considers Anderson's 2012 and 2013

11   scores, which Yahoo maintains were significantly below the average for other Yahoo

12   managers.  As relevant to Anderson's "manager effectiveness," at the end of 2012, 22% of

13   his direct reports agreed with the following statements: "My manager does a great job at

14   people management," "My manager does a great job of managing the work," and "My

15   manager is an outstanding leader."  Dkt. No. 41-3 at 10 (filed under seal)[4].  In comparison,

16   
17   [2] Most questions on the Surveys had nothing to do with manager performance.  The Court
    will only reference those questions pertinent to Anderson's performance as a manager.
18   [3] There is a dispute as to whether the Employee Surveys were used in deciding to terminate
    an employee.  Mini Khroad, Yahoo's Rule 30(b)(6) witness testified that the Employee
19   Surveys were taken into account in creating the "bad managers list."  Khroad Dep. at 122.
    Other Yahoo employees testified the Employee Surveys were taken into account when
20   creating the bad managers list.  Day Dep. at 72; Reses Dep. at 114-15 (Dkt. No. 43-15).
    Artimiss Fagerlund, who worked in HR, could not recall if the Employee Surveys were
21   used in generating the bad managers list.  Fagerlund Dep. at 62 (Dkt. No. 43-20).  Valree
    Hill, who also worked in HR testified that she could not recall if the Employee Surveys
22   were used to identify underperforming managers.  Hill Dep. at 31 (Dkt. No. 43-12).  Three
    employees explicitly remembered that Employee Surveys were used in creating the "bad
23   managers list," while two employees do not remember if they were used.  No employee
    stated that they were *not* used, contrary to plaintiffs' argument.  Dkt. No. 49 at 15.  The
24   Court will not assume this was the case.  Lastly, for a report to be generated out of the
    Surveys, at least five direct reports needed to respond.  Khroad Dep. at 125.  In 2012,
25   Anderson had 6 direct reports, and in 2013 he had 8 direct reports.  All of his direct reports
    responded to the Employee Surveys both years.  Thus, the Court accepts that the Employee
26   Surveys were used as a factor in deciding whether to terminate managers.
    [4] Several of the documents cited to in this order were filed under seal by Yahoo or
27   plaintiffs.  The documents discuss either the QPR process or Yahoo's hiring practices.  For
    that reason, the Court has filed this order under seal.  However, the Court will only keep
28   this order under seal for seven days, until November 14, 2017.  By that time, the parties
    must file with the Court any objections to unsealing this order.

manager effectiveness for Yahoo managers on average was 64%. *Id.* Anderson's direct reports' reviews of his "Feedback and Accountability" were more mixed. *Id.* at 11. As for Anderson's 2013 Employee Surveys, Anderson's "manager effectiveness" scores markedly improved (43% positive) compared to the previous year (22% positive). Dkt. No. 41-6 at 3, 10 (filed under seal). However, Anderson's scores were still significantly below the average positive score of 66% for Yahoo overall. *Id.*

Even Ard expressed criticisms of Anderson's performance as a manager, and because of his lack of interest in some of the subjects under his jurisdiction at Yahoo. Dkt. No. 43-6 at 16 (May 9, 2014 email from Ard to Scott Day). Liberman testified that Robert Barrett told her when she took over Anderson and Ard's department that Anderson was "a very poor manager." Liberman Dep. at 123. Anderson has repeatedly cited email exchanges between Liberman and Scott Day, in which Liberman states that it would "be a disaster for us on autos if we let [Anderson] go now." Dkt. No. 43-19 at 28-29 (April 14-15, 2014, emails between Liberman, Day, and Higgins). However, the plain text of that email shows that the "disaster" dealt with the financial cost to the company of terminating him, not because of his merit as a manager. *Id.*

In September 2014, Anderson took a leave of absence to attend a fellowship, and during that time, Ard added Anderson's day-to-day duties to his own. Dkt. No. 42 at 19, Ard Dep. at 92. During Anderson's absence, he was designated as a "serial skimmer," or someone who hovers at the low end of "Achieves." *Id.* at 19. At the same time, Yahoo created a "bottom 5%" list of employees documenting who received the lowest 5% of QPR scores over the prior four quarters. *Id.* at 19-20. Anderson was on that list. *See* Savitt Dep. at 121. Liberman terminated Anderson on November 10, 2014. Dkt. No. 49 at 16.

There is a question regarding who ordered Anderson's termination. Savitt denied doing so, and stated that "HR" would have done so. *Id.* at 55. Reses, the head of HR stated that she did not know who made the decision to terminate Anderson based on performance. Reses Dep. at 116. Per Savitt, Anderson was on the bottom 5% list, and according to "policy," he would be terminated for that reason. Savitt Dep. at 87. Plaintiffs

argue that the fact that no one knows who gave the order to terminate Anderson "shows a consciousness of guilt" as to Anderson having been terminated because he was a man. Dkt. No. 49 at 17.  This statement is wholly unsupported by evidence.  Liberman terminated Anderson.  Liberman testified she received an email from Artimiss Fagerlund in HR, which told her the employees she needed to set up calls with to terminate based on the bottom 5% list.  Liberman Dep. at 95.  The email Liberman refers to appears in the exhibits to the deposition of Khroad.  Dkt. No. 43-9 at 8-9 (November 4, 2014, email from Fagerlund to Liberman notifying Liberman that she is to terminate Anderson).  Yahoo met its burden in showing that it had "a legitimate, non-discriminatory reason for" firing Anderson: his poor managerial performance.  *Reynaga*, 847 F.3d at 691.

Before turning to the issue of pretext, the Court addresses Anderson's argument that he was replaced by a woman.  Anderson argues that he was replaced by Sharon Carty, the EIC of Autos digital magazine.  Dkt. No. 49 at 14.  The Court disagrees.  When Anderson went on leave, Ard took over his duties.  Ard Dep. at 90-92.  The Court found no evidence that Ard transferred the Autos position to another employee before being terminated himself.  Anderson nonetheless argues that his position was taken over by Sharon Carty who was to run the Autos *digital magazine*, which was not yet in existence.  This argument makes little sense given the fact that Anderson applied to become the EIC of the magazine.  One does not apply to a position one already has.

Anderson has not stated a prima facie case for disparate treatment and Yahoo has proffered evidence that it had a legitimate non-discriminatory reason for terminating Greg Anderson.  Nonetheless, the Court will consider Anderson's arguments regarding pretext.

### ii.    Pretext

The burden falls upon Anderson to show that Yahoo's proffer of evidence is mere pretext for discriminating against him.  *See id*.  Anderson's argument has a couple of parts.  First, Anderson argues that his QPR scores had been "artificially deflated," and that he was only on the bottom 5% list because his Q1 2014 score had been lowered and he was not given a Q3 2014 score.  Dkt. No. 49 at 13.  As to the reduction in Anderson's Q1 2014

QPR score, Anderson argues Liberman "arbitrarily reduced" his score from 2.5 to 2.2 because he is a man.  Dkt. No. 49 at 14.  However, by the time of the April 14, 2014, email in which Liberman discussed with Valerie Higgins reducing Anderson's scores, Liberman had already spoken to Robert Barrett, who had told her Anderson was a poor manager, Ard said Andeson had "management problems," and Anderson was on the bad managers list.  Liberman Dep. at 123-24.  Liberman wrote in the April 14 email that she was not comfortable making any argument for keeping him as an employee *at all* except that Yahoo needed him until the Autos digital magazine was started.  Dkt. No. 49-19 at 3.  With respect to the same email, Valerie Higgins wrote that: "I think if you don't want to keep him, we should not put him at a 2.5.  I think you can challenge Scott [Ard] on that and push back a little—he didn't sound 100% confident in the capabilities either, admitted to not being able to speak much to his performance and wasn't set on 2.5 either."  *Id.*  All of the concerns expressed in the decision to reduce Anderson's QPR score for the first quarter of 2014 were performance-based.  There is no evidence suggesting this score change was pretext for discriminating against Anderson because he is a man.

Yahoo demonstrated that even if Anderson's score had not been changed in Q1 2014, he still would have been in the serial skimmers list because his average QPR score would have been 2.33, below the 2.5 minimum for people managers.  Dkt. No. 42 at 27.  Anderson also argues his Q3 2014 QPR score was wrongly withheld by Liberman because he worked for two of the three months of that quarter, which entitled him to a score.  Dkt. No. 49 at 14.  It appears that Anderson should have been given a QPR score for the third quarter of 2014.  Khroad Dep. at 69.  Liberman states that she understood that Anderson did not receive a QPR score for that quarter because he was on leave.  Liberman Dep. at 342.  The Court finds that Anderson presented evidence that the failure to assign Anderson a QPR score in Q3 2014 was in error.  The issue, then, is whether this failure is evidence of pretext.  The Court does not find that it is.  At most, the failure to provide Anderson with a QPR score that quarter was a mistake caused by the fact that Anderson was gone for a month during the quarter and would be gone for eight months.  *Lucent Techs.*, 642 F.3d at

United States District Court
Northern District of California

1   746. The Court does not find that confusion regarding whether Anderson was entitled to a

2   score demonstrates "weaknesses, implausibilities, inconsistencies, incoherencies, or

3   contradictions" in Yahoo's proffered reasons for terminating Anderson. *Id.*

4   Also, there was no testimony about what Anderson's score would have been in Q3

5   2014, had he been given a score. Ard, who was deposed on this topic, gave no feedback

6   about Anderson's performance during Q3 2014. Ard could not recall whether he gave

7   Anderson a Q3 2014 QPR score and said nothing about Anderson's performance despite

8   being the person who would best be able to speak to Anderson's performance during that

9   time. Ard Dep. at 284. However, Ard did state that he would have given Anderson a QPR

10   score if he had been able to, though he does not remember whether he provided a number.

11   *Id.* Anderson's apparent conclusion for why he was denied a Q3 2014 score was that it

12   facilitated placing him in the bottom 5% score. *See* Dkt. No. 49 at 15. Anderson has not

13   shown that the failure to allow for a score to be given to him was an excuse to fire him, nor

14   has Anderson demonstrated that his performance would have improved that quarter such

15   that he would have been removed from the bottom 5% list.

16   Anderson also argues pretext because of an email Savitt wrote in which she said he

17   would have to go "regardless." Dkt. No. 49 at 13. Anderson does not provide evidence

18   regarding the context of this email. Savitt discussed the basis for the statement in the

19   email, stating that regardless of Anderson being selected for a journalism fellowship, he

20   needed to be terminated eventually from the position of running the Autos vertical. Savitt

21   Dep. at 79. Savitt stated that Anderson would not be able to stay as the head of Autos

22   because "he did not have the right skill set," and he would not be the future EIC of the

23   Autos magazine. *Id*. at 79-80. Rather than supporting Anderson's pretext argument, this

24   fact actually undermines it because it shows that the Yahoo upper-management had

25   planned to terminate Anderson months before his actual termination.

26   Lastly, Anderson argues that his termination was "unusual" because it was

27   "delayed" after the decision was made to terminate him. Dkt. No. 49 at 13. Yet Anderson

28   does not explain how this supports his claim for gender-based discrimination. If anything,

1   Yahoo's keeping Anderson on for months after it had planned to fire him for performance

2   reasons undermines his position that the Yahoo upper-level management discriminated

3   against him.

4       Anderson has not provided any evidence that his termination had *anything* to do

5   with his gender other than his feelings that he was being discriminated against.  While "a

6   plaintiff's burden to raise a triable issue of pretext is hardly an onerous one," *Earl*, 658

7   F.3d at 1112-13, such evidence must still be specific and substantial.  *Lucent Techs*, 642

8   F.3d at 746.  Anderson's purported evidence is neither specific nor substantial.  The Court

9   GRANTS Yahoo's motion for summary judgment as to Anderson's Title VII and FEHA

10   disparate treatment claim based on his termination.

11          **b.**   **Anderson May Not Bring A Discrimination Claim Regarding Not**

12                 **Obtaining the Autos Digital Magazine Editor-in-Chief Position**
                    **Because He Did Not Exhaust His Administrative Remedies.**

13       In examining the operative complaints of plaintiffs, the Court found that neither

14   plaintiff alleged facts regarding their being overlooked for the Autos digital magazine EIC

15   position.  This led to the Court's concern that the plaintiffs may lack standing because they

16   must exhaust administrative remedies before filing suit.

17       A plaintiff must exhaust his or her administrative remedies before filing a

18   discrimination case in federal court.  *Rodriguez v. Airborne Express*, 265 F.3d 890, 896

19   (9th Cir. 2001).  "To properly exhaust these claims, a claimant must first file the charge

20   with either the EEOC (enforcing Title VII) or the DFEH (enforcing FEHA).  A claimant

21   must file a charge with the EEOC *within 180 days* of the alleged violation, 42 U.S.C. §

22   2000e–5(e)(1), or else with the DFEH *within one year* of the alleged unlawful conduct,

23   Cal. Gov't Code § 12960(d)."  *Dornell v. City of San Mateo*, 19 F. Supp. 3d 900, 905 (N.D.

24   Cal. 2013) (emphasis in original).  Here, Anderson received Right to Sue letters from both

25   the DFEH and EEOC.  Dkt. No. 58-1 at 5-6, 8-9.  Anderson's administrative complaint,

26   which apparently was submitted to both the DFEH and EEOC based on the caption on the

27   complaint provides as follows:

28          1. I, Gregory   Anderson,   allege   that   I   was   subjected   to

1   Discrimination by respondent, Yahoo, Inc. due to one or more
    Fair Employment and Housing Act protected bases: Age - 40
2   and over, Sex- Gender.

3   2. I was Denied a work environment free of discrimination
    and/or retaliation, Terminated.  The most recent harm occurred
4   on or around November 10, 2014.

5   3. My belief is based on the following: I. On November 10,
    2014, I was subjected to a negative quarterly performance
6   review and terminated while in the position as Editorial Director
    earning approximately $150,000.00 annually. I was hired on
7   November 2010. II. Megan Liberman, Vice President told me I
    was being terminated because I was in the bottom 5% of the
8   company.  III.  I believe I was terminated on the basis of my age
    [40] and sex [Male] and in retaliation for taking leave.  My
9   beliefs are based on the following: A. From August 2014 to May
    2015, I was approved for an extended sabbatical leave. B. On
10  November 10, 2014, I [sic] Subjected to a negative quarterly
    performance review and terminated because of my age [40] and
11  sex [Male] although non male and younger employee are not
    terminated for similar reasons.

12  *Id.* at 2.  Based on the plain language of Anderson's administrative complaint, he never

13  mentioned the EIC position, Sharon Carty (the eventual EIC of the magazine), or Susan

14  Kittenplan, who allegedly made discriminatory statements.  Thus, in deciding whether the

15  Court has jurisdiction over Anderson's claim, the Court must decide if this claim of

16  gender-based discrimination is "'like or reasonably related to' the allegations made before

17  the EEOC, as well as charges that are within the scope of an EEOC investigation that

18  reasonably could be expected to grow out of the allegations."  *Leong v. Potter*, 347 F.3d

19  1117, 1122 (9th Cir. 2003) (citing *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990)).

20      The Court finds that based on a plain reading of Anderson's administrative

21  complaint, his allegations regarding his discriminatory termination are *not* "like or

22  reasonably related to" his claim that he was overlooked for the EIC position.  One action

23  has to do with the termination of his job, and the other with his application for a position

24  he did not already have.  While the common factor in both of these claims is Savitt who

25  was his superior three levels up, and one of the decision-makers in hiring the new EIC, his

26  administrative complaint was devoted to his termination and alleged retaliation for taking a

27  leave.  Anderson may not bring a claim based on his not obtaining the EIC position.  Thus,

28  the Court also GRANTS Yahoo's motion for summary judgment as to Anderson's

United States District Court
Northern District of California

1    disparate treatment claim on this issue.

2         **2.    Scott Ard**

3              **a.    Ard Has Not Raised A Triable Issue of Material Fact Suggesting
                      That the Decision to Terminate Him Was Animated By Gender-
4                      Based Discrimination.**

5         Yahoo argues that it terminated Scott Ard in January 2015 because it determined

6    that Ard was not adding sufficient value to the company.  Dkt. No. 42 at 23.  Yahoo further

7    argues that Ard was not replaced; rather, Melissa O'Neal, one of Ard's subordinates, took

8    over his duties after Ard was terminated.  *Id*.

9              **i.    Prima Facie Case & Legitimate Non-Discriminatory Reason**

10        Ard's prima facie case is that (1) as a male he belongs to a protected class, (2) he

11   was performing according to Yahoo's legitimate expectations, (3) he was fired, and (4) he

12   was replaced by a woman.  *Reynaga*, 847 F.3d at 691.

13        Yahoo disputes Ard's gender-based discrimination claim in the same way it

14   disputed Anderson's claim.  Yahoo argues that Ard was not performing up to its

15   expectations, and it also argues that Ard was not replaced by a woman.  The question of

16   whether Ard performed up to Yahoo's expectations and whether Yahoo had a legitimate

17   non-discriminatory reason for terminating Ard is melded here as it was in the case of

18   Anderson.  The Court considers these issues together.

19        Liberman became Ard's manager in early 2014.  Liberman Dep. at 33.  Liberman

20   was based in New York, while Ard was in Sunnyvale.  *Id*. at 43-44.  According to

21   Liberman, she was told by Savitt that Ard was a "poor performer" and did not understand

22   her desires for the Yahoo homepage.  *Id*. at 45.  Liberman removed Ard from running the

23   editorial on Yahoo's homepage in July 2014, and replaced him with a woman.  *Id*. at 51.

24   Per Liberman, Johnston was not just hired to run Yahoo's homepage, but also to "build a

25   breaking news team and protocol" to generate original content.  *Id*. at 51.

26        Ard received the following QPR scores: Q3 2013: 2.8; Q4 2013: 3.1, Q1 2014: 2,

27   Q2 2014: 2.7, and Q3 2014: 2.2.  Dkt. No. 41-10, 41-11 (filed under seal).  Ard's 2014

28   year-to-date average QPR score was 2.3, but his rolling four quarter average was 2.5.  As

     Case Nos. 16-cv-05635 NC, 16-cv-00527 NC       17

United States District Court
Northern District of California

to Liberman's own observations, she found Ard "sometimes resistant" to feedback and "defensive." Liberman Dep. at 46. Liberman testified that when she questioned him about what he was doing, he was not forthcoming about what he specifically was doing on a group project versus what the group was doing as a whole. *Id.* at 210-14. Ard received an "Occasionally Misses" QPR score for Q4 2014. Ard Dep. at 11.

Ard was informed by Liberman that he received this score on January 30, 2015, the date of his termination. *Id.* Liberman was dissatisfied with his performance and did not know what value he was adding to the company. Dkt. No. 42 at 23. Savitt reaffirmed that Liberman did not feel that Ard's skillset was needed based on the direction the company was taking. Savitt Dep. at 140.

Liberman does not remember terminating Ard. Liberman Dep. at 253. Liberman states that Ard was not replaced, rather Melissa O'Neal, a lower level manager absorbed "most of" Ard's "portfolio" in addition to her own. *Id.* at 309, 313. This fact is important because it means that Ard does not state a prima facie case for disparate treatment. He was not replaced by a woman, a woman assumed much of his duties. *Holtzclaw v. Certainteed Corp.*, 795 F. Supp. 2d 996, 1011 (E.D. Cal. 2011) (finding a plaintiff did not state a prima facie case for age discrimination where his duties were taken over by a younger employee where that employee added the plaintiff's duties to the younger employee's already-existing duties). As far as the Court knows, no one was hired to replace Ard. The Court need not rely on this finding, however, because Yahoo showed that it had a legitimate non-discriminatory reason for terminating Ard: his performance and the fact that there was not a clear need for him in his position.

### a. Retaliation

The Court briefly discusses Ard's allegations of retaliation. Ard alleges he was retaliated against because he objected to the QPR score changes of three male direct reports. Dkt. No. 49 at 25. Ard said nothing of discrimination. At no time during his employment did Ard ever complain to HR or any of his supervisors about discrimination against men. Ard Dep. at 298. The only person Ard ever spoke to about possible bias in

favor of women at Yahoo was Anderson, and that conversation dealt with a comment Kittenplan allegedly made about hiring a woman to be the EIC of the Autos magazine. *Id.* Ard did stand up for employees who were being terminated or who received low QPR scores. However, there is no record of Ard complaining to management about the treatment of men while he worked at Yahoo.

Ard's allegations of retaliation on the basis of his advocacy for men are belied by the fact that in a long email to Savitt and Reses after being terminated, Ard's criticisms were about the QPR and the toxic culture of Yahoo under Marissa Mayer, not about discrimination against males. Dkt. No. 54-2 at 92-92 (February 2, 2015 email from Ard to Savitt and Reses) (filed under seal). This email was a request for Ard's discharge status to be changed to a "mutual parting" and a post-mortem of what Ard believed to be the shortcomings in the QPR system as implemented by Yahoo. What this email evidenced was that Ard believed that Liberman specifically had been unfair to him by never meeting with him or giving him feedback, and then firing him because she claimed she never knew what he was up to. It is never brought up in this email that Ard believed he was discriminated against because he was a man. Thus, any claim that Ard was fired because he stood up for men while he was employed is a non-starter.

### ii.   Pretext

As to pretext, Ard argues there is a dispute regarding why he was terminated. Liberman testified that his termination was performance-based, while Fenice testified he was to be terminated in February 2015 for efficiency reasons. Fenice Dep. at 139; Dkt. No. 49 at 22. Ard also discusses a late 2014 spreadsheet in which Yahoo described Ard as someone they had no clear role or need for. Dkt. No. 49 at 22; Dkt. No. 41-11 at 2 (QPR tool) (filed under seal). This evidence, Ard argues, is sufficient for the Court to find pretext. The Court disagrees that this evidence undermines Yahoo's non-discriminatory reason for terminating Ard. If anything, this evidence suggests that Ard was perhaps terminated to reduce headcount. Ard's evidence of pretext in no way supports his claim that he was discriminated against because he is a man. The Court GRANTS Yahoo's

1    motion for summary judgment as to Ard's Title VII and FEHA disparate treatment claim

2    based on his termination.

3              **b.    Ard Raised a Triable Issue of Material Fact As to His Being**
                      **Overlooked for the Autos Digital Magazine Editor-in-Chief**
4                     **Position.**

5        Yahoo argues that Ard was not chosen to become the EIC of the Autos magazine

6    because he did not have the high-profile status sought for that position.  Dkt. No. 42 at 29.

7        The elements of Ard's discrimination claim are: (1) Ard is a member of a protected

8    class; (2) Ard was qualified for the position of EIC; (3) Ard did not obtain the EIC

9    position; and (4) a woman (i.e., not a member of his protected class) obtained the position.

10   Ard testified there was no formal posting for the EIC position, and that he was "quite

11   certain" he submitted his resume to Kittenplan, and did not hear back.  Ard Dep. at 237.

12   As the Court must construe all facts in the light most favorable to the non-movant, the

13   Court accepts for purposes of this motion that Ard submitted his resume to Kittenplan.

14       Though Yahoo maintains it was seeking and EIC with a higher-profile than Ard, the

15   Court assumes Ard was qualified for the position.  Thus, the burden shifts to Yahoo to

16   establish a non-discriminatory reason for not hiring Ard for the position.  Yahoo's non-

17   discriminatory reason for not hiring Ard is "[b]ecause the strategy of the magazines was to

18   have a high-profile, celebrity-like editor in chief."  Fenice Dep. at 72.  December 2014

19   emails between Fenice, Savitt, and Kittenplan reveal Yahoo still weighing options

20   regarding what type of EIC to hire.  Dkt. No. 41-15 (filed under seal).  Yahoo hired Sharon

21   Carty as EIC in April 2015, after Ard's termination.  Kittenplan Dep. at 82.  Ard alleges

22   Carty was not as qualified as he was because she had no experience working at a

23   magazine.  Dkt. No. 49 at 30.  There is no evidence suggesting Carty was unqualified for

24   the position.

25       Ard's evidence that women were preferred in the hiring of the EIC is a statement

26   allegedly made by Kittenplan that "wouldn't it be great if we could get a female for this

27   role, or something like that."  Anderson Dep. at 150, Ard Dep. at 232-33.  Kittenplan does

28   not believe she said this, Kittenplan Dep. at 73, but for purposes of this motion, the Court

accepts plaintiffs' testimony as true.  Kittenplan was charged with finding the EIC of the digital magazines.  *Id.* at 31.  This is sufficient to raise a triable issue of material fact,[5] even though Ard had already been terminated when Carty was hired.  Yahoo argues this statement was merely a stray remark by a non-decision-maker.  Dkt. No. 51 at 10.  This is true as to Yahoo's argument that Kittenplan had no role in Ard's *termination*, but it is not true as to the hiring of the EIC.  Kittenplan was a decision-maker for *hiring* the heads of the digital magazines.  Thus, the Court DENIES Yahoo's motion for summary judgment as to Ard's disparate treatment claim regarding the hiring of the Autos digital magazine EIC.

### 3.   Disparate Impact

Disparate impact is not the focus of Yahoo's motion or plaintiffs' opposition. Yahoo's position is that the statistics show that the makeup of Savitt's Media Organization did not change while she was in charge of it.  Dkt. No. 42 at 24.  Plaintiffs argue that the disparate impact of Yahoo's hiring and QPR practices is shown by the change in gender composition of managers in the Organization.  Dkt. No. 49 at 38.

To establish a prima facie case for discrimination based on a disparate impact theory, the plaintiff must show: "(1) the occurrence of certain outwardly neutral employment practices, and (2) a significantly adverse or disproportionate impact on persons of a particular sex produced by the employer's facially neutral acts or practices."

---

[5] Ard's claim that he was discriminated against in the selection of the Autos EIC position is not in his complaint.  "An addition of new issues during the pendency of a summary judgment motion can be treated as a motion for leave to amend the complaint."  *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) (citing *Roberts v. Arizona Bd. of Regents*, 661 F.2d 796, 798 n.1 (9th Cir. 1981)).  In deciding whether to allow amendment, the Court considers four factors: "bad faith, undue delay, prejudice to the opposing party, and the futility of amendment."  *Id.* (citing *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987)).  Here, it does not appear Ard showed bad faith in neglecting to claim that he was discriminated against when he was not selected for the position.  Amendment would not be futile because this factual issue survives Yahoo's motion.  As for undue delay and the prejudice to Yahoo, the Court recognizes that trial is in two months and Yahoo may be prejudiced by allowing amendment.  Yet given the limited scope of the remaining case, the interests of justice favor allowing Ard to amend his complaint on this sole issue.  Ard may not add new claims or new defendants absent leave of Court.  Ard must file an amended complaint by November 17, 2017.

1    *Spaulding v. University of Washington*, 740 F.2d 686, 705 (9th Cir. 1984), *overruled on*

2    *other grounds by Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1482 (9th Cir. 1987)

3    (en banc).  "A disparate impact claim must challenge a specific business practice."

4    *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749 (9th Cir. 2003).

5        "[I]t is not enough to simply allege that there is a disparate impact on workers, or

6    point to a generalized policy that leads to such an impact.  Rather, the employee is

7    responsible for isolating and identifying the specific employment practices that are

8    allegedly responsible for any observed statistical disparities."  *Smith v. City of Jackson,*

9    *Miss.*, 544 U.S. 228, 241 (2005) (internal quotation marks and citation omitted).  A

10   plaintiff must show he or she was subjected to the particular employment practice with the

11   alleged disparate impact.  *Pottenger*, 329 F.3d at 750.  In addition, statistics may be "used

12   to demonstrate how a particular employment practice causes a protected minority group to

13   be under represented in a specific area of employment."  *Paige v. California*, 291 F.3d

14   1141, 1145 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (July 18,

15   2002) (citing *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)).  "The

16   statistical analysis must show a disparity that is 'sufficiently substantial' as to 'raise such

17   an inference of causation.'"  *Id.* (quoting *Watson*, 487 U.S. at 995).  If the plaintiff

18   establishes a prima facie disparate impact case, "the burden shifts to the defendant who

19   may either discredit the plaintiff's statistics or proffer statistics of his own which show that

20   no disparity exists."  *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990).

21            **a.  Ard Has Not Raised a Triable Issue of Material Fact Regarding**
22                 **Disparate Impact Caused By Application of the QPR Process, and**
                   **Anderson Failed to Exhaust His Administrative Remedies.**

23       Plaintiffs argue the QPR process, though facially neutral "operated to discriminate

24   against men in the Media Org through 'implicit' or 'hidden bias' in the minds of the

25   women assigning scores, reducing men's scores while increasing women's scores."  Dkt.

26   No. 49 at 38.  Plaintiffs' proof for this assertion is "the dramatic change in gender

27   composition in the Media Org."  *Id*.

28       Plaintiffs satisfy the first element of a prima facie disparate impact claim because

Case Nos. 16-cv-05635 NC, 16-cv-00527 NC      22

the QPR was an outwardly neutral employment practice.  *Spaulding*, 740 F.2d at 705.

Both plaintiffs were subjected to the QPR process.  *Pottenger*, 329 F.3d at 750.  However,

only Ard may bring a claim under a disparate impact theory because Anderson failed to

exhaust his administrative remedies.  Anderson's administrative complaint, as quoted in its

entirety above, only refers to his termination specifically.  Unlike Ard, he says nothing in

his administrative complaint about a preference for women in the QPR process.  Thus,

Anderson's purported disparate impact claim is not "like or reasonably related to" the

allegations he made before the EEOC or DFEH, or within the scope of that claim.  *Leong*,

347 F.3d at 1122; *see also Ross v. O'Leary*, No. 95-cv-03829 MHP, 1996 WL 682009, at

*6-*7 (N.D. Cal. Oct. 31, 1996) (dismissing disparate impact claim for same).

The second element is at issue: "a significantly adverse or disproportionate impact

on persons of a particular sex produced by the employer's facially neutral acts or

practices."  *Id*.  Ard argues men were disproportionately negatively affected by the

application of the QPR process.  The evidence Ard presents is that Mayer fired Henrique

De Castro and replaced him with Savitt, and that 4 male Vice Presidents and 1 male Senior

Director were terminated or had their roles replaced by women.  Dkt. No. 49 at 13.  Yet

Ard does not assert that these leaders were fired by application of the QPR process.  The

Court knows nothing about these employees' performances or the circumstances

surrounding their departures from Yahoo.  The Court will not consider this data further.

Ard provides the following instances where women were allegedly favored in the

QPR process: Savitt suggested raising two females' QPR scores in February 2014 and

lowering the scores of three men, Liberman lowering the score of one male in April 2014,

a woman successfully appealing a 1.0 QPR score in Q2 2014, and Liberman lowering the

QPR scores of three men and maintaining the scores of two women in January 2015.  Dkt.

No. 49 at 23-24, 26.

Ard's evidence regarding the allegedly uneven application of the QPR process is

anecdotal.  In short, the evidence is that five women were either benefited or not hurt by

the QPR process while the scores of seven men were lowered by Liberman or Savitt in the

United States District Court
Northern District of California

span of one year.  For the two women Savitt suggested raising scores for and three men she

suggested lowering scores for, the Court was not told if the scores were modified.  The

Court will not assume such action was taken.  Furthermore, it is unknown how many

people Liberman oversaw, but the Court does know how many employees Savitt oversaw.

During her time at Yahoo, Savitt oversaw between 531 and 1,319 employees.  *See* Dkt.

No. 44-1.  There is no statistical analysis of the number of men who left Yahoo,

voluntarily or otherwise or of the women who benefited from the QPR.  Thus, as a matter

of law, Ard has not provided sufficient evidence bring a disparate impact claim based on

the QPR process.  *See Barnes v. The Hershey Co.*, No. 12-cv-01334 CRB, 2016 WL

192310, at *11-*12 (N.D. Cal. Jan. 15, 2016); *c.f. Butler v. Home Depot, Inc.*, No. 94-cv-

04335 SI, 1997 WL 605754, at *11, *13 (N.D. Cal. Aug. 29, 1997) (finding that plaintiffs'

anecdotal evidence, when combined with statistical evidence sufficed to survive a motion

for summary judgment on disparate impact and treatment claims).

> **b.    Anderson and Ard May Not Bring a Disparate Impact Claim Based on the Media Organization's Gender Composition or Yahoo's Hiring Practices Because Both Failed to Exhaust Their Administrative Remedies.**

Just as neither plaintiffs nor Yahoo brought up the issue of the failure to exhaust

administrative remedies regarding plaintiffs' disparate treatment claims, the failure to

exhaust was not discussed regarding plaintiffs' disparate *impact* claims.  The Court found

that Ard exhausted his remedies regarding his failure to obtain the Autos digital magazine

EIC position and a disparate impact theory regarding the QPR process.  However, Ard has

not exhausted his administrative remedies regarding bringing a disparate impact claim

regarding Yahoo's hiring practices or the gender composition of the Media Organization.

Ard's administrative complaint provides in relevant part:

> 3. My belief [that I was discriminated and retaliated against] is based on the following: From August 2014 through January 30, 2015, I was subjected to differential treatment [denied selection to the Editor of Yahoo Autos, not allowed to document performance reviews, denied quarterly performance reviews, denied calibration sessions, denied an appeal for rating of my staff, denied the appeal process for myself and terminated], by

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

Megan Liberman, Vice President, and Susan Kittenplan, Vice President/Hiring Manager. On January 30, 2015, I was terminated from my Senior Director position earning $210,000 annually. On September 19, 2011, I was hired. Ms. Liberman terminated me stating due to low performance. I believe that I was subjected to differential treatment due to my age over [40] and sex [male] and terminated in retaliation for complaining about discrimination.  My beliefs are based on the following: From August 2014 through January 30, 2015, I was performing the duties of Editor of Yahoo Autos. On or about August 14, 2014, Susan Kittenplan, Vice President, informed me that she preferred to hire a female for the position of Editor of Yahoo Autos.  I was denied the Editor of Yahoo Autos position even though I am the best qualified.  Person hired female younger than [40] less qualified with less experience and less seniority. Ms. Liberman terminated stating due to low performance. The Quarterly Performance Review [QPR] process was set up with standards that are not enforced, and offer no transparency, oversight, or accountability.  I was not invited to a "calibration" session for Q4, also a mandatory step for all managers with direct reports.  I also was not given the opportunity to appeal my rating, as other female employees are afforded.  I am aware of specific situations whether the QPR process was manipulated to favor women over men.  In January 2015, I complained to Artimis Fagerlund, Human Resources.  However, no corrective actions were taken. My termination was not handled in a manner that was consistent with other female employees.  I am aware of females [sic] employees who were not terminated for low performance. Female employees were not scrutinize [sic] and subjected to this type of treatment.

16  Dkt. No. 58-1 at 11-12.  Other than the reference that he personally was not selected for

17  the Autos EIC position, Ard never said anything about Yahoo's hiring practices.  Ard also

18  said nothing in his administrative complaint about any change in the gender composition

19  of the Media Organization.  Ard cannot now bring a disparate impact claim regarding these

20  issues.  Ard stated no facts in his administrative complaint that would lead the DFEH or

21  EEOC to investigate Yahoo's hiring practices or the gender composition of the Media

22  Organization.  "Disparate treatment and disparate impact discrimination claims are

23  separate and distinct."  *De Los Santos v. Panda Exp., Inc.*, No. 10-cv-01370 SBA, 2010

24  WL 4971761, at *4 (N.D. Cal. Dec. 3, 2010) (*Raytheon Co. v. Hernandez*, 540 U.S. 44,

25  52-53 (2003)).  Ard did not exhaust his administrative remedies.  *Id.* ("federal courts in

26  general have concluded that an administrative charge that only alleges a discrimination

27  claim based on disparate treatment is insufficient to exhaust a claim for disparate impact—

28  and vice-versa.") (collecting cases).  Anderson likewise cannot bring a disparate impact

1   claim regarding Yahoo's hiring practices for the same reason.  Yahoo is entitled to

2   summary judgment on both plaintiffs' disparate impact theories.

3       **B.    WARN Act and Cal-WARN Act Claims**

4           Yahoo argues plaintiffs' terminations did not trigger the WARN or Cal-WARN

5   Acts because Yahoo did not terminate a sufficient number of employees from its

6   Sunnyvale office.  Dkt. No. 42 at 32.

7           The WARN Act provides that an employer may not order a "mass layoff until the

8   end of a 60-day period after the employer serves written notice of such an order . . . to each

9   affected employee[.]"  29 U.S.C. § 2102(a).  A "mass layoff" is "a reduction in force

10  which-- (A) is not the result of a plant closing; and (B) results in an employment loss at the

11  single site of employment during any 30-day period for . . . (i)(I) at least 33 percent of the

12  employees (excluding any part-time employees); and (II) at least 50 employees (excluding

13  any part-time employees)[.]"  29 U.S.C. § 2101(a)(3).  Employees discharged for cause are

14  not counted in the number of laid-off employees for purposes of the Act.  § 2101(a)(6).

15  "An employer who violates the notice provisions is liable for penalties by way of a civil

16  action that may be brought 'in any district court of the United States for any district in

17  which the violation is alleged to have occurred, or in which the employer transacts

18  business.'"  *Johnson v. Keolis Am.*, No. 15-cv-03104 MEJ, 2016 WL 454076, at *3 (N.D.

19  Cal. Feb. 5, 2016), *aff'd*, No. 16-15364, 2017 WL 4512206 (9th Cir. Oct. 10, 2017)

20  (quoting 29 U.S.C. § 2104(a)(5)).

21          Similarly, under California's WARN Act, "[a]n employer may not order a mass

22  layoff, relocation, or termination at a covered establishment unless, 60 days before the

23  order takes effect, the employer gives written notice of the order to" affected employees

24  and certain governmental entities.  Cal. Labor Code § 1401(a).  A "layoff" is "a separation

25  from a position for lack of funds or lack of work."  § 1400(c).  A "mass layoff" is "a layoff

26  during any 30-day period of 50 or more employees at a covered establishment."  §1400(d).

27          As to the WARN Act allegations, the main piece of evidence the plaintiffs proffer is

28  a January 2014 email from Savitt to Artimiss Fagerlund.  Dkt. No. 54-2 at 65 (filed under

seal).  The relevant portion of that email states: "Utilizing a 2.2 average would result in 10 terminations and utilizing the 2.3 average would result in 18 terminations.  I recommend that we utilize the 2.3 rolling four quarter average to help you get in front of the HC work that Anne has been working on with McKinsey."  *Id*.  McKinsey was a consulting firm assisting Yahoo.  Dkt. No. 49 at 10.  This email shows that even though Yahoo may have been terminating employees based on low QPR scores, at least part of their rationale for terminating these employees was to reduce headcount.

Even assuming that Yahoo used the QPR as a way to lay-off low-performing employees, for most of the months the Court received information regarding Yahoo's voluntary and involuntary terminations, the aggregate number of voluntarily and involuntarily terminated employees did not reach 50.  The Court received information regarding the terminations for the months of February 2014 through January 2015 regarding the Sunnyvale campus.  Dkt. No. 49-16 at 5-8.  In April, May, August, September, and November 2014, the number of aggregate voluntary and involuntary terminations exceeded 50.  *Id*. at 6-7.  The maximum aggregate number of voluntary and involuntary terminations was 73 in November 2014.  *Id*.  At no time did the voluntary terminations exceed 50.  *See id*. at 6.  Thus, as a matter of law, the Court concludes that for at least seven of the twelve months in which data was provided, no violation of either the WARN or Cal-WARN Act was committed by Yahoo.  As for the other five months, neither party has provided any evidence of why those employees left Yahoo.  Plaintiffs provide no reason to conclude that every one of the voluntarily terminated employees were laid-off, as opposed to leaving for new jobs, leaving the work force, or going to school.  Yahoo has met its burden, and plaintiffs have not raised a triable issue of material fact that Yahoo violated either the federal or California WARN Acts.  The Court GRANTS Yahoo's motion for summary judgment as to these claims.

## C.   Other Claims Under California Law

Plaintiffs bring additional claims under California law arising out of their terminations from Yahoo.  These claims are (1) for termination in violation of public

1    policy, (2) under the UCL, and (3) for declaratory relief.  Yahoo moves for summary

2    judgment on all of these claims.

### 4.    Yahoo Is Entitled to Summary Judgment on Plaintiffs' Claims For Termination in Violation of Public Policy.

5        Yahoo argues that Anderson and Ard cannot bring claims for termination in

6    violation of public policy because they cannot show that Yahoo discriminated against

7    them.  Dkt. No. 42 at 30.

8        The elements of a claim for termination in violation of public policy are (1) that the

9    employee engaged in a protected activity; (2) the employer subjected him or her to an

10   adverse employment action; and (3) there is a causal link between the protected activity

11   and the adverse employment action.  *Saba v. Unisys Corp.*, 114 F. Supp. 3d 974, 986 (N.D.

12   Cal. 2015), *aff'd*, 669 F. Appx. 372 (9th Cir. 2016) (citing *Loggins v. Kaiser Permanente*

13   *Int'l*, 151 Cal. App. 4th 1102, 1109 (2007)); *see also Ryan v. Sandia Corp.*, No. 15-cv-

14   04102 CRB, 2016 WL 1697946, at *5 (N.D. Cal. Apr. 28, 2016) (stating the elements of

15   this claims as requiring "(1) an employer-employee relationship; (2) that the termination of

16   plaintiff's employment was a violation of public policy; (3) the termination of employment

17   was a legal cause of the plaintiff's damage; and (4) the nature and the extent of the

18   plaintiff's damages. (citing *Holmes v. Gen. Dynamics Corp.*, 17 Cal. App. 4th 1418, 1427,

19   n.8 (1993)).  Here, the Court found that neither Anderson nor Ard stated a claim for

20   gender-based discrimination under Title VII or FEHA with respect to their terminations.

21   There is no evidence that Ard was retaliated against for speaking up for male employees

22   who were to be terminated.

23       The Court notes that neither party addressed Anderson's theory for termination in

24   violation of public policy.  Anderson's theory is that a motivation for his termination was

25   his complaining to Yahoo management about "illegal manipulation of the QPR Process."

26   Dkt. No. 7 at 15 (Anderson Compl. at 15).  Anderson also alleged that "possible

27   motivation" for his termination was his complaint to Yahoo management regarding

28   possible bribery and extortion regarding the QPR process.  *Id*. at 16.  Cursory and vague as

these allegations may be, Yahoo neglected to rebut them.  Yahoo's motion for summary judgment on the termination in violation of public policy claim is entirely premised on plaintiffs' inability to bring a gender-based discrimination claim.  However, the Court nonetheless grants Yahoo's motion for summary judgment on this claim because Anderson alleged no causal link between his alerting Yahoo of the alleged "illegal manipulation" and his termination other than stating that his termination was "motivated" by his complaint.  Likewise an allegation of a "possible motivation" for Anderson's termination is insufficient for causation purposes.  The Court GRANTS Yahoo's motion for summary judgment on plaintiffs' wrongful termination in violation of public policy claim.

### 5.  Yahoo is Entitled to Summary Judgment on the UCL Claim.

Yahoo moves for summary judgment as to plaintiffs' UCL claim.  Yahoo argues that the plaintiffs cannot bring a claim against Yahoo because they request improper relief and lack standing.  Plaintiffs do not oppose Yahoo's arguments.  Plaintiffs' UCL claim is based on the alleged misuse of the QPR process to discriminate and circumvent the WARN Act and Cal-WARN Act.  Dkt. No. 1 at 18-20.

Non-restitutionary disgorgement is not recoverable under the UCL.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1152 (2003).  "Restitution simply returns that which defendants obtained from plaintiff as a result of their wrongful conduct." *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 454 (2005) (brackets omitted). Plaintiffs do not request restitution.  *See* Dkt. No. 1 at 19 ("As a further proximate result of the Practices Defendant Yahoo has obtained an unfair advantage over its competitors. Defendant has benefited from the money and property it wrongly obtained and has further benefited by operating outside the constraints of the law.  Equity requires that the money and property wrongly acquired should be disgorged for the benefit of those wrongly deprived.").  Plaintiffs request disgorgement, and do not specify what allegedly rightfully belongs to them, and the Court cannot guess if the plaintiffs request $1 in disgorgement or $1 billion.  The UCL claim is also deficient because it requests an injunction for an alleged practice that neither plaintiff is subject to any longer.  *See Richards v. Ernst & Young LLP*,

United States District Court
Northern District of California

No. 08-cv-04988 JF (HRL), 2010 WL 682314, at *2 (N.D. Cal. Feb. 24, 2010) (citing *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004)) (finding plaintiff may not bring a UCL claim against former employer for labor code violations because he no longer was in danger of suffering from such violations).

More importantly, plaintiffs have not provided evidence that the QPR process *was* used improperly such that plaintiffs could bring a UCL claim based on the review process. The only claim that survives is under Title VII and FEHA regarding Ard's failure to obtain the Autos digital magazine EIC position. Ard might feasibly state a claim under the UCL for this claim, but it is not the claim he brought. In any event, Ard is not entitled to relief under the UCL based on his requested relief. Thus, the Court GRANTS Yahoo's motion for summary judgment as to the UCL claim.

### 6. Yahoo Is Entitled To Summary Judgment as to Plaintiffs' Declaratory Relief Claim.

Yahoo argues that plaintiffs may not bring a claim for declaratory relief because they are no longer Yahoo employees, and thus lack standing to bring such claims. Dkt. No. 42 at 32-33. Plaintiffs did not address Yahoo's argument. The Court agrees with Yahoo. Neither Anderson nor Ard stand to benefit if judgment is entered against Yahoo because they no longer work for Yahoo or are subject to the QPR. Therefore, they lack standing to bring a claim for declaratory relief against Yahoo on this issue. *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014). The Court GRANTS Yahoo's motion for summary judgment as to the declaratory relief claim.

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART Yahoo's motion for summary judgment.

Ard must amend his Title VII and FEHA disparate treatment claims as to the hiring of the Autos digital magazine EIC consistent with this order by November 17, 2017. Ard's disparate impact, termination in violation of public policy, UCL, and declaratory relief claims are DISMISSED WITH PREJUDICE.

United States District Court
Northern District of California

Case Nos. 16-cv-05635 NC, 16-cv-00527 NC      30

1    None of Anderson's claims survive Yahoo's motion.

2    In addition, if, based on the results of this order, the parties want to appear for a

3    case management conference, they must jointly consult the Court's courtroom deputy, Lili

4    Harrell to request a CMC for November 29, 2017.

5    Lastly, the Court informs the parties that this order will be temporarily sealed for

6    one week, until November 15, 2017.  The parties must file any objections to the Court

7    unsealing any portion of this order by that date in the form of proposed redactions to this

8    order or a motion to seal.  Any proposed redactions or motions to seal must be

9    accompanied by declarations addressing the proper standard.  The Court thus cautions the

10   parties that there is a "strong presumption" in favor of access, and the parties must

11   overcome this presumption by presenting the Court with compelling reasons for keeping

12   judicial records sealed.  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th

13   Cir. 2006).

15   **IT IS SO ORDERED.**

17   Dated:  November 8, 2017                    _____

18                                              NATHANAEL M. COUSINS
                                                United States Magistrate Judge

United States District Court
Northern District of California